PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>RONALD YANDELL, ET AL.,<br><br>Defendants. | CASE NO. 2:19-CR-00107-KJM<br><br>UNITED STATES' MOTION FOR PRETRIAL FINDING OF THE EXISTENCE OF A CONSPIRACY FOR PURPOSES OF RULE 801(d)(2)(E)<br><br>DATE: December 20, 2023<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |

## I.     INTRODUCTION

The United States moves for the Court to make a pretrial finding that the Aryan Brotherhood was a "conspiracy" for purposes of Rule 801(d)(2)(E). *See* Fed. R. Evid. 801(d)(2)(E). There is extensive evidence already in the record—through a sworn affidavit and sworn factual bases in six separate plea agreements—that proves that the Aryan Brotherhood engaged in a joint venture to dominate and control illegal activities in the California prison system, and that the defendants in this case acted together to further this joint venture. From this evidence, the Court can easily find by a preponderance of the evidence that the Aryan Brotherhood writ large meets the broad definition of a "conspiracy" under Rule 801(d)(2)(E).

II. **FACTS**

A. **The sworn affidavit in support of the criminal complaint proves that the Aryan Brotherhood prison gang operated with common purposes, rules of conduct, and symbols, and that the defendants acted to further this Aryan Brotherhood conspiracy.**

As detailed in the sworn affidavit in support of the criminal complaint in this case, the Aryan Brotherhood is a well-established prison gang with common purposes, rules of conduct, and symbols. The complaint outlines four common purposes of the Aryan Brotherhood: (1) to control illegal activities in the California prison system in order to generate money for the Aryan Brotherhood; (2) to enrich "the leaders, members, and associates of the enterprise through, among other things, illegal trafficking of controlled substances"; (3) to preserve, protect, and enhance "the power, territory, reputation, and profits of the Aryan Brotherhood through threats, intimidation, and violence"; and (4) to use "threats and violence to keep victims in fear of the Aryan Brotherhood and in fear of its leaders, members, and associates." *See* Nehring Aff. at 25, ECF No. 1. To further these common purposes, Aryan Brotherhood members attack and intimidate those who threaten its operations; they sell drugs; they smuggle contraband into prison; and they use symbols, phrases, and gestures to demonstrate gang affiliation. *See* Nehring Aff. at 25–26.

The criminal complaint also details several examples of the specific defendants in this case committing acts of violence, selling drugs, and smuggling contraband into prison, all in furtherance of the Aryan Brotherhood conspiracy. William Sylvester murdered a rival gang member because, as Sylvester and Yandell told Brant Daniel in a wiretapped call years later, that rival gang had an allegiance against the Aryan Brotherhood. *See* Nehring Aff. at 28–33. Sylvester and Yandell attempted to smuggle drugs and other contraband into prison for the Aryan Brotherhood. *See* Nehring Aff. at 55–68. Yandell coordinated drug deals, smuggled contraband into prison, and conspired to murder gang members who were rivals to the Aryan Brotherhood. *See, e.g.,* Nehring Aff. at 33–35 (murder of rival gang member Hugo Pinell), 86–97 (smuggling contraband), 98–100 (drug dealing). Brant Daniel murdered an inmate who was in protective custody then gave a warning to his fellow white inmates that they had to do the same. *See* Nehring Aff. at 129–32. In other calls, Daniel also talked to Yandell about the Aryan Brotherhood's plans to murder an Aryan Brotherhood member who Yandell believed to be an

FBI informant. *See* Nehring Aff. at 111–16. Danny Troxell also talked with Yandell about murdering another Aryan Brotherhood member who had violated Aryan Brotherhood rules. *See* Nehring Aff. at 80–84. And Jason Corbett and Pat Brady, together, stabbed an inmate to death using inmate-made weapons, one of which was etched with the Nazi "SS" lightning bolts. *See* Nehring Aff. at 128–29.

These defendants also extensively discussed the business and affairs of the Aryan Brotherhood in wiretapped conversations, and they relayed messages to keep each other apprised of Aryan Brotherhood business. Yandell, for instance, explained to another Aryan Brotherhood associate that the Aryan Brotherhood was "building an army" and that he, Troxell, and a third individual were the three commissioners of the Aryan Brotherhood. Nehring Aff. at 65. Sylvester, Yandell, and Daniel discussed the four "skinhead" gangs that had teamed up against the Aryan Brotherhood, and Yandell told Daniel to "move on" inmates who belonged to one of the rival gangs if they did not denounce their gang. Nehring Aff. at 29. Yandell, Daniel, and Brady all discussed an Aryan Brotherhood member named "Grizzle," and they discussed the Aryan Brotherhood-related murder that Grizzle committed while out of prison, and his efforts to kill another Aryan Brotherhood member. *See* Nehring Aff. at 107–08, 110. Yandell and Troxell discussed Aryan Brotherhood business, and after police arrested two Aryan Brotherhood members outside of prison, Yandell messaged Troxell to warn him not to call those members' phones. Nehring Aff. at 105. And Corbett updated Yandell on the Aryan Brotherhood members on his prison yard who were ready to help him kill another inmate who was in bad standing with the Aryan Brotherhood. Nehring Aff. at 80.

In other words, the sworn affidavit in support of the criminal complaint gives concrete examples of these defendants—all members of the Aryan Brotherhood—acting together and using violence, selling drugs, and smuggling contraband into prison, all to further the common purposes of the Aryan Brotherhood. It also provides several specific examples of these defendants calling each other to keep each other apprised of the affairs of the Aryan Brotherhood.

### B. The Court has accepted six separate extensive sworn factual admissions demonstrating the existence of an Aryan Brotherhood conspiracy and these defendants' involvement in it.

Since the filing of the Criminal Complaint and return of the Indictment, the Court has received substantial evidence demonstrating the existence of the Aryan Brotherhood conspiracy and each

defendant's role in it. In particular, the Court has accepted six sworn guilty pleas[1] that were each supported by detailed admissions of facts demonstrating that the Aryan Brotherhood operated as a conspiracy between 2011 and the present that engaged in multiple racketeering acts, including specific acts of drug trafficking, a large conspiracy to distribute controlled substances, and two conspiracies to commit a murder in aid of racketeering.

More specifically, the Court has accepted the following guilty pleas which prove the existence of the Aryan Brotherhood conspiracy:

1. Guilty plea of Nickolas Perez – Case No. 2:19-CR-00071-KJM, ECF 39, 40
2. Guilty plea of Donald Mazza – ECF 1196, 1197
3. Guilty plea of Travis Burhop – ECF 1321, 1322
4. Guilty plea of Samuel Keeton – ECF 685, 690
5. Guilty plea of Kristen Demar – ECF 1278, 1279
6. Guilty plea of Justin Petty – ECF 1423, 1425

### III.   PROCEDURAL HISTORY

Earlier this year, defendants Ronald Yandell, Danny Troxell, William Sylvester, Brant Daniel, Pat Brady, and Jason Corbett moved for the Court to order the United States to disclose a list of each co-conspirator statement that the United States intended to admit at trial under Rule 801(d)(2)(E) of the Federal Rules of Evidence. ECF 1318. The United States opposed the motion, and in its opposition it asked the Court to make a finding that a conspiracy existed for purposes of the co-conspirator exception to the rule against hearsay. ECF 1334 at 6–15.

The Court denied the defendants' motion for disclosure of co-conspirator statements. ECF 1444. Although the Court did not make a finding that the United States had "already proven the alleged conspiracy," it noted the "great deal of evidence" about the conspiracy that is "already in the public record," and it left open "the possibility the government could make the necessary showing" to prove the existence of a conspiracy "in the future." Order at 9, ECF 1444.

The United States now moves for the Court to make a pretrial finding that the Aryan

---

[1] A seventh defendant, Jeanna Quesenberry, is scheduled to plead guilty on December 11, 2023, as well.

Brotherhood operated as a conspiracy for purposes of Rule 801(d)(2)(E).

## IV. DISCUSSION

### A. In cases where members of a gang operate with shared common goals and purposes, the gang writ large is a conspiracy for purposes as of Rule 801(d)(2)(E).

Under Rule 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay where the United States demonstrates by a preponderance of the evidence that: (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant against whom the statement is offered were members of that conspiracy; and (3) the statement was made during the course of, and in furtherance of, the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987).

The scope of a "conspiracy" under Rule 801 is broader than the scope of a criminal conspiracy. Congress intended the co-conspirator exception under Rule 801 "to carry forward the universally accepted doctrine that a joint venturer is considered as a coconspirator for the purposes of this rule even though no conspiracy has been charged." Fed. R. Evid. 801, Note to Subdivision 801(d)(2)(E) (1974) (citing *United States v. Rinaldi*, 393 F.2d 97, 99 (2d Cir. 1968); *United States v. Spencer*, 415 F.2d 1301, 1304 (7th Cir. 1969)). The only question, therefore, is "whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture . . . ." *United States v. Manning,* 56 F.3d 1188, 1197 (9th Cir. 1995). For purposes of Rule 801, a "conspiracy" may be broader than the conspiracy charged in the indictment. *United States v. Marino*, 277 F.3d 11, 25–26 (1st Cir. 2002). This makes sense because Rule 801 applies even when *no* conspiracy is charged in the indictment. *United States v. Fries*, 781 F.3d 1137, 1151–52 (9th Cir. 2015).

Therefore, "[a] coconspirator's statement is admissible upon proof that it was made in furtherance of a conspiracy," even if the person who made the statement is not charged with conspiracy. *Manning,* 56 F.3d at 1197; *see also United States v. Williams*, 989 F.2d 1061, 1067 (9th Cir. 1993) ("[A]n individual need not be indicted to be considered a coconspirator for the purposes of rule 801(d)(2)(E)."). "The question is merely whether there was proof of a sufficient concert of action to show the individuals to have been engaged in a joint venture . . . ." *Id.*; *see also United States v. Williams*, 435 F.2d 642, 645 (9th Cir. 1970) ("[A]dmissions and statements of a co-defendant are admissible as against the other even in the absence of a conspiracy count where there is independent

evidence of a concert of action.").

In addition, the defendants need not be present at the time the co-conspirator made the declaration. *Sendejas v. United States*, 428 F.2d 1040, 1045 (9th Cir. 1970); *United States v. Angiulo*, 847 F.2d 956, 969 (1st Cir. 1988) ("As long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims, statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of."), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52, 62 (1997).

In RICO cases, specifically, courts have held that when gang members operate as part of the same gang with "shared common goals," the gang "writ large" and its shared criminal activities are a conspiracy for purposes of a co-conspirator statement under Rule 801. *Marino*, 277 F.3d at 26. The scope of the conspiracy is not limited to the RICO conspiracy "charged at trial." *Id.* at 25–26 ("We have already ruled that another conspiracy, larger than the one charged at trial, may provide the basis for the admission of the coconspirator's statements.").

**B.** **There is ample evidence in the record for this court to make a pretrial finding that the Aryan Brotherhood writ large operated as a conspiracy for purposes of Rule 801(d)(2)(E).**

From the ample evidence already in the record, the Court should now make a finding—in advance of trial—that the United States has established by a preponderance of the evidence that the Aryan Brotherhood operated as a conspiracy for purposes of Rule 801(d)(2)(E).

As an initial matter, because the admissibility of co-conspirator statements is a preliminary procedural question, the Court is well within its discretion to make a pretrial ruling that the Aryan Brotherhood operated as a conspiracy for purposes of Rule 801(d)(2)(E). *See Bourjaily*, 483 U.S. at 175; *United States v. Zemek*, 634 F.2d 1159, 1169 and n.13 (9th Cir. 1980) (noting that district court has discretion to make a pretrial ruling on admissibility of co-conspirator statements, though the Ninth Circuit does not require pretrial ruling on admissibility).

In making a factual determination of the admissibility of co-conspirator statements under this rule, the Court may consider co-conspirator statements themselves as well as any other independent evidence of the conspiracy. *Bourjaily*, 483 U.S. at 180–81; *see* Fed. R. Evid. 104(a). "[T]he court is not

bound by evidence rules." Fed. R. Evid. 104(a).  Nor does the Confrontation Clause require the court to make an inquiry into the independent indicia of the reliability of the statement.  *Bourjaily*, 483 U.S. at 182; *see also United States v. Allen*, 425 F.3d 1231, 1235 (9th Cir. 2005) ("[C]o-conspirator statements are not testimonial and therefore beyond the compass of *Crawford's* holding.").  In addition, "hearsay may be considered" and "there must be some evidence, aside from the proffered statements, of the existence of the conspiracy and the defendant's involvement."  *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988).

      Here, two categories of evidence already in the record prove by a preponderance of the evidence that the Aryan Brotherhood "writ large" meets the broad definition of a "conspiracy" for purpose of Rule 801.  First, Special Agent Nehring's sworn affidavit in support of the criminal complaint proves that the Aryan Brotherhood meets the definition of a conspiracy for purposes of Rule 801.  As set forth in Special Agent Nehring's affidavit, and discussed in further detail above, the Aryan Brotherhood had shared common goals of (1) controlling illegal activities in the California prison system, (2) enriching its members and associates, (3) enhancing the power of the Aryan Brotherhood through violence, and (4) using violence to keep others in fear of the Aryan Brotherhood. *See* Nehring Aff. at 20.  And its members—including each of the charged defendants—acted together to further those common goals.  Special Agent Nehring's affidavit therefore proves that there was sufficient "concert of action" among the members and associates of the Aryan Brotherhood that the gang "writ large" is a conspiracy for purposes of Rule 801(d)(2)(E).  *United States v. Gonzalez*, 715 F.2d 1411, 1412 (9th Cir. 1983); *Marino*, 277 F.3d at 26.

      Second, the sworn admissions in signed plea agreements from six separate members and associates of the Aryan Brotherhood also prove by a preponderance of the evidence that the Aryan Brotherhood operated as a conspiracy for purposes of Rule 801.  These six signed sworn admissions detail the Aryan Brotherhood's concert of action, its joint venture, and its shared common goals.

      Specifically, the Court accepted the guilty plea of Nickolas Perez in Case No. 2:19-CR-0071-KJM.  As part of his plea agreement, the Court received the following sworn admissions, along with many additional corroborative facts in Exhibit "A":

**Count One - Conspiracy to Participate in a Racketeering Enterprise**

**Count Two - Conspiracy to Distribute and Possess with Intent to Distribute Heroin and Methamphetamine**

PEREZ admits that, between January 2016 and October 2017, there was an agreement between two or more persons to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). PEREZ joined the agreement knowing of its purpose and intending to help accomplish that purpose.

More specifically, PEREZ admits that he knew [REDACTED] was an Aryan Brotherhood ("AB") member based upon their [REDACTED] and based upon admissions made by [REDACTED] to PEREZ. During this conspiracy, [REDACTED] was incarcerated. PEREZ understood that the drugs that he was trafficking for [REDACTED] belonged to the AB.

Between January 2016 and October 2017, PEREZ knowingly and intentionally agreed to follow instructions from [REDACTED] to transport drugs and collect drug money for AB members [REDACTED], who were also incarcerated.

As part of this criminal agreement, PEREZ admits that (1) he knowingly associated with the AB; (2) the AB was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, assault, conspiracy to commit murder, burglary, extortion, and drug trafficking; (3) he knowingly agreed to participate in the conduct of the affairs of the AB by acquiring and distributing heroin and methamphetamine on behalf of the AB and delivering the proceeds from this drug trafficking to the AB and its members; (4) these activities affected interstate commerce in that they took place in a number of different states; and (5) he was aware of the essential nature and scope of the AB's criminal enterprise and intended to participate in it.

Between January 2016 and October 2017, PEREZ knowingly agreed with [REDACTED] distribute methamphetamine and heroin to customers in [REDACTED]. Some of PEREZ's drug trafficking on behalf of the AB took place in Sacramento, California. Between January 2016 and October 2017, PEREZ communicated with AB members [REDACTED] and committed drug trafficking crimes to benefit and enrich them. PEREZ also aided and abetted drug trafficking activities of AB member [REDACTED] and AB [REDACTED] and [REDACTED]

The drugs stored, transported, and distributed by PEREZ were purchased with resources pooled and provided by AB members. Between January 2016 and October 2017, [REDACTED] developed various sources of supply for drugs. Because they were incarcerated, [REDACTED] depended upon PEREZ and others to distribute, transport, and store the AB's drugs outside of prison. PEREZ was also critical to the AB's drug operations because he collected money from their drug sales and routed the proceeds according to instructions he received from [REDACTED]. PEREZ understood he was an important cog in the larger AB criminal enterprise.

Case No. 2:19-CR-00071-KJM, ECF 40, at 13 (partially unsealed).

The Court accepted the guilty plea of Samuel Keeton. In his guilty plea, the Court received the following sworn admissions, along with many additional corroborative facts in Exhibit "A":

> **Summary of Count One – Conspiracy to Participate in a Racketeering Enterprise**
>
> Defendant Samuel Keeton admits that, as part of the criminal agreement charged in Count One of the Indictment, between March 2016 and at least October 2016, he agreed with co-conspirators Ronald Yandell, Billy Sylvester, Kevin MacNamara, Jeanna Quesenberry, Kristen Demar, and others to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). Keeton joined the agreement knowing of its purpose and intending to help accomplish that purpose. As part of this criminal agreement, Keeton admits that (1) he knowingly associated with the Aryan Brotherhood; (2) the Aryan Brotherhood was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, assault, conspiracy to commit murder, and drug trafficking; (3) he knowingly agreed to participate in the conduct of the affairs of the Aryan Brotherhood by acquiring and distributing methamphetamine and heroin on behalf of the AB and delivering the drug proceeds to Aryan Brotherhood associates; (4) these criminal activities affected interstate commerce in that they took place in a number of different states and involved drug trafficking; and (5) he was aware of the essential nature and scope of the Aryan Brotherhood's criminal enterprise and intended to participate in it.
>
> More specifically, Keeton admits that (1) he knew that Ronald Yandell and Billy Sylvester were Aryan Brotherhood members based upon his discussions with them during 2016, including the crimes that he was asked to commit and that he agreed to commit, such as assisting in smuggling cell phones, drugs, and other contraband into prison; (2) he transported and delivered at least 100 grams of heroin from Southern California to Jeanna Quesenberry in the Eastern District of California on behalf of Yandell and the Aryan Brotherhood; (3) he knew he was participating in the affairs of the Aryan Brotherhood because his conversations with Aryan Brotherhood member Ronald Yandell, Aryan Brotherhood member Billy Sylvester, and Aryan Brotherhood then-associate Travis Burhop (in which he asked his to facilitate criminal activities on behalf of the Aryan Brotherhood) occurred through communications in 2016 with Yandell and Sylvester over contraband phones in CSP Sacramento and with Burhop over contraband cell phones from CSP Calipatria in which Keeton's directions to transport drugs and collect and distribute drug money on behalf of the AB were requested; and (4) he knew he was associating with the AB based on additional information he learned from Yandell, Sylvester, Burhop, Jeanna Quesenberry, Matt Hall, and others.

ECF 690, at 11.

The Court accepted the guilty plea of Donald Mazza. In his guilty plea, the Court received the following sworn admissions, along with many additional corroborative facts in Exhibit "A":

**Summary of Count One – Conspiracy to Participate in a Racketeering Enterprise**

Defendant Donald Mazza admits that, as part of the criminal agreement charged in Count One of the Indictment, between at least 2016 and continuing through 2020, he agreed with co-conspirators Ronald Yandell, Billy Sylvester, Danny Troxell, Matt Hall, and others to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). Mazza joined the agreement knowing of its purpose and intending to help accomplish that purpose.

As part of this criminal agreement, Mazza admits that (1) he knowingly became a member of the Aryan Brotherhood; (2) the Aryan Brotherhood was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, robbery, conspiracy to commit murder, and drug trafficking; (3) he knowingly agreed to participate in the conduct of the affairs of the Aryan Brotherhood by facilitating criminal activities on behalf of the AB, including by providing money to support incarcerated Aryan Brotherhood members and associates, and engaging in the conspiracy discussed below; (4) these criminal activities affected interstate commerce in that they took place in a number of different states, involved drug trafficking, and use of communications over cell phones and other activities; and (5) he was aware of the essential nature and scope of the Aryan Brotherhood's criminal enterprise and intended to participate in it because he was initimately familiar with the enterprise's members, its codes of conduct, and the breadth of its operations in prison and outside of it.

More specifically, Mazza admits that (1) he became a member of the Aryan Brotherhood in approximately 2009 while incarcerated at Pelican Bay State Prison and knew that Ronald Yandell, Billy Sylvester, Danny Troxell, Pat Brady, Jason Corbett, and others were Aryan Brotherhood members based upon his discussions with them during years incarcerated with the California Department of Corrections and Rehabilitations, or during pretrial detention within the 400 Pod of Eight West at the Sacramento County Jail, including crimes that he was asked to commit and that he agreed to commit, such as arranging the murder of AB member Michael Trippe; (2) he communicated with Ronald Yandell about the conspiracy to murder Trippe over a contraband cell phone possessed by Yandell while Yandell was incarcerated at CSP–Sacramento in 2016 in the Eastern District of California; (3) he knew he was participating in the affairs of the Aryan Brotherhood because he was a member of the enterprise and based upon his conversations with Aryan Brotherhood member Ronald Yandell, Aryan Brotherhood associate Matt Hall (in which he asked his to facilitate criminal activities on behalf of the Aryan Brotherhood), and others occurred through communications with Yandell over a contraband prison phone and with Hall in person in Southern California when it was ordered that Mazza kill Trippe on behalf of the Aryan Brotherhood; and (4) he knew he was associating with the Aryan Brotherhood based upon extensive additional information he learned from being a long-time member of the criminal enterprise and from conversations he had with Yandell, Sylvester, Troxell, Brady, Corbett, Travis Burhop, Hall, and others.

**Summary of Count Five – Conspiracy to Murder AB Member Michael Trippe**

Mazza admits that, as part of the criminal agreement charged in Count Five of the Indictment, between August 19, 2016, and October 1, 2016, during and in furtherance of the RICO Conspiracy in Count One, he agreed with co-conspirators Ronald Yandell, Matt Hall, and others to commit the murder of Aryan Brotherhood member Michael Trippe.

**Summary of Facts Supporting Counts One and Five**

During the overall RICO conspiracy in Count One and Violent Crimes in Aid of Racketeering ("VICAR") conspiracy in Count Five, Yandell was incarcerated in the California prison system. Beginning at some time in 2016, Mazza was told by AB associate Matt Hall that the Aryan Brotherhood had targeted enterprise member Michael Trippe for murder. Over time, Mazza became aware that, as an Aryan Brotherhood member, the enterprise had assigned responsibility for killing Trippe to Mazza. Although Mazza was friends with Trippe and did not want to carry out the murder, Mazza understood that, if he did not carry out the order, he would eventually be targeted by the enterprise for murder because he had not carried out his responsibility as a member of the enterprise. Thus, in order to maintain his position in the enterprise and avoid the reprucussions for not killing Trippe, Mazza agreed to arrange the murder of Trippe.

In connection with the plot to kill Trippe, in 2016, investigators gathered substantial corroborating evidence about the conspiracy during wiretapped calls made over a contraband cell phone possessed by Yandell while he was incarcerated at CSP–Sacramento. In particular, agents intercepted multiple calls in which Yandell and other Aryan Brotherhood members discussed an ongoing enterprise need for Trippe to be murdered.

ECF 1197, at 10.

The Court accepted the guilty plea of Travis Burhop. In his guilty plea, the Court received the following sworn admissions, along with many additional corroborative facts in Exhibit "A":

**Summary of Count One – Conspiracy to Participate in a Racketeering Enterprise**

Defendant Travis Burhop admits that, as part of the criminal agreement charged in Count One of the Indictment, between at least early 2016 and continuing through 2020, he agreed with co-conspirators Ronald Yandell, Billy Sylvester, Danny Troxell, Matt Hall, Nickloas Perez, Jeanna Quesenberry, and others to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). Burhop joined the agreement knowing of its purpose and intending to help accomplish that purpose.

As part of this criminal agreement, Burhop admits that (1) he knowingly became an associate and, later, a member of the Aryan Brotherhood; (2) the Aryan Brotherhood was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, robbery, conspiracy to commit murder, and drug trafficking; (3) he knowingly agreed to participate in the conduct of the affairs of the Aryan Brotherhood by

facilitating criminal activities on behalf of the AB, including by arranging for drug suppliers and drug couriers to deliver drugs on the streets in order to enrich incarcerated Aryan Brotherhood members and associates, and engaging in a conspiracy to murder James Mickey, discussed below; (4) these criminal activities affected interstate commerce in that they took place in a number of different states, involved drug trafficking, and the use of communications over cell phones and other activities; and (5) he was aware of the essential nature and scope of the Aryan Brotherhood's criminal enterprise and intended to participate in it because he was intimately familiar with the enterprise's members, its codes of conduct, and the breadth of its operations in prison and outside of it.

More specifically, Burhop admits that (1) he became an associate of the Aryan Brotherhood in approximately 2016 while incarcerated at Calipatria prison, and later became a member of the enterprise in approximately 2018 – Burhop knew that Ronald Yandell, Billy Sylvester, Danny Troxell, Pat Brady, Jason Corbett, and others were Aryan Brotherhood members based upon his discussions with them during the years that he was incarcerated within the California Department of Corrections and Rehabilitations, as well as during pretrial detention within the 400 Pod of Eight West at the Sacramento County Jail, including crimes that he was asked to commit and that he agreed to commit, such as arranging the murder of AB member James Mickey, and drug trafficking during the charged RICO conspiracy; (2) he communicated with Ronald Yandell and Danny Troxell about the conspiracy to murder Mickey over contraband cell phones possessed by Yandell and Troxell while each were incarcerated in California – including while Yandell was housed at CSP–Sacramento in the Eastern District of California; (3) he knew he was participating in the affairs of the Aryan Brotherhood because he became a member of the enterprise and based upon his conversations with Aryan Brotherhood members Ronald Yandell and Danny Troxell, and others occurred through communications over contraband cellphones; and (4) he knew he was associating with the Aryan Brotherhood based upon additional information he learned from being a long-time associate, and, later, a member of the criminal enterprise, and from conversations he had with Yandell, Sylvester, Troxell, Brady, Corbett, Jeanna Quesenberry, and others.

**Summary of Count Three – Conspiracy to Murder AB Member James Mickey**

Burhop admits that, as part of the criminal agreement charged in Count Three of the Indictment, between at least August 20, 2016, and continuing through August 21, 2016, during and in furtherance of the RICO Conspiracy in Count One, he agreed with co-conspirators Ronald Yandell, Danny Troxell, and others to murder Aryan Brotherhood member James Mickey.

**Summary of Facts Supporting Counts One and Three**

During the overall RICO conspiracy in Count One and the Violent Crimes in Aid of Racketeering ("VICAR") conspiracy in Count Three, Yandell, Troxell, and Burhop were each incarcerated in the California prison system. Beginning some time prior to August 2016, members of the Aryan Brotherhood agreed that one of their members – James Mickey –

> needed to be murdered based upon allegations that Mickey violated the enterprise's codes of conduct.  Specifically, AB members Troxell and Yandell believed that Mickey had stolen money from the enterprise and had shown cowardice during a past prison incident by not committing violence when given the opportunity to do so.
>
> In August 2016, CDCR officials placed Mickey in Calipatria prison – the same prison where defendant Burhop resided at the time.  During the wiretap investigation in this case, Yandell, Troxell, and Burhop all became aware of Mickey's arrival at Calipatria prison in August 2016.  During the intercepted calls discussed below, AB members Yandell and Troxell assigned responsibility for arranging the killing of Mickey to Burhop.  The order to kill Mickey included a promise from Yandell that a successful killing of Mickey would go a long way to supporting Burhop's entrance into the Aryan Brotherhood as a "brother," or member of the enterprise.  Although Burhop was hesitant to arrange the killing of a made member of the Aryan Brotherhood, Burhop understood that, if he did not carry out the order, he could eventually be targeted by the enterprise for murder because he had not carried out his responsibility as an associate of the enterprise.  Thus, in order to gain entrance into in the enterprise and avoid the repercussions for not killing Mickey, Burhop agreed to arrange the murder of Mickey at Calipatria state prison in August 2016, even though his heart was not in the killing.
>
> In connection with the plot to kill Mickey, in 2016, investigators gathered corroborating evidence about the conspiracy during wiretapped calls made over a contraband cell phone possessed by Yandell while he was incarcerated at CSP–Sacramento.  In particular, agents intercepted multiple calls in which Yandell, Troxell, Burhop, and others discussed an ongoing enterprise need for Mickey to be murdered.

ECF 1321, at 11–12.

The Court accepted the guilty plea of Kristen Demar.  In her guilty plea, the Court received the following sworn admissions, along with many additional corroborative facts in Exhibit "A":

> **Summary of Count One – Conspiracy to Participate in a Racketeering Enterprise**
>
> Defendant Kristen Demar admits that, as part of the criminal agreement charged in Count One of the Indictment, between January 2016 and at least October 2016, she agreed with co-conspirators Ronald Yandell, Billy Sylvester, Kevin MacNamara, Jeanna Quesenberry, Samuel Keeton, and others to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c).  Demar joined the agreement knowing of its purpose and intending to help accomplish that purpose.  As part of this criminal agreement, Demar admits that (1) she knowingly associated with the Aryan Brotherhood; (2) the Aryan Brotherhood was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, assault, conspiracy to commit murder, robbery, and drug trafficking; (3) she knowingly agreed to participate in the conduct of the affairs of the Aryan Brotherhood by acquiring and distributing methamphetamine on behalf of the AB and delivering the proceeds from this drug trafficking to

> the AB and its members; (4) these criminal activities affected interstate commerce in that they took place in a number of different states and involved drug trafficking; and (5) she was aware of the essential nature and scope of the Aryan Brotherhood's criminal enterprise and intended to participate in it.
>
> More specifically, Demar admits that (1) she knew that Billy Sylvester was an Aryan Brotherhood member based upon her discussions with him in 2016, including the crimes that he asked her to commit and that she agreed to commit, such as smuggling cell phones, drugs, and other contraband into prison; (2) she knew that her husband, Charles Demar, was an active participant in the affairs of the Aryan Brotherhood because he was as an incarcerated associate of the gang functioning under Aryan Brotherhood member Travis Burhop in Calipatria prison in 2016; (3) she knew she was participating in the affairs of the Aryan Brotherhood because of her conversations with Aryan Brotherhood leader Ronald Yandell in which he asked her to facilitate criminal activities on behalf of the AB and to blame any criminal charges on the gang to avoid getting herself in trouble; and (4) she knew she was associating with the AB based on additional information and discussions she learned from Jeanna Quesenberry, Kevin MacNamara, and others.

ECF 1278, at 10.

The Court accepted the guilty plea of Justin Petty. In his guilty plea, the Court received the following sworn admissions, along with many additional corroborative facts in Exhibit "A":

> **Summary of Count One – Conspiracy to Participate in a Racketeering Enterprise**
>
> Defendant Justin Petty admits that, as part of the criminal agreement charged in Count One of the Indictment, between August 2016 and at least September 2016, he agreed with two charged co-conspirators to participate in a racketeering enterprise, in violation of 18 U.S.C. § 1962(c). Petty joined the agreement knowing of its purpose and intending to help accomplish that purpose. As part of this criminal agreement, Petty admits that (1) he knowingly associated with the Aryan Brotherhood; (2) the Aryan Brotherhood was a criminal enterprise regularly engaging in a pattern of racketeering activity including murder, conspiracy to commit murder, robbery, and drug trafficking; (3) he knowingly agreed to participate in the conduct of the affairs of the Aryan Brotherhood by acquiring and distributing methamphetamine, heroin, and other contraband to a charged conspirator at CSP–Sacramento and a charged co-conspirator at High Desert prison; (4) these criminal activities affected interstate commerce in that they involved drug trafficking and use of the mails to ship the contraband; and (5) he was aware of the essential nature and scope of the Aryan Brotherhood's criminal enterprise and intended to participate in it.
>
> More specifically, Petty admits that (1) he knew that a charged co-conspirator was an Aryan Brotherhood member based upon his discussions with him during 2016, including the crimes that he was asked to commit and that he agreed to commit which involved secreted drugs and contraband in packages sent to state prisons; (2) he knew he was

> participating in the affairs of the Aryan Brotherhood because of his phone conversations with the charged co-conspirator which specifically included discussions about Petty facilitating criminal activities on behalf of the AB, including by sending drugs and contraband to a charged co-conspirator at High Desert prison; and (4) he knew he was associating with the AB based on additional information he learned from a charged co-conspirator.
>
> \* \* \* \*
>
> **Summary of Facts Supporting Counts One and Twelve**
>
> During the overall RICO conspiracy in Count One and the drug trafficking conspiracy in Count Twelve, two of Petty's charged co-conspirators were incarcerated in the California prison system. Petty understood that the contraband, including at least 50 grams of methamphetamine (actual) and 100 grams of heroin that he secreted inside two different packages were designed to enrich members of the Aryan Brotherhood leaders, members, and associates, as described in more detail below.

ECF 1425, at 10.

As demonstrated above, the facts admitted in support of each guilty plea (contained in each Exhibit "A" to the six plea agreements listed) constitute sworn facts that easily satisfy the minimal threshold showing that the Aryan Brotherhood enterprise operated as a conspiracy for purposes of Rule 801. And, in addition to these sworn admissions attesting to the operation of the Aryan Brotherhood conspiracy, the facts outlined in Special Agent Brian Nehring's sworn affidavit in support of the Criminal Complaint further prove that the Aryan Brotherhood had shared goals and operated as a joint venture.

The sworn facts in the Criminal Complaint substantially overlap and verify the factual admissions from the guilty pleas, corroborated by intercepted calls, undercover drug purchases, and drug seizures. ECF 1. These overlapping layers of corroborating evidence show by a preponderance that the Aryan Brotherhood operated as a conspiracy for purposes of Rule 801 and that the defendants were a part of that conspiracy.[2]

---

[2] Indeed, while the question for purposes of Rule 801(d)(2)(E) is whether these defendants were engaged in a joint venture—and not a criminal conspiracy—there is ample evidence from these sworn factual admissions that their conduct also meets the narrower definition of a RICO criminal conspiracy specifically.

C.  **Any statement made by a fellow Aryan Brotherhood conspiracy member in furtherance of the conspiracy is therefore admissible against these defendants.**

Because the Aryan Brotherhood is a "conspiracy" for purposes of Rule 801, and because each of these defendants was a member of that conspiracy, any statements that their fellow Aryan Brotherhood conspirators made in furtherance of the conspiracy are admissible against all defendants.  *See* Fed. R. Evid. 801(d)(2)(E).

At this point, the United States does not ask the Court to rule that any specific statements are in furtherance of the conspiracy, but rather it provides the following overview of the types of statements that it will seek to admit at trial pursuant to Rule 801(d)(2)(E).  For a statement to be "in furtherance" of the conspiracy, the statement must "further the common objectives of the conspiracy or set in motion transactions that are an integral part of the conspiracy."  *United States v. Yarbrough*, 852 F.2d 1522, 1535–36 (9th Cir. 1988) (citing *United States v. Layton*, 720 F.2d 548, 556–57 (9th Cir. 1983)).  "In determining whether a statement is made 'in furtherance of' a conspiracy, the court looks to the declarant's intent in making the statement, not the actual effect of the statement." *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993).

Statements may be in furtherance of the conspiracy in several situations, such as when they "prompt further action on the part of conspirators," when they are "made to 'reassure' members of a conspiracy's continued existence" or "allay a conspirator's fears," when they are made to report information to "higher ups" of the group, or when they are made to keep co-conspirators "abreast of an ongoing conspiracy's activities."  *Yarbrough*, 852 F.2d at 1535–36 (collecting cases); *United States v. Moody*, 778 F.2d 1380, 1382 (9th Cir. 1985).

Courts have specifically held that statements updating co-conspirators about planned and completed murders qualify as co-conspirator statements. In *Yarbrough*, the seminal Ninth Circuit case on co-conspirator statements, the Ninth Circuit held that a declarant's statements updating his co-conspirators of the details of a murder was in furtherance of the co-conspiracy because it was "made with the intent to keep his coconspirators abreast of what the [organization] had done, was doing, or would do in the future."  *Yarbrough*, 852 F.2d at 1536.

Likewise, in *Angiulo*, the First Circuit held that statements by declarants discussing a mafia

family's "past and future murder plans" were made in furtherance of the conspiracy, even when the defendants were not present when the statements were made and did not have knowledge of the specific murders. 847 F.2d at 969–70. "As long as it is shown that a party, having joined a conspiracy, is aware of the conspiracy's features and general aims," the First Circuit explained, "statements pertaining to the details of plans to further the conspiracy can be admitted against the party even if the party does not have specific knowledge of the acts spoken of." *Id.* at 969.

In drug cases, courts have held that statements arranging to sell drugs and discussing the source of the drugs are in furtherance of the conspiracy. *See Williams*, 989 F.2d at 1068 (holding that statements that are made to arrange drug sales are "integral to the conspiracy" and thus in furtherance of the conspiracy); *United States v. Larson*, 460 F.3d 1200, 1212 (9th Cir. 2006) (holding that statements identifying a drug source are in furtherance of a drug conspiracy because they "provide assurance" to the buyer that the buyer will receive drugs "from a source of supply known to him"), *as modified on other grounds on reh'g en banc*, 495 F.3d 1094, 1099 n.4 (9th Cir. 2007).

Courts have also held that statements warning fellow co-conspirators about police presence and to conceal the conspiracy's illegal activities are co-conspirator statements. *See United States v. Mayberry*, 896 F.2d 1117, 1122 (8th Cir. 1990) (finding that statement made to avoid detection of law enforcement was co-conspirator statement); *Williams*, 989 F.2d at 1069 (finding no error in admitting statement from one co-conspirator to another "not to tell anyone about the trip" to pick up drugs because statement was made "an effort to conceal the conspirators' illegal activities").

At trial, the United States plans to introduce co-conspirator statements that fit within each of these categories, such as statements by Aryan Brotherhood members discussing past and future murders, arranging to sell drugs, keeping fellow members abreast of the conspiracy's members and plans, and attempting to hide contraband from law enforcement. Because these types of statements are all in furtherance of the Aryan Brotherhood conspiracy, these statements are admissible against the defendants.

V. **CONCLUSION**

The United States asks this Court to make a pretrial finding that the Aryan Brotherhood was a conspiracy for purposes of Rule 801(d)(2)(E).

Dated:  November 17, 2023

PHILLIP A. TALBERT
United States Attorney

By: /s/ ROSS PEARSON
ROSS PEARSON
Assistant United States Attorney