PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>     v.<br><br>RONALD YANDELL,<br>BILLY SYLVESTER, and<br>DANNY TROXELL,<br><br>          Defendants. | CASE NO. 2:19-CR-00107-KJM<br><br>OPPOSITION OF THE UNITED STATES TO MOTIONS TO SEVER BY DEFENDANTS YANDELL, SYLVESTER, AND TROXELL<br><br>[ECF 1838, 1839, 1841] |

## I.    **INTRODUCTION**

The United States respectfully submits its opposition to the three motions to sever filed by defendants Ronald Yandell, Billy Sylvester, and Danny Troxell ("Yandell," "Sylvester," "Troxell," or "defendants"). ECF 1838, 1839, 1841. Despite earlier demands for a speedy trial, the three trial defendants now move for various forms of relief that run contrary to binding Ninth Circuit precedent and make no practical sense. In short, the defendants' motions to sever should be denied because all three fail to present authority or any persuasive basis to sever these properly-joined defendants. This is especially true in a case where the government's theories and evidence have been set forth for four years, this trial has been set for more than a year, and the defendants' arguments are meritless.

## II.   BACKGROUND

### A.   Fall 2016 – RICO-related wiretap intercepts of Yandell, Sylvester, and Troxell

During the fall of 2016, DEA intercepted dozens of lengthy gang-related conversations between Yandell, Sylvester, and Troxell discussing Aryan Brotherhood business, including plots to kill rivals, members and associates who had run afoul of the gang, and plans to smuggle contraband into various prisons in order to enrich AB members.  The Aryan Brotherhood is an ongoing criminal enterprise operating in the California prison system.  ECF 1, at 82–83.[1]  In order for any jury to understand the evidence in this case, they will need to hear historical context of past events coupled with 2016 interceptions where Yandell, Sylvester, and Troxell candidly discuss the state of affairs within the AB at that time.  Severing any one defendant will unnecessarily require more than one jury to hear the same contextual evidence in separate trials, burden limited judicial resources, and permit the defendants to "game the system" by strategically filing motions with this Court that are less about substance and more about playing games to avoid accountability.

As an example of a wiretapped call that is evidence of the charged enterprise, the Aryan Brotherhood, on August 26, 2016, at about 5:54 p.m., Yandell and Daniel discussed their belief that their phones were being tapped.  However, they didn't believe that they were being tapped right at that moment.  *Id.* at 82.  Yandell believed that the authorities were trying to put the pieces of the puzzle together.  *Id.*  Yandell didn't think it mattered what any informant told them: If the authorities didn't have him "ordering shit," then they couldn't do anything.  *Id.* at 83.  Yandell said that the authorities knew he was a shot-caller, meaning an influential leader, in "the Brand."  *Id.*  Yandell said that the only way "the feds" could get them was on a conspiracy.  *Id.*

Yandell and Daniel discussed a brewing situation with another AB member named Kenneth "Kenwood" Johnson and a homicide that had occurred during July 2016 in Anaheim.  *Id.*  They discussed how the murder had occurred and how they had used their respective phones, which could now be linked to the phones seized from the suspects on the street.  *Id.*  Yandell said that, despite the law enforcement scrutiny caused by the Anaheim murder, "we still have to commit crimes."  *Id.*  Yandell

---

[1]     This is not an exhaustive summary of all calls or evidence involving the trial defendants, but provides some context for the pending RICO conspiracy charge against them.

said that law enforcement would have arrested him by now if they knew Yandell "had moved on dude. Already it's a conspiracy, RICO, organized crime, ordered a hit on another prisoner." *Id.*

### B. October 7, 2011 – Aryan Brotherhood member Billy Sylvester murdered Ronald Richardson at Folsom Prison to gain entrance to, and increase his position with, the Aryan Brotherhood.

One of the predicates alleged in the RICO conspiracy charged against the trial defendants focuses on a murder committed by Sylvester in 2011. ECF 1375, Superseding Indictment ¶ 27. Before Yandell and Sylvester became cellmates at Folsom prison in 2015, Sylvester earned enterprise membership through the murder of Ronald Richardson. ECF 1, at 28–33. The facts of this murder and the later intercepted calls demonstrate how the facts in this case require context and many of the criminal acts from the past are interwoven with facts developed during DEA's wiretap investigation of the Aryan Brotherhood in 2016.

On October 7, 2011, Sylvester and another inmate, Lance Clemens, stabbed Richardson to death on a yard in Folsom prison. *Id.* Richardson had been a member of the United Society of Aryan Skinheads ("USAS"). *Id.* Sylvester murdered Richardson to gain admission to the Aryan Brotherhood and to increase his status with the enterprise.[2] *Id.*

To understand why Sylvester's murder was significant to the enterprise, the context is important. In particular, the Aryan Brotherhood's relationship with the USAS informs the murder Sylvester committed that day. *Id.* Trial evidence will demonstrate that, long before 2011, AB members began targeting USAS members for murder because the USAS has consistently refused to subordinate its California prison members to the AB. According to CW-1, the Aryan Brotherhood considers itself the only legitimate white prison gang. As such, it will not allow another white prison gang to function independently within California prison system.

Contravening the AB's view, the USAS has tried since approximately 2005 to unite all disparate Skinhead factions under one umbrella, prison gang. *Id.* According to CW-1, if this effort is successful, it might result in a Skinhead prison gang that outnumbers the Aryan Brotherhood. *Id.* Leaders of the

---

[2]      On August 14, 2018, a Sacramento County jury found Sylvester guilty of Richardson's murder in violation of California Penal Code § 187. The Superior Court later sentenced Sylvester to life in prison for this murder.

USAS openly defied the Aryan Brotherhood and refused to act in a subordinate manner to the enterprise. Therefore, in about 2005 or 2006, AB members at Pelican Bay decided that every single member of USAS would be targeted for assault unless they came to the AB, denounced the USAS, and revealed to the AB which inmates were still aligned with the USAS. *Id.* After the Aryan Brotherhood announced this edict, enterprise members were expected to kill or to orchestrate the killing of any USAS member with whom they came into contact. *Id.* Failure to fulfill this expectation could result in the AB member himself being targeted for murder. *Id.*

A call intercepted during the 2016 investigation corroborated the AB's ongoing targeting of USAS and other white prison gang members for murder. *Id.* at 30. Specifically, during a call intercepted on October 16, 2016, Yandell told Aryan Brotherhood member Brant Daniel that members of various skinhead groups were targeted for murder. *Id.* Yandell asked whether Daniel had any "Skinhead Wolf Pack" gang members at Salinas Valley prison, where Daniel was housed at the time. *Id.* Daniel said no. *Id.* Yandell then told Daniel that, if he ran in to any of the "Skinhead Wolf Pack" dudes, Daniel would have to tell them that they had to denounce the Wolf Pack. Yandell instructed Daniel that he would have to "move on" these other inmates if they didn't agree to denounce the Wolf Pack. *Id.*

During the same intercepted call, Yandell asked his cellmate, Sylvester, which skinheads had an alliance against "the Brand." Yandell relayed to Daniel that the skinhead gangs that had joined forces against the Aryan Brotherhood were USAS, Wolf Pack, the Golden State Skins, and the American Front. Yandell added that he and Sylvester had "removed" all of the Wolf Pack affiliates from Folsom prison. Yandell also said that they disassociated from them. However, Yandell added that Sylvester was not letting the former members of the skinhead groups off the hook. Yandell explained that they found out that the four "clicks" of skinhead groups – USAS, Wolf Pack, Golden State Skins, and American Front – had a secret pact to take over all of the main lines, meaning areas, within California prisons.

Yandell asked Daniel to repeat the names that Yandell had listed. Yandell told Daniel that they were going to kill all of them. *Id.* Yandell said that information from High Desert prison – where AB members Pat Brady and Jason "Jake" Corbett were housed – had apprised them of the secret pact. *Id.*

Yandell told Daniel to let all the brothers know that they need to take care of business and that members of these skinhead groups "need to get smashed." *Id.* Daniel affirmed his commitment to do so. *Id.*

Richardson's murder occurred within a small, concrete yard inside B-3 Security Housing Unit at Folsom prison. *Id.* at 30–31. It is a yard where inmates in this segregated unit are allowed to exercise. *Id.* Inmates kept in this part of Folsom prison are separated from other general population inmates. *Id.*

The attack began shortly before 7:35 a.m. on October 7, 2011. *Id.* at 31. A video surveillance camera positioned above the prison yard captured the murder. *Id.* In the video, Sylvester approaches the victim and surreptitiously removes a prison-made weapon. *Id.* With the weapon, Sylvester violently stabs Richardson repeatedly in the head, neck, and back. *Id.* Clemens also uses a weapon to stab Richardson in the head, neck, and back. *Id.*

When CDCR officials entered the exercise yard, the six other inmates present laid prone on the ground. *Id.* Surveying the yard, CDCR officers found a prison-made weapon about five feet away from Sylvester. *Id.* As officers ordered the inmates to exit the yard, officers found a second prison-made weapon near where Clemens had been laying. *Id.*

When CDCR officers examined Sylvester, they discovered blood stains on his hands, shoes, and right sleeve. *Id.* In the video, Sylvester stabs Richardson repeatedly with his right hand. Evidence at trial will demonstrate that Sylvester targeted and killed Richardson because Richardson he was a USAS member and Sylvester desired to earn AB membership by committing this murder. *Id.*

The Sacramento County Coroner's Office determined that Richardson died of multiple stab wounds to his neck and back. *Id.*

**C.     August 11, 2016 – Yandell and Matt Hall discuss Yandell and Danny Troxell's leadership positions within the Aryan Brotherhood and a plot to kill AB member Kenneth Johnson.**

The interconnected nature of the criminal enterprise evidence linking Troxell, Yandell, and Sylvester is demonstrated in an intercepted call from August 11, 2016. ECF 1, at 65–68. During the call, Yandell spoke to Matt Hall for about one hour and 19 minutes, and discussed many issues within the Aryan Brotherhood. As it relates to Troxell, Hall told Yandell that Hall wanted to purchase several ounces of methamphetamine because Hall was expected to deliver it to AB member "Danny" Troxell. *Id.* at 65. Hall said he was doing work for Troxell and being harassed by AB member "Kenwood,"

whom agents subsequently identified as Kenneth Johnson.  *Id.*

Yandell explained how the enterprise was functioning at that time.  Specifically, Yandell said that he and Sylvester were drug distribution partners.  *Id.*  Yandell also said that he and Troxell were attempting to "build an army."  *Id.*  Yandell identified himself as being one of the AB's three commission members.  *Id.*  Yandell boasted that everything was run through him.  *Id.* Yandell identified Troxell and a third man as the other two commission members.  *Id.*

### D.      August 20–21, 2016 – Yandell, Burhop, and Troxell discuss plot to murder Aryan Brotherhood member James Mickey at Calipatria prison.

Calls intercepted between August 20–21, 2016, revealed a plot involving Yandell, Troxell, and Burhop to murder AB member James Mickey at Calipatria prison.  *Id.* at 75–79.  Severing Troxell from a trial involving Yandell would be a waste of judicial resources and be inefficient to cover the same evidence twice before two separate juries.

During the intercepted call, Burhop said that "Mickey" had "hit A yard" in Calipatria prison, where Burhop was incarcerated at the time.  *Id.* at 76.  Yandell said that he was "going to have that dude (Mickey) hit."  *Id.*  Yandell said he had attempted to contact Troxell the previous night but had been unsuccessful.  *Id.*  However, Yandell told Burhop that Troxell had previously agreed that Mickey should be killed.  *Id.*  Burhop confirmed this understanding and said he had spoken to Troxell that morning and Troxell had agreed with this.  *Id.*  Troxell thought that Mickey should be "whacked," meaning killed, as soon as possible.  *Id.*

Yandell said they needed to get somebody to "kill his ass," not just stab him a couple of times, because they needed to send a message.  *Id.* at 77.  Burhop said he had spoken to Troxell about this.  *Id.* According to Burhop, Troxell agreed that Mickey had to be killed, the sooner, the better.  *Id.*

Yandell made clear that he wanted to "have his ass killed."  *Id.*  Yandell counseled Burhop that there would be a lot of law enforcement scrutiny when an AB member was killed.  *Id.*  Yandell said the assassins should take precautions, including cleaning out their cells in advance of the killing.  *Id.* Burhop and Yandell then discussed various ways to kill Mickey.  *Id.*  For example, Yandell said that Mickey could be "choked out" and then stabbed through the eye socket.  *Id.*  Yandell lamented that few people knew how to stab anyone to death anymore.  *Id.*

**E.      August 21, 2016 – Yandell and Troxell discuss murdering James Mickey and Yandell says he and Sylvester are sponsoring Jason Corbett for AB membership.**

On August 21, 2016, agents intercepted a call between Yandell and Troxell about the plot to kill James Mickey.[3]  During the intercepted call, Troxell said he wanted to talk to Yandell about something important.  Yandell acknowledged and said to go ahead. Troxell asked if Yandell remembered someone and Yandell then interrupted and said he knew exactly who Troxell was talking about; it was determined that they were discussing James Mickey.

Troxell asked if Yandell knew where Mickey was located now. Yandell said he did.  Troxell said he was going to put that (that is, the killing of Mickey) in motion, getting that handled as soon as Mickey got fresh air.  Yandell said Mickey already got fresh air; he was already out there (meaning released to the general inmate population).  Troxell asked if Mickey was mingling, Yandell acknowledged.  Troxell asked if Yandell knew what was up right there (meaning whether Yandell understood Mickey was marked for death).  Yandell indicated he did.

Yandell said he that the Aryan Brotherhood ("the rock") would have to take care of killing Mickey.  Troxell described Mickey as a liability.  Troxell said if Mickey was mingling they could not afford for it not to be dealt with as soon as possible because they didn't want another bad situation comparable to something Troxell described as the "little Ronnie" problem.  Yandell acknowledged and said he was talking to Travis Burhop.  Yandell said he told Burhop to handle that shit, but he had to make sure it was handled all the way or for it not to get back to the authorities that Mickey's life was in danger.  Yandell said Burhop could handle it because it was very important and without management being brought into it. Troxell acknowledged that he told Burhop the same thing.  Yandell said he wanted to know if Burhop had the skills to do that, the savvy and he wanted to make sure if he had the skills to put the murder of Mickey together.  Troxell said they were about to find out.

During the August 21 call, Yandell confirmed that he and Sylvester were sponsoring Jason Corbett for Aryan Brotherhood membership.  ECF 1, at 79 n.15.  Yandell explained that, during the previous four years, Corbett had run High Desert effectively.  *Id.*  Yandell told Troxell that Sylvester

---

[3]      The following summary is from an intercepted call from August 21, 2016, at about 7:16 p.m. produced as a file named "9168053817.L2T1LINE015 - 08.21.2016 at 19.16.49.693-1.wav"

GOVT.'S OPP. TO MOTIONS TO SEVER BY DEFENDANTS
YANDELL, SYLVESTER, AND TROXELL

had known Corbett for a long time and that Corbett was loyal. *Id.* Yandell explained that Corbett had

offered to kill an AB member/associate named "K-Bob." *Id.* Moreover, Corbett had offered to commit

the murder while Corbett held a phone nearby, thereby allowing Yandell to listen to K-Bob's murder.

*Id.* Later intercepted calls revealed that this murder was called off by Yandell. *Id.* In fact, during one

intercepted call, Yandell spoke to K-Bob and K-Bob expressed relief that they had cleared up confusion

about K-Bob's alleged bad standing with the Aryan Brotherhood. *Id.*

### F.   August 27 and 28, 2016 – Yandell and Travis Burhop discuss Aryan Brotherhood business and plans endorsed by Troxell to have Burhop kill James Mickey.

Like much of the evidence in this case, the wiretap evidence cannot be segregated because the

criminal enterprise necessarily involved each of the defendants keeping each other apprised of the

criminal activities being undertaken on behalf of the Aryan Brotherhood throughout California. This is

demonstrated during an intercepted call from August 27, 2016. *Id.* at 83–84. During the call, Yandell

spoke with Travis Burhop. Yandell counsels Burhop about how to control the inmates at his prison. *Id.*

at 84. Specifically, Yandell said that Burhop needed to "micromanage" his people so that they did not

get out of hand. *Id.* Yandell said that he told the white inmates at his prison that they would be stabbed

and killed if they owed more than $200. *Id.* Yandell said he had people ready to commit violence. *Id.*

He had told specific people that they were going to get killed if they were disrespectful. *Id.*

Yandell also related that he had spoken to Troxell about Burhop. *Id.* Yandell said he vouched

for Burhop's qualities to Troxell, including Burhop's willingness to kill if needed. *Id.* According to

Yandell, Troxell agreed that they should change the enterprise's policy about having to kill someone to

become an AB member. *Id.* at 85. Troxell said that, if a candidate had already killed someone, it was

stupid to waste somebody they already knew was good to do it. *Id.* Yandell said that Sylvester agreed

as well. *Id.* Yandell explained that just killing someone didn't make the person a viable AB member.

*Id.* Yandell believed that they were going to have to kill AB member Kenwood Johnson because he was

in trouble and could not be trusted. *Id.*

### III.   PROCEDURAL BACKGROUND

In 2019, a grand jury charged sixteen defendants with several crimes arising out of their

participation in the Aryan Brotherhood enterprise. ECF 25, Indictment. In 2022, with the agreement of

GOVT.'S OPP. TO MOTIONS TO SEVER BY DEFENDANTS
YANDELL, SYLVESTER, AND TROXELL

1  the parties, the Court placed the defendants in two separate groups for trial:  defendants Ronald Yandell,

2  Danny Troxell, William Sylvester, Brant Daniel, Pat Brady, and Jason Corbett were placed in the first

3  trial group with a trial date of March 20, 2023.  ECF 988 (Minutes).  The remaining defendants were

4  placed in the second trial group, and no trial date was set.

5          On December 8, 2022, a grand jury returned a Superseding Indictment.  ECF 1375.  At a hearing

6  on January 25, 2023, the Court continued trial to February 26, 2024.  ECF 1404 (minutes).  When

7  defendants Sylvester, Daniel, and Troxell indicated that they might move to sever their case from the

8  other defendants and have an earlier trial date, the Court "directed any Defendant requesting to set a trial

9  date earlier than 2/26/2024, to meet and confer with the Government about a briefing schedule on a

10  Motion to Sever and an earlier trial date."  ECF 1404.

11         The Court subsequently considered the severance motions from Daniel, Sylvester, and Troxell

12  and denied them.  Order, ECF 1474.  The Court found that Troxell and Sylvester "were properly joined

13  in the same indictment" and had not "shown a six-defendant trial in February 2024 would compromise

14  their trial rights."  Order, ECF 1474, at 1.  The Court further found that Sylvester and Troxell failed to

15  show that a trial with all six of the original trial defendants "would 'prevent the jury from making a

16  reliable judgment about guilt or innocence.'" Order, ECF 1474, at 1–2 (quoting *Zafiro v. United States*,

17  506 U.S. 534, 539 (1993)).

18                              **IV.    ANALYSIS**

19    **A.    Increasing judicial efficiency, conserving court funds, and diminishing witness
              inconvenience support keeping the defendants together for trial.**

20

21         At the outset, the trial defendants do not assert that they are improperly joined under Rule 8.

22  Fed. R. Crim P. 8(a) ("The indictment or information may charge a defendant in separate counts with 2

23  or more offenses may if the offenses charged . . . are based on the same act or transaction, or are

24  connected with or constitute parts of a common scheme or plan.").  The Ninth Circuit construes "Rule

25  8(b) liberally in favor of initial joinder," *United States v. Sanchez-Lopez*, 879 F.2d 541, 551 (9th Cir.

26  1989), because joint trials "conserve state funds, diminish inconvenience to witnesses and public

27  authorities, and avoid delays in bringing those accused of crime to trial." *Bruton v. United States*, 391

28  U.S. 123, 134 (1968).  When defendants are properly joined, "[A] district court should grant a severance

under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.  Here, the defendants fail to make any showing that their joinder in the February 2024 trial presents a "serious risk" that a "specific trial right" would be comprised or would "prevent the jury from making a reliable judgment about guilt or innocence" about either of them.  *Id.*

Count One of the Superseding Indictment charges Yandell, Sylvester, and Troxell, and their co-defendants with conspiring to violate 18 U.S.C. § 1962(c) – that is, conspiring "to conduct and participate, directly and indirectly, in the conduct of the affairs of the Aryan Brotherhood through a pattern of racketeering activity," in violation of § 1962(d).  ECF 1375, Superseding Indictment ¶ 25.  To prove a violation of § 1962(c), in turn, the government must prove four elements:

1. There was an on-going enterprise with some sort of formal or informal framework for carrying out its objectives consisting of a group of persons associated together for a common purpose of engaging in a course of conduct;

2. The defendant was employed by or associated with the enterprise;

3. The defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  To conduct or participate means that the defendant had to be involved in the operation or management of the enterprise; and

4. The enterprise engaged in or its activities in some way affected commerce between one state and another state.

Ninth Cir. Model Crim. Jury Instr. No. 18.18 (2023).

For the first element—the existence of an enterprise—the government must prove that the Aryan Brotherhood was "a group of people who have associated together for a common purpose of engaging in a course of conduct over a period of time."  Ninth Cir. Model Crim. Jury Instr. No. 18.9.  For the third element—a pattern of racketeering activity—the government must prove that the enterprise engaged in a pattern of crimes that "embraced the same or similar purposes, results, participants, victims, or methods of commission, or were otherwise interrelated by distinguishing characteristics."  Ninth Cir. Model Crim. Jury Instr. No. 18.14.

Stated another way, the government must prove that the Aryan Brotherhood was a gang and that the defendants in this case were members who joined or associated with the gang, intended to participate

in the gang, and were aware that their fellow gang members would commit a series of crimes.  *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Fernandez*, 388 F.3d at 1230).  The government does not need to prove that any defendant personally committed, or agreed to personally commit, two or more racketeering acts.  *United States v. Tille*, 729 F.2d 615, 619 (9th Cir. 1984).  Rather, the crime is the defendant's involvement in the criminal enterprise.  *United States v. Marino*, 277 F.3d 11, 33 (1st Cir. 2002) ("The RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise.").

Here, the Superseding Indictment defines the Aryan Brotherhood enterprise as "including its leaders, members, and associates."  *Id.* ¶ 2.  The Superseding Indictment also describes the enterprise's membership criteria, command structure, codes of conduct, purposes, and shared symbols; in short, each component makes up the method and means by which the enterprise executes its criminal activities.  *Id.* ¶¶ 1–14.  Finally, the Superseding Indictment alleges eleven predicate acts carried out by the enterprise in furtherance of the RICO conspiracy in Count One, including: (1) the murder of Ronald Richardson, (2) the murder of Hugo Pinell, (3) a conspiracy to distribute and possess with intent to distribute methamphetamine and heroin, (4) a conspiracy to murder Kenneth Johnson, (5) a conspiracy to murder James Mickey, (6) a conspiracy to murder Paul Diaz, (7) a conspiracy to murder Michael Trippe, (8) a conspiracy to murder Doug Maynard, (9) the murder of Doug Maynard, (10) the murder of Zachary Scott, and (11) the murder of Donald Pequeen.  *Id.* ¶¶ 27–35.

In this case, evidence of the defendants' membership in the Aryan Brotherhood, the enterprise's command structure, codes of conduct, purposes, and shared symbols directly informs and provides context to their intercepted discussions about committing murders, conspiracies to murder, and engaging in large-scale drug trafficking, as well as the completed criminal acts themselves, and all are "relevant to the RICO charges" against each "because [they] tend[] to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."  *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992).  In other words, the evidence of the Aryan Brotherhood enterprise and its racketeering activity—including murders and conspiracies to commit murder—will still be admissible at trial against each of these defendants even if the Court orders their trial severed, because this evidence is direct proof

of the elements of the RICO conspiracy charged against Yandell, Sylvester, and Troxell.  *See id.*  This is true even if the defendants did not personally participate in each of the RICO predicates discussed above.  *See id.* ("Proof of [RICO] elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts.  Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant, and the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless."); *see also United States v. Finestone*, 816 F.2d 583, 585–87 (11th Cir. 1987) (upholding admission of murder, kidnapping, and drug trafficking by enterprise member other than defendant in RICO case to prove pattern of racketeering activity); *United States v. Gonzalez*, 921 F.2d 1530, 1545–47 (11th Cir. 1991) (uncharged crimes by defendant and other conspirators admissible to prove the enterprise and continuity); *United States v. Brady*, 26 F.3d 282, 286–88 (2d Cir. 1994) (holding that uncharged murders committed by non-defendant members of the Colombo LCN family were admissible to prove the Colombo family enterprise and the charged conspiracy by a faction of the Colombo family to kill members of a rival faction of the Colombo family); *United States v. Coonan*, 938 F.2d 1553, 1561 (2d Cir. 1991) (holding that admission of evidence of murders by enterprise members occurring prior to the defendant's joining the enterprise was proper to show the existence of the enterprise); *United States v. Ellison*, 793 F.2d 942, 949 (8th Cir. 1986) (holding that uncharged crimes of violence by other members of the enterprise were admissible to establish existence of enterprise).

Given the law applicable to the charges in this case, if the Court severed Yandell and Sylvester from Troxell, it would result in the Court presiding over two nearly identical trials and burdening two sets of jurors.  A severance motion brought in a RICO case is different from those in other criminal cases because "[t]he typical spillover claim is that evidence admissible against only one defendant is prejudicial to all defendants and that individual trials should have been held to avoid that prejudice."  *DiNome*, 954 F.2d at 843.  In contrast, in a RICO trial "the evidence in question is relevant to the RICO charges against all defendants and most probably would have been admitted even if defendants had been accorded individual trials."  *DiNome*, 954 F.2d at 843–44.

In their motions, the defendants fail to demonstrate how judicial efficiency is achieved, or court

funds conserved, or inconvenience to jurors, witnesses, and public authorities diminished, by holding two separate trials where the same evidence demonstrating the Aryan Brotherhood's membership, command structure, codes of conduct, purposes, and pattern of racketeering activity are introduced twice before two different juries.  Likewise, the defendants are silent about the justification for wasting judicial resources and burdening two sets of jurors for lengthy trials by granting severance because each trial would feature admission of the same evidence of each of the eleven predicate acts alleged in the RICO conspiracy.

**B.**    **Defendants fail to carry their burden to justify severance under Rule 14 of the Federal Rules of Criminal Procedure.**

The burden to justify severance under Rule 14 rests with the trial defendants.  "'Defendants jointly indicted ordinarily should be jointly tried. Serious consideration must be given to judicial economy. The burden is on each defendant to show 'clear,' 'manifest,' or 'undue' prejudice from a joint trial.'"  *United States v. Mikhel*, 889 F.3d 1003, 1046 (9th Cir. 2018) (quoting *United States v. Polizzi*, 801 F.2d 1543, 1553–54 (9th Cir. 1986)).  "Rule 14 provides that, at the discretion of the trial judge, a severance may be ordered when it appears that a defendant may be significantly prejudiced by a joint trial with his codefendants."  *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980).  "Generally speaking, defendants jointly charged are to be jointly tried." *Id.* (*citing United States v. Gay*, 567 F.2d 916, 919 (9th Cir. 1978)).  "This is also the rule in conspiracy cases."  *Escalante*, 637 F.2d at 1201 (*citing United States v. Kelly*, 569 F.2d 928, 938 (5th Cir. 1978) and *Haggard v. United States*, 369 F.2d 968, 974 n.16 (8th Cir. 1966)).  "There is a preference in the federal system for joint trials of defendants who are indicted together."  *Zafiro*, 506 U.S. at 537.  Trials of properly-joined defendants "promote efficiency and 'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.'"  *Id.* (*quoting Richardson v. Marsh*, 481 U.S. 200, 210 (1987)).[4]

In this case, a joint trial of Yandell, Sylvester, and Troxell is particularly appropriate because they face a RICO conspiracy involving gang-related wiretapped conversations among the co-

---

[4]    This Court's decision not to sever is reviewed for an abuse of discretion.  *United States v. Smith*, 795 F.2d 841, 850 (9th Cir. 1986).  "[T]here is no abuse of that discretion unless the defendant proves that the joint trial of the charges was 'manifestly prejudicial.'"  *Id.*

1  conspirators that reference one another, crimes they are planning to commit on behalf of the enterprise,

2  and crimes they have committed in past on behalf of the enterprise.  Importantly, testimony of

3  cooperating witnesses and intercepted calls will cover each defendant's role in the enterprise and

4  significant interactions with each of the trial defendants during the RICO conspiracy.  Severing one

5  defendant would result directly in an unnecessary duplication of witness testimony and enormous

6  consumption of judicial time with no appreciable benefit.

7         In the context of a RICO prosecution against the Mexican Mafia prison gang, the Ninth Circuit

8  observed that a joint trial was "particularly appropriate where the co-defendants are charged with

9  conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible

10  prejudice to the defendants when much of the same evidence would be admissible against each of them

11  in separate trials." *Fernandez*, 388 F.3d at 1242.  The considerations in *Fernandez* apply with equal

12  force to the present trial group.

13         The *Fernandez* opinion cited approvingly to a Second Circuit opinion that wholly undermines

14  the argument about prejudicial spillover in the context of a RICO prosecution.  This is because the very

15  nature of evidence necessary to prove a RICO enterprise includes evidence of criminal activities

16  engaged in by other members and associates of the Aryan Brotherhood.

17              [W]e note here that the government must prove an enterprise and a pattern
                of racketeering activity as elements of a RICO violation. 18 U.S.C.
18              § 1962(c). Proof of these elements may well entail evidence of numerous
                criminal acts by a variety of persons, and each defendant in a RICO case
19              may reasonably claim no direct participation in some of those acts.
                Nevertheless, evidence of those acts is relevant to the RICO charges
20              against each defendant, and the claim that separate trials would eliminate
                the so-called spillover prejudice is at least overstated if not entirely
21              meritless.

22  *DiNome*, 954 F.2d at 843.  For these reasons, each defendant fails to carry his burden to demonstrate

23  severance based upon prejudicial evidence is appropriate or consistent with Ninth Circuit authority in

24  RICO cases.

25     **C.   Defendants' vague claim of an antagonistic defense does not carry the "heavy
             burden" to warrant severance under Ninth Circuit precedent.**
26

27         "Antagonism between defenses or the desire of one defendant to exculpate himself by

28  inculpating a codefendant [] is insufficient to require severance." *United States v. Throckmorton*, 87

F.3d 1069, 1072 (9th Cir. 1996) (citing *United States v. Sherlock*, 962 F.2d 1349, 1363 (9th Cir. 1989), *cert. denied sub nom. Charley v. United States*, 506 U.S. 958 (1992)).   "To be entitled to severance on the basis of mutually antagonistic defenses, a defendant must show that the core of the codefendant's defense is so irreconcilable with the core of his own defense that the acceptance of the codefendant's theory by the jury precludes acquittal of the defendant." *Id.*[5]   "Mutually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other." *United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir. 1991) (citation omitted).

All three defendants fail to meaningfully engage with the standard applicable to severance based upon antagonistic defenses.   In fact, a close examination of the motions reveals that Yandell and Sylvester base their arguments on pure speculation about Troxell's anticipated defense at trial.   ECF 1838, at 6 ("From the representations at status hearings, and today's filing by Troxell, it is still difficult to ascertain the full parameters of Troxell's antagonistic defense (although it is clear that this defense is antagonistic to Yandell).").[6]   As a threshold matter, Yandell's motion concedes ]that he is not sure what Troxell intends to do but he still wants a severance. *Id.*   Such speculative grounds are legally insufficient to warrant a severance on the basis of antagonistic defenses. *Throckmorton*, 87 F.3d at

---

[5]     Both Yandell and Troxell cite to a four-factor test for evaluating the prejudicial effect of not granting a severance; but that is not the correct standard in deciding these particular motions.   ECF 1838, at 3 (citing *United States v. Hernandez-Orellana*, 539 F.3d 994, 1001 (9th Cir. 2008); ECF 1841, at 12 (same).   The test from *Hernandez-Orellana* cites to *United States v. Sullivan*, 522 F.3d 967, 981 (9th Cir. 2008).   The *Sullivan* case, in turn, explains that the four-factor test is to determine "the prejudicial effect of a joint trial" and cites to *Fernandez* for this proposition. *Fernandez* makes clear the four-factor test is used by an appellate court to conduct an "[i]nquiry into the prejudicial effect of a joint trial" *after* conviction. *Fernandez*, 388 F.3d at 1241.   By contrast, in *Hernandez-Orellana*, the Court addresses severance on the basis of antagonistic defenses in a *different section* of the opinion and that standard is the one applicable to each of the defendants' motions to sever. *See Hernandez-Orellana*, 539 F.3d at 1002 ("[W]e have described Drewry's burden as a heavy one"; "Indeed, in order to prevail on an antagonistic defense theory, Drewry must demonstrate that acquittal of [Hernandez] would necessarily call for [her own] conviction.") (quotation and citation omitted).

[6]     A few representative examples of the vague, conclusory assertions about Troxell's anticipated defense and strange threats about what Yandell will do in response are included here.   ECF 1838, at 4 ("Troxell's antagonistic defense will only exacerbate this problem since the jury will need to navigate a maze of interconnected conspiracies while also weighing Co-defendant Troxell's motivation in attacking Mr. Yandell and Mr. Sylvester."); ("Moreover, in the face of attacks in the form of antagonistic defense, Mr. Yandell will have no choice but to respond in kind."); *Id.* at 5 ("Counsel for Mr. Yandell has met and conferred with counsel for Mr. Troxell, and warned of the serious impeachment evidence that awaits should Mr. Troxell pursue an antagonistic defense."); *Id.* at 6 ("Adding daily admonitions regarding the antagonistic evidence and cross-examinations of Troxell will be ineffective, in this instructional morass.").

1072.  Instead, Yandell bears the heavy burden to "show that the core of [Troxell's] defense is so

irreconcilable with the core of [Yandell's] own defense that the acceptance of [Troxell's] theory by the

jury precludes acquittal of [Yandell]."  *Id.*  Because Yandell fails to identify what specifically in

Troxell's defense is irreconcilable with "the core of his own defense," he cannot demonstrate that

severance is available or appropriate under binding Ninth Circuit precedent.

Moreover, even if Troxell seeks to impeach Yandell with inconsistent statements or present

evidence demonstrating that the enterprise was targeting him, such evidence does not constitute an

antagonistic defense.  ECF 1838, at 7 ("What was obvious became crystalline clear today, when counsel

for Mr. Troxell gave notice that he intends to use statements made by Mr. Yandell captured in Title III

intercepts – *even if those statements are not introduced by the government.*") (emphasis in original).  In

order to be antagonistic, Troxell would have to present evidence that he is innocent because of the

"exclusive guilt" of Yandell or Sylvester.  *Tootick*, 952 F.2d at 1082.  Such a scenario is highly unlikely

in any RICO prosecution, but especially in this one because all three trial defendants are intercepted

talking to one another or about one another during a wiretap over a contraband cellphone controlled by

Yandell and Sylvester.[7]  Moreover, trial testimony will demonstrate the interconnectedness of all three

defendants in overseeing the affairs of the Aryan Brotherhood and committing crimes in furtherance of

the enterprise during the RICO conspiracy.  Indeed, during the RICO conspiracy, Yandell and Troxell

were uniquely situated as leaders because they held two of the enterprise's three commissioner seats and

they conspired with one another to murder another member, as well as discussed multiple other AB

members, associates, and crimes being committed or planned to further AB interests.  There is no set of

facts in this case where Troxell can plausibly claim that he is innocent because of the "exclusive guilt"

of Yandell or Sylvester.  *Tootick*, 952 F.2d at 1082.

If Troxell pursues a strategy of introducing evidence to demonstrate Yandell or Sylvester have

---

[7]     The government could not identify a published Ninth Circuit case finding prejudicial
joinder based upon an antagonistic defense in a RICO prosecution.  Even extreme examples of
prejudicial spillover evidence have been found to not be an abuse of discretion.  For a particularly
dramatic example, see *United States v. Vasquez-Velasco*, 15 F.3d 833, 846 (9th Cir. 1994).  In that case,
the defendant was joined with co-defendants who murdered DEA Special Agent Enrique "Kiki"
Camarena in Mexico and the evidence featured "gruesome and emotionally moving" audio-taped
recording of Camarena's interrogation by his captors as well as "emotionally-charged" evidence
involving the Camarena murder.

made inconsistent statements in the past or have prior convictions for various crimes, he will attempt to introduce such evidence during his case-in-chief. At that point, the Court can easily provide appropriate "admonitory instructions" so the jury can "collate and appraise the independent evidence against each defendant solely upon the defendant's own acts, statements, and conduct." *Tootick*, 952 F.2d at 1082 (quoting *United States v. Brady*, 579 F.2d 1121, 1128 (9th Cir. 1978)).

While Yandell and Sylvester understandably desire a trial that does not feature divisions among the defense strategies, ECF 1838, at 6 n.2, such a desire is not a legally-cognizable basis for severance and is common in multi-defendant criminal trials. All three defendants fail to make any showing, much less a compelling one, that Troxell has an antagonistic defense because the enterprise-based charges, wiretapped calls, and cooperating testimony do not lend themselves to Troxell being able to demonstrate he is innocent based upon the "exclusive guilt" of Yandell or Sylvester. *Tootick*, 952 F.2d at 1082. For these reasons, each motion to sever should be denied.

### D.    Yandell's arguments for severance misapprehend the basic administration of a criminal trial and do not support severance.

Yandell's brief includes a number of puzzling assertions that are inconsistent with the proper administration of a criminal trial. For example, in support of severance, Yandell asks the following rhetorical question: "To provide one clear example, what message will it send to the jury if counsel for Mr. Yandell and Mr. Sylvester successfully impeach a government witness about the meaning and significance of a wiretap recording, establishing that the government's interpretation of these recordings is not credible, only to be followed with Troxell's attorney *introducing* wiretap recordings and vouching for their accuracy?" ECF 1838, at 7 (emphasis in original). This order of proof does not exist and is not how a criminal trial works. In reality, the government will introduce inculpatory wiretap recordings during its case-in-chief against Yandell, Sylvester, and Troxell. Once the government rests, each defendant will introduce evidence during each of their cases-in-chief. It is only at that point, when the trial reaches the phase of Troxell's case-in-chief, that he will attempt to introduce evidence to support his defense. Whether those exhibits and testimony are admissible over hearsay objections, or Rule 403 considerations, will be determined by the Court. This phase is far removed from the government's introduction of its evidence and it will be unmistakably clear to the jury that Troxell is introducing his

own evidence.  The Court can then administer proper limiting instructions if necessary when Troxell's evidence is received in evidence by the Court.  As a result, Yandell's conjuring of imagined jury confusion or instructional nightmares is not realistic because it is not based on the normal course of how a criminal trial proceeds.

In a similar vein, this passage of Yandell's describes a trial scenario that will not happen. "Without a severance, every day of this trial will be the same ritual: the presentation of the government's evidence, the presentation of a 'second prosecutor's' evidence by Mr. Troxell's counsel, immediately followed by Mr. Yandell's motion for a mistrial."  ECF 1838, at 7.  As detailed above, Troxell's case-in-chief is not intertwined with the presentation of the government's case-in-chief.  Troxell's case will move forward during the defense phase of the trial.  The jury will have clear in mind that Troxell's lawyer is presenting evidence that he believes helps his client.  Nothing more and nothing less.  The fact that Troxell's lawyer may elicit facts from government witnesses during its case-in-chief that help Troxell or cast Yandell or Sylvester in a negative light is not a basis for severance because impeachment evidence of a co-defendant is not "the core of [Troxell's] defense [that] is so irreconcilable with the core of [Yandell's or Sylvester's] own defense that the acceptance of [Troxell's] theory by the jury precludes acquittal of [Yandell or Sylvester]."  *Throckmorton*, 87 F.3d at 1072.[8]

In addition, as discussed above, even if Troxell introduces evidence against Yandell or Sylvester, the Ninth Circuit has held that any potential prejudice can be cured by the Court periodically reminding the jury "that it must consider the evidence against each defendant and evaluate each defendant's guilt separately," *Fernandez*, 388 F.3d at 1243, and "juries are presumed to follow their instructions." *Zafiro*, 506 U.S. at 504; *United States v. Roselli*, 432 F.2d 879, 902 (9th Cir. 1970) (the Court can cure any prejudice by "carefully instruct[ing] the jury about the compartmentalization of the evidence as to each defendant"); *United States v. Nelson*, 2023 WL 411355, at *3 (N.D. Cal. Jan. 25, 2023).  Moreover, in

---

[8]      Sylvester's theory of prejudice is even more attenuated than that advanced by Yandell. In particular, Sylvester argues that Troxell introducing evidence to impeach or impugn Yandell will have a collateral spillover effect on Sylvester because "those statements and that impeachment will seriously prejudice Mr. Sylvester as well as Mr. Yandell because of the government's theory that the two are so closely aligned and were roommates."  ECF 1839, at 2.  This conclusory prejudice argument falls well short of the type of prejudice required for antagonistic defenses in *Throckmorton* and related authorities cited throughout this brief.

RICO prosecutions, the Ninth Circuit has flatly rejected the "complexity" theory advanced by Yandell.

> There is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence. No such showing was made in the instant matter. The crimes here may have been large in number and variety, but they were rather ordinary in nature, except in their viciousness. The evidence could also be understood without difficulty, the alleged complexity stemming more from the abundance of evidence than from the subtlety of the analysis needed to consider it.

*Fernandez*, 388 F.3d at 1243–44 (quoting *DiNome*, 954 F.2d at 842).  The analysis from *Fernandez* applies with equal force to the evidence in this case.  The intercepted calls among the conspirators in this case can easily be "understood without difficulty," and any "alleged complexity" in this case stems "more from the abundance of evidence than from the subtlety of the analysis needed to consider it." *Fernandez*, 388 F.3d at 1243–44.  On the issue of prejudice in a RICO trial with joined defendants, the Ninth Circuit has "repeatedly held that a district court's careful and frequent limiting instructions to the jury, explaining how and against whom certain evidence may be considered, can reduce or eliminate any possibility of prejudice arising from a joint trial." *Id.* at 1243.  Yandell's dire warnings of hopeless confusion by the jury and endless court days spent on fictional issues is counsel's view of trials that is not consistent with reality.  Yandell's arguments do not overcome the Ninth Circuit's view that instructions from the Court during the trial will "reduce or eliminate any possibility of prejudice arising from a joint trial." *Id.*

This claim also fits a familiar pattern for Yandell's arguments: he avoids addressing the merits by threatening the Court with delays in the trial or speculating about sinister unforeseen consequences of ruling against him.  This tactic is not persuasive and, at least in this recent manifestation, is based on a misapprehension of what trial will actually look like.  The Court is well familiar with criminal trials and should not be persuaded by vague threats of trial delay.  The law on severance based upon antagonistic defenses sets a high burden for the defendants and Yandell falls well short of meeting that burden despite his apocalyptic rhetoric.

In his memorandum, Troxell attempts to distinguish his case from that of his co-defendants charged with murders (Yandell and Sylvester), but this argument fails both legally and factually.  ECF 1841, at 4–7.  First, as a legal matter, a defendant's generalized claim that he is less culpable than his co-

defendants and, thus, that he might fare better at a separate trial is not a basis for severance.  It is well-established that "[i]t is not enough for [the defendants] to show that separate trials would have created a better chance for acquittal." *United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993), *as amended* (Dec. 13, 1993), *overruled on other grounds by United States v. Nordby*, 225 F.3d 1053, 1059 (9th Cir. 2000).  "Nor is the fact that a defendant is to be tried with a more culpable defendant enough to require severance." *Id.*  Put differently, "[t]he facts that [the defendant's] name arose somewhat less often during the trial and that he was charged with fewer offenses are not enough. Rather, he must demonstrate that the joint trial impinged on a fundamental trial right or compromised the fairness of the proceedings in a tangible way." *United States v. Hanley*, 190 F.3d 1017, 1027 (9th Cir. 1999).

Second, Yandell and Sylvester fail to identify how a joint trial will impinge on their fundamental trial right or compromise the fairness of their trial.  Rather, they each make vague claims about the impact of evidence that each believes Troxell will introduce to impeach Yandell during the trial.  ECF 1838, at 7.  But, Yandell's vague fear does not match what Troxell will be permitted to do under the Rules of Evidence.  As discussed, the bulk of the alleged impeachment evidence of Yandell will not, as Yandell suggests, be introduced during the government's case-in-chief.  Thus, the risk of confusion about the government's case against these defendants by the jury hearing evidence introduced by Troxell during his case-in-chief against Yandell is minimal.

Moreover, Yandell's fear of Troxell's evidence is overblown because Troxell will still need to convince the Court that impeaching Yandell with hearsay statements offered for the truth of the matters asserted is admissible.  Evidence offered by the co-defendant to impeach another co-defendant is inadmissible hearsay.  Fed. R. Evid. 801.  This type of evidence stands in contrast to statements offered by the government against the defendants because they are statements made by the defendants during and in furtherance of the conspiracy.  Fed. R. Evid. 801(d)(2)(E).  Troxell's arguments under Rule 806 require close scrutiny because that rule has significant limitations and is not a free pass to introduce anything and everything that Troxell desires.

Troxell's argument of joinder prejudice also fails to address that evidence of Yandell and Sylvester's murders will be introduced against Troxell as part of the RICO conspiracy alleged in Count One whether he stands trial by himself or with his co-defendants.  This is true because evidence of the

Aryan Brotherhood's intercepted discussions about committing murders, conspiracies to murder, and engaging in large-scale drug trafficking, as well as the committed acts themselves, and all are "relevant to the RICO charge[]" against Troxell because "because [they] tend[] to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities." *DiNome*, 954 F.2d at 843.  In other words, evidence demonstrating the criminal enterprise alleged in Count One, including the behavior of Troxell's co-conspirators – who are members and associates of the enterprise – will be presented to the jury because it is necessary to demonstrate his guilt on Count One.[9]

Third, as a factual matter, the evidence does not show that Troxell is less culpable than his co-defendants.  As detailed in the facts above and the wiretap call described below, evidence of Troxell's culpability in the RICO conspiracy is not limited to the conspiracy to kill James Mickey.  Instead, DEA intercepted Troxell listening to a plan to kill Kenwood Johnson and receiving details about Yandell and Sylvester planning to sponsor co-defendant Jason Corbett for membership into the Aryan Brotherhood. The United States also anticipates trial witnesses will provide additional inculpatory evidence of Troxell's long-time role as a leader within the AB because, at the time of the wiretap in this case, Troxell, like Yandell, held one of three commission spots in the Aryan Brotherhood's chain of command.  Only the commission can approve the murder of an AB member and trial evidence will show that, as an AB commissioner, Troxell signed off on multiple AB kill orders.

In sum, Troxell fails to carry his burden "to show 'clear,' 'manifest,' or 'undue' prejudice from a joint trial.'" *Mikhel*, 889 F.3d at 1046.  Accordingly, his motion to sever should be denied.

**E.** **Troxell's cramped view of the evidence against him is not a basis to sever him – Troxell is implicated in multiple criminal acts in furtherance of the RICO conspiracy charged in Count One and he thus fails to carry his burden to justify severance.**

To justify severance, Troxell presents a cramped narrative of the evidence against him.  While it is true that the conspiracy to kill James Mickey forms the core of facts alleged in Count Three, and his

---

[9]     In addition, to the extent that Troxell is concerned about being tried with more culpable defendants, the Ninth Circuit has held that any potential prejudice can be cured by the Court providing periodic reminders to the jury by instructing "that it must consider the evidence against each defendant and evaluate each defendant's guilt separately." *Fernandez*, 388 F.3d at 1243.

intercepted call with Yandell on this score leaves little to the imagination, it does not follow that the evidence to be presented against him in the RICO conspiracy charged in Count One is limited to the Mickey conspiracy.  Indeed, evidence disclosed in *Jencks* discovery, and made plain in other intercepted calls identified in the trial exhibits, demonstrate that Troxell was a significant and influential leader within the Aryan Brotherhood from the early 2000's through the intercepted calls in the case.  Indeed, one of the trial exhibits demonstrates Troxell's significant knowledge and authority over the Aryan Brotherhood.

In particular, on October 9, 2016, DEA intercepted a call that begins with enterprise-related business being discussed between Yandell and Troxell.  As the call progresses, Yandell hands the phone over to Sylvester so that Sylvester and Troxell can work through a misunderstanding from an earlier call involving two different people named "Frank."  Based on the comments and the tones used by the two men, that earlier misunderstanding had caused tension between Sylvester and Troxell.

Toward the end of the call, the two discuss Sylvester's continuing desire to have AB member "Kenwood" Johnson murdered.  Sylvester tells Troxell, "I'm not changing my stance on Kenwood, just so you know."  Sylvester goes on to say that his desire to kill Kenwood is "between me and him, man. That's all."  Troxell responds, "Just listen to what I'm saying.  You just can't go fucking off the cuff and do shit like that to another brother, you know what I mean?"

During the call, Troxell makes clear that Sylvester's desire to kill Kenwood must be done in accordance with the enterprise's expected codes of conduct; otherwise, Sylvester will have to answer to the "tip," a common term used by AB members to refer to the Aryan Brotherhood.

| | |
|---|---|
| Troxell: | You can't do that without the consent of, you know what I mean. |
| Sylvester: | Of what? |
| Troxell: | Huh? |
| Sylvester: | Do I answer to somebody?  Who am I answering to? |
| Troxell: | You will have to answer to the tip.  I guarantee you, man, I'm not making no threats or nothing. |
| . . . | |
| Troxell: | Telling you that if you put a hand on another brother, regardless of what it is, then you answer with the tip.  That's all.  It's simple. |

| | | |
|---|---|---|
| Sylvester: | Okay. | |
| Troxell: | Ask Ronnie. | |
| Sylvester: | That's cool. | |
| Troxell: | You know what I mean.  You ask any brother about that.  So, there's consequences. | |
| Sylvester: | I know. | |
| Troxell: | That's all I'm saying, Billy. | |

This call, and others like it, as well as anticipated trial testimony, make clear that Troxell is interwoven in the RICO conspiracy with Yandell and Sylvester and he carries significant authority among the co-conspirators.  In short, trial of properly-joined defendants "promote[s] efficiency" and that is certainly true in this case.  *Zafiro*, 506 U.S. at 537.

Troxell's theory of severance is incoherent.  He argues that he needs to present evidence of co-defendant Pat Brady plotting to kill him in 2023, *seven years after* his involvement in a conspiracy to kill AB member James Mickey captured over wiretapped calls.  ECF 1841, at 3.  Whatever transpired between Brady and Troxell in 2023 cannot possibly demonstrate that Troxell is not guilty of the RICO conspiratorial acts from 2016 or that Brady's desire to kill him in 2023 will have any prejudicial impact on Yandell or Sylvester.  Brady will not be at trial and cannot be prejudiced by Troxell's evidence of a 2023 plot to kill him.

Troxell also points to evidence of two other conspiracies as proof that he has an antagonistic defense to Yandell and Sylvester.  Both of these occurred three years after the conspiracy to kill Mickey and neither is availing or meets the standard required for prejudice for severance based upon a purported antagonistic defense.  Specifically, Troxell points to a letter authored by Yandell (seized by CDCR officials in 2019).  The letter is addressed to an AB member in Pelican Bay.  The letter details plans to kill co-defendant Brant Daniel.  In the letter, Yandell indicates that all three commissioners (Yandell, Troxell, and a third person not charged here) were unanimous in wanting to kill Daniel.  To the extent Troxell takes issue with Yandell including him in that letter, he can elicit facts suggesting that Troxell was unaware of this plot.  But, that is not an antagonistic defense.  Indeed, Troxell can easily be found guilty of the RICO conspiracy and the conspiracy to kill Mickey even if the jury believes he did not

authorize or agree with Yandell to send out word to kill Daniel in that particular letter.  In short, Troxell's severance theory fails because there is no set of facts in this case where Troxell can plausibly claim that he is innocent because of the "exclusive guilt" of Yandell or Sylvester.  *Tootick*, 952 F.2d at 1082.

The same analysis applies to his complaint about evidence involving an effort among the defendants to assault a deputy while they were housed in the Sacramento County Jail during 2019. Evidence will show that Yandell and Sylvester believed a deputy had been disrespectful to them and, in response, they tasked a co-defendant with assaulting a deputy to respond to the perceived disrespect of enterprise members.  Troxell's insistence that he "joined in neither of these plots" is not a basis for severance.  However, it may be perfectly appropriate for "admonitory instructions" so the jury can "collate and appraise the independent evidence against each defendant solely upon the defendant's own acts, statements, and conduct."  *Tootick*, 952 F.2d at 1082; *Roselli*, 432 F.2d at 902 (Court can cure any prejudice by "carefully instruct[ing] the jury about the compartmentalization of the evidence as to each defendant").

Troxell's argument that severance is appropriate because he was targeted as part of internal disputes within the enterprise is undermined by *Fernandez*.  In that case, the defendants argued that there was insufficient evidence to convict them of the racketeering acts because the charged conspiracies to murder various members of the enterprise "were not part of the conduct of the enterprise's affairs, but rather the acts of individuals who had personal feuds with the intended victims."  *Fernandez*, 388 F.3d at 1221.  The Ninth Circuit flatly rejected this argument as a basis to find insufficient evidence to support the convictions, much less a basis to find prejudice requiring severance.

> [T]he argument that conspiracies to murder other members of the enterprise could not be part of the enterprise's affairs is a variation on a theme reprised throughout Appellants' briefs, the central assertion of which is that any violence between factions within an organization either proves that the group was not a RICO enterprise, or that the violence could not be considered a predicate act of the enterprise's racketeering activity. *See, e.g.*, 2002 WL 32302660 at *66, 70, 84. Similar arguments have been flatly rejected by the Second Circuit, and Appellants' argument is inconsistent with the jurisprudence of at least two other circuits.

*Id.* at 1222.  The ensuing discussion in *Fernandez* and the authority cited in the decision undermine Troxell's argument that being targeted for murder by his own enterprise requires severance.  For

example, in *United States v. Pungitore*, 910 F.2d 1084 (3d Cir. 1990) (cited with approval in *Fernandez*), the Third Circuit held that evidence of the enterprise under RICO properly included facts that showed the defendants "killed in response to a member's showing of disloyalty to the organization," and killed "to eliminate a faction of the enterprise's membership which threatened [the defendant's] leadership." *Pungitore*, 910 F.2d at 1100–01.  Thus, even if Troxell is correct that he was targeted by Brady and the enterprise in 2023 for being perceived as disloyal to the Aryan Brotherhood, such evidence is probative to show how the enterprise reacted "in response to a member's showing of disloyalty to the organization." *Id.*  These facts do not support severance under an antagonistic defense theory or demonstrate prejudicial joinder under *Fernandez*.  Moreover, it is more likely that evidence at trial would show that Brady targeted Troxell because Troxell confronted Brady about failing to enforce an expected code within the AB – quintessential enterprise evidence.  For these reasons, defendants' motions to sever should be denied.

## V.     CONCLUSION

The United States respectfully requests that the Court deny the motions to sever filed by Yandell, Sylvester, and Troxell.

PHILLIP A. TALBERT
United States Attorney

Dated:  January 29, 2024                    By:  /s/ *Jason Hitt*
                                                JASON HITT
                                                Assistant United States Attorney