PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>RONALD YANDELL,<br>BILLY SYLVESTER, and<br>DANNY TROXELL,<br><br>　　　　　　Defendants. | CASE NO. 2:19-CR-00107-KJM<br><br>UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO SUPPRESS THE WIRETAP OF YANDELL'S CONTRABAND CELLPHONE<br><br>[ECF 1836] |

The United States respectfully submits its opposition to the motion to suppress the wiretap of a contraband cell phone used by defendants Ronald Yandell ("Yandell") and Billy Sylvester ("Sylvester") (collectively "defendants") in their shared prison cell at CSP–Sacramento during the fall of 2016.  ECF 1836.[1]  Despite two previous rulings finding that Yandell lacks standing to challenge the wiretap because all of his intercepted communications were over a contraband prison cell phone in which he had no expectation of privacy, he has not filed a motion to reconsider.  Order, ECF 1172.  Instead, Yandell filed a suppression motion in which he reiterates previously-rejected arguments.  On the substance, a close reading of defendants' motion seeks to suppress a slice of intercepted calls made by Yandell on his

---

[1] Defendant Danny Troxell filed a joinder to Yandell's suppression motion that does not advance any new or different arguments than those made in Yandell's motion except that he claims he is an aggrieved person under Title III because he was intercepted over Yandell's phone.  ECF 1846.

contraband phone known as Target Telephone 4 between August 11–26, 2016. In making his arguments, Yandell relies on inapposite precedent for suppression and fails to articulate any basis to suppress anything. Based on the applicable statutory provision, 18 U.S.C. § 2517(5), and well-established precedent, the Court should deny defendants' motion.[2]

## I. BACKGROUND

**A. July 2016: the Court authorizes wiretaps for Jeanna Quesenberry's phones as part of DEA's investigation into the Yandell Drug Trafficking Organization operating under the authority of the Aryan Brotherhood**

On July 7, 2016, this Court authorized DEA to intercept communications of Jeanna Quesenberry over two phones she used to distribute and facilitate drug deals based upon the first wiretap affidavit by DEA Special Agent Nehring. The first wiretap affidavit spanned 119 pages and extensively addressed probable cause and necessity for the wiretap. Def. Ex. A, at AB_00027598–AB_00027716 (affidavit); Def. Ex. B (order). In describing the investigative goals in that initial wiretap affidavit, Special Agent Nehring explained that Quesenberry was "a key participant, organizational leader and source of supply for heroin and methamphetamine for the Ronald YANDELL Drug Trafficking Organization ("YANDELL DTO")." Def. Ex. A, at AB_00027605. The affidavit described the YANDELL DTO as "a sophisticated and successful drug trafficking enterprise engaged in the transport and distribution of heroin and methamphetamine throughout the region" that was "believed to be operating under the authority of the Aryan Brotherhood ("AB") prison gang, of which YANDELL is a leading member." *Id.* at AB_00027605–AB_00027606. On July 20, 2016, the Court authorized DEA to intercept communications by Quesenberry over a new phone she began using at that time. Def. Ex. C (affidavit), Def. Ex. D (order). Having intercepted criminal, drug-related calls between Quesenberry and Yandell, DEA sought to move upstream in the investigation. Def. Ex. E, at AB_00028176 (explaining that agents were attempting to "move 'upstream' from QUESENBERRY in the YANDELL DTO and gather evidence against the upper tier of the conspiracy.").

---

[2] Although defendants request an evidentiary hearing, there is no basis to hold one. The facts and law are presented in the parties' exhibits. The Court can make a ruling on the legal issues raised without further briefing or the need to hear from witnesses.

B. **August 2016: the Court authorizes an initial wiretap on Yandell's contraband cell phone as DEA's investigation moves up the hierarchy from Quesenberry to Yandell and the Aryan Brotherhood**

By August 2016, the investigation revealed that "the incarcerated AB member Ronald Dean YANDELL" was directing Quesenberry "outside of prison to distribute heroin and methamphetamine" and, "[t]o facilitate this ongoing drug-trafficking enterprise, YANDELL is using **TARGET TELEPHONE 4** to communicate with his customers, arrange drug deliveries, and coordinate delivery drug loads AB members/associates and to direct this criminal enterprise." Def. Ex. E, at AB_00028155–AB_00028156 (emphasis in original). Through the investigation, agents understood that Yandell and Quesenberry were "using their respective telephones to communicate with suspected Southern California sources of supply and with the Target Subjects to engage in the Subject Offenses, including drug deals, money laundering, and otherwise communicate with the suppliers and co-conspirators in the Yandell Drug Trafficking Organization." *Id.* at AB_00028156. Agents targeted Target Telephone 4, a contraband cellphone possessed by Yandell and Sylvester in their shared cell at CSP–Sacramento. Def. Ex. E, at AB_00038138 (defining target facility and explaining Yandell possessed and used that phone).[3]

On August 10, 2016, the Court authorized interceptions of Yandell's contraband cellphone known as Target Telephone 4. Def. Ex. F, at AB_00028526–AB_000228531.

The Court's Order authorizing interceptions over Target Telephone 4 included the following crimes:

    a.    possession with intent to distribute and distribution of heroin and methamphetamine, and manufacture of marijuana, in violation of 21 U.S.C. § 841;

    b.    conspiracy and attempt to possess with intent to distribute and to distribute heroin and methamphetamine, and manufacture of marijuana, in violation of 21 U.S.C. §§ 841, 846;

    c.    use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b);

---

[3] The affidavit for Target Telephone 4 attached and incorporated by reference the previous two wiretap affidavits targeting Quesenberry's phones. Def. Ex. E, at AB_00028206–AB_00028326 (Attachment A);AB_00028327–AB_00028404 (Attachment B).

    d.  laundering of monetary instruments in violation of 18 U.S.C. §§ 1956 and 1957; and

    e.  maintaining a drug-involved premises, in violation of 21 U.S.C. § 856.

Govt. Ex. A, at AB_00028513.[4]

    When interceptions began on August 11, agents heard Yandell discussing drug-related crimes, as well as plots to murder people targeted by the Aryan Brotherhood, and general enterprise-related business. *See* Govt. Ex. B (First Periodic Report), at AB_00028446–AB_00028451 (detailing calls and corroboration of plot to smuggle drugs into Sylvester during lawyer visit at CSP–Sacramento); *id.* at AB_00028451–AB_00028455 (calls covering Yandell's position on the commission, advice to Burhop on how to control inmates at his prison, plot to kill Kenwood Johnson, concerns about the Mexican Mafia). Although Yandell's criminal activities seamlessly overlapped in many of his conversations, the government promptly alerted the Court in the First Periodic Report that interceptions over Yandell's phone revealed that he used the facility to discuss intertwined crimes that touched upon conspiracies to commit enterprise-related murders, prison gang politics, drug trafficking, and topics related to his position as an AB commissioner. Govt. Ex. B, at AB_00028451 n.1. Specifically, the government provided a detailed explanation of what agents were hearing over Yandell's phone and how "the AB's drug trafficking operations inside and outside of prison are intertwined with violence needed to insure debts are collected and discipline/trust is maintained by the drug trafficking participants, customers, and partners." *Id.* The entire text from the First Periodic Report is reproduced below.

> Evidence gathered to date in this investigation demonstrates that the YANDELL DTO operates under the authority and for the benefit of the Aryan Brotherhood prison gang. Because intercepts over YANDELL's phone regarding AB criminal business, including the prison interdiction at Folsom with DEMAR and MACNAMARA, as well as various planned

---

[4] Defendants do not submit the Court's Order authorizing interceptions over Target Telephone 4 as one of their exhibits. This seems strange given that it is the Order challenged in their motion. In its place, the defendants submit the sanitized Order provided to the phone's service provider which, by design, does not disclose the criminal activities being investigated by federal law enforcement. *Compare* Govt. Ex. A (Order Authorizing Interceptions) *with* Def. Ex. F (Order to Service Provider).

UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS THE YANDELL WIRETAP

4

murders or murders that have occurred in the past on behalf of the AB, are intertwined with the scope and objectives this investigation, this First Periodic Report requests permission to continue monitoring and intercepting future calls of this subject matter, that is, the criminal activities of the AB. As will become clear from the intercepted calls, the AB's drug trafficking operations inside and outside of prison are intertwined with violence needed to insure debts are collected and discipline/trust is maintained by the drug trafficking participants, customers, and partners. Such conversations may constitute predicates offenses under 18 U.S.C. § 2516, including, 18 U.S.C. §§ 1962(d), 1963(a) – Racketeering Conspiracy, 18 U.S.C. § 1959(a)(5) – Conspiracy to Commit Murder in Furtherance of Racketeering, 18 U.S.C. § 1959(a)(6) – Conspiracy to Assault with a Deadly Weapon in Furtherance of Racketeering, 18 U.S.C. § 2 – Aiding and Abetting a Rackeeting [sic] Conspiracy, and related statutes.

*Id.*

In an abundance of caution, the government also applied for an Order expressly authorizing it to intercept Yandell's communications about conspiracies to commit murder, admissions about past murders, and related violent enterprise-based calls. Def. Ex. G, at AB_00028427 –AB_00028435. The Court granted the expansion application on August 26, 2016. Def. Ex. H, at AB_00028432–AB_00028434.

On September 20, 2016, the Court granted an application to continue intercepting Yandell over Target Telephone 4, and initiate a wiretap on a phone used by Travis Burhop. Def. Ex. I.

## II.     ANALYSIS

### A.     Defendants' challenge to the lawful wiretap of Target Telephone 4 is without merit.

"Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, permits law enforcement officials to engage in electronic surveillance if certain privacy safeguards are observed." *United States v. McGuire*, 307 F.3d 1192, 1196 (9th Cir. 2002). A "judge authorizing a wiretap has considerable discretion." *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986). A court should uphold a wiretap if "[l]ooking only to the four corners of the wiretap application . . . there is a substantial basis for these [statutorily-required] findings of probable cause." *United States v. Meling*, 47 F.3d 1546, 1552 (9th Cir. 1995).[5]

---

[5] For convenience and to match with defendants' usage in their brief, the government uses the term "Wiretap Act" to refer to "Title III," and 18 U.S.C. §§ 2510–2520. *United States v. Carey*, 836 F.3d 1092, 1095 (9th Cir. 2016) (describing Title III as being "known colloquially as the Wiretap Act.").

UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS THE YANDELL WIRETAP

5

B. **The law of the case doctrine establishes defendants lack standing to challenge the wiretap of Yandell's contraband cellphone known as Target Telephone 4.**

In this case, the Court has already adjudicated the issue of the defendants' lack of standing to challenge the wiretap of Yandell's contraband cell phone. In a May 2022 Order, Magistrate Judge Claire ruled that Yandell lacks standing to challenge the lawfulness of the wiretap orders in this case, and therefore could not obtain discovery targeted at developing a motion to suppress the wiretap interceptions. Order, ECF 1172, at 5–8. This Court affirmed Judge Claire's ruling. Order, ECF 1365, at 6, 9.

In particular, the Court found that the Fourth Amendment did not permit Yandell to challenge his illegal conversations over a contraband phone because "[s]ociety is unwilling to tolerate cell phones in prison cells, so by definition, it is unwilling to tolerate private conversations on those phones." *Id.* at 6. The Court also rejected standing based upon the "aggrieved person" language in the Wiretap Act. *Id.* at 7. In particular, the Court held that Fourth Amendment standing, "is a prerequisite for a Title III challenge." *Id.*

Despite these rulings, Yandell now seeks to relitigate his standing in order to suppress non-drug related intercepts over Target Telephone 4. "The law of the case doctrine generally precludes a court from reconsidering an issue that has been previously decided by the same court or a higher court in the same case. *United States v. Yandell*, 2023 WL 3378463, at *4 (E.D. Cal. May 11, 2023), *reconsideration denied*, 2023 WL 5597463 (E.D. Cal. Aug. 29, 2023) (citing *United States v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1977)). "For the doctrine to apply, the issue in question must have been decided either explicitly or by necessary implication in the prior disposition." *Id.* (citing *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir.), *cert. denied* 508 U.S. 951 (1993)).

Because this Court previously decided that Yandell did not have standing to challenge the wiretap in this case, that prior ruling is now subject to the law of the case doctrine. That doctrine precludes this Court from revisiting the issue. Thus, the Court should deny Yandell's motion on this ground and, as discussed below, on the merits.

C. **<u>DEA properly targeted Yandell and the Aryan Brotherhood through wiretap authorizations.</u>**

DEA's investigative goals arising out of its investigation of Jeanna Quesenberry broadened in August 2016 as agents sought authorization to wiretap Target Telephone 4 – Yandell's contraband cell phone. The affidavit expressly included the stated investigative goal of targeting the criminal activities of the Aryan Brotherhood criminal enterprise intercepted over Target Telephone 4. Def. Ex. E, at AB_00028141.

> The primary objective of this investigation is to dismantle the YANDELL DTO, including its primary heroin and methamphetamine supplier, distributors, transporters, and individuals associated with YANDELL, QUESENBERRY, the AB and FAIM through the successful identification, arrest, and prosecution of all its participants and conspirators. This Affidavit specifically seeks to further this objective by intercepting communications of Ronald Dean YANDELL over **TARGET TELEPHONE 4** as they relate to the drug trafficking and money laundering activities of QUESENBERRY, the YANDELL DTO and individuals associated with YANDELL, QUESENBERRY, the AB and FAIM in order to obtain evidence necessary to identify QUESENBERRY's and YANDELL's source(s) of supply for controlled substances, specifically heroin and methamphetamine, trafficked by YANDELL, QUESENBERRY, the AB, and identify and arrest the individuals, business entities and/or methods used by the YANDELL DTO, and individuals associated with YANDELL, QUESENBERRY, the AB to launder the proceeds of the YANDELL DTO's drug trafficking.

*Id.* (emphasis in original).

The broad investigative goals in this case are similar to those upheld by the Ninth Circuit when targeting large criminal organizations. *United States v. Shryock*, 342 F.3d 948 (9th Cir. 2003) (wiretap targeting Mexican Mafia prison gang). A district court "has considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy." *United States v. Reed*, 575 F.3d 900, 909 (9th Cir. 2009). The Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension and prosecution of . . . other satellite conspirators." *Id.* at 909–10.

In *Shyrock*, the government targeted the Mexican Mafia using, among other investigative techniques, wiretaps. *Shryock*, 342 F.3d at 976. In assessing necessity, the court described the Mexican Mafia "as a broad based organization with several hundred members and an unknown number of

associates." *Id.* As in *Shryock*, the 73-page wiretap affidavit of DEA Special Agent Brian Nehrhing (which attached and incorporated the initial 119-page affidavit for Quesenberry's phone, and a subsequent 78-page affidavit for a second Quesenberry phone), Def. Ex. E, at AB_00028206–AB_00028326 (Attachment A);AB_00028327–AB_00028404 (Attachment B), explained that the investigation sought to "dismantle the YANDELL DTO, including its primary heroin and methamphetamine supplier, distributors, transporters, and individuals associated with YANDELL, QUESENBERRY, the AB and FAIM through the successful identification, arrest, and prosecution of all its participants and conspirators." Def. Ex. E, at AB_00028141.

To further this objective, the wiretap specifically sought to intercept Yandell's communications over Target Telephone 4 "as they relate to the drug trafficking and money laundering activities of QUESENBERRY, the YANDELL DTO and individuals associated with YANDELL, QUESENBERRY, the AB and FAIM in order to obtain evidence necessary to identify QUESENBERRY's and YANDELL's source(s) of supply for controlled substances, specifically heroin and methamphetamine, trafficked by YANDELL, QUESENBERRY, the AB, and identify and arrest the individuals, business entities and/or methods used by the YANDELL DTO, and individuals associated with YANDELL, QUESENBERRY, the AB to launder the proceeds of the YANDELL DTO's drug trafficking." *Id.* The crimes authorized included drug trafficking of heroin, methamphetamine, and marijuana, conspiracy to commit the same crimes, use of communication facilities to further drug trafficking crimes, money laundering, and maintaining a drug-involved premises. Govt. Ex. A, at AB_00028513.

Thus, the initial affidavit for Target Telephone 4 presented probable cause of the drug trafficking crimes uncovered to date but expressly articulated that the investigation would likely expand because it was moving upstream from Quesenberry to Yandell who was known to be a prominent member of the Aryan Brotherhood at the time. Thus, the government properly used wiretaps to target Yandell and the AB because, like the group in *Shryock*, sources and cooperating witnesses "could not possibly reveal the full nature and extent of the enterprise and its countless, and at times disjointed, criminal tentacles." *Shryock*, 342 F.3d, 976. Moreover, once the interceptions uncovered crimes of enterprise-related violence, the government took appropriate precautionary measures to ensure its interceptions were

1  authorized by this Court.

2  For context, at the time of the affidavit for Target Telephone 4 was submitted, evidence gathered from intercepts over Quesenberry's phone did not include visibility into Yandell's communications with other AB members about violence or enterprise-related topics. Yandell did not engage in such conversations with Quesenberry when agents intercepted him talking with her during wiretaps on her phones. However, as soon as interceptions over Target Telephone 4 revealed that Yandell's drug-related communications were interwoven with violent racketeering acts and enterprise-related politics, the government promptly apprised the Court in the First Periodic Report submitted for Target Telephone 4. Govt. Ex. B, at AB_00028451 n.1. The government also applied for expanded authority to intercept Yandell's enterprise-related calls and the Court granted that application. Def. Ex. G; Def. Ex. H, at AB_00028432–AB_00028434.

Accordingly, the Court did not abuse its discretion in finding that the wiretap was necessary to identify the full scope of the Yandell DTO, including AB members and associates who were facilitating its criminal activities and "develop an effective case" against its members. *Reed*, 575 F.3d at 910.

### D. Under the Wiretap Act, DEA was authorized to intercept Yandell's criminal conversations that were interwoven and arose directly out of crimes specified in the wiretap application.

Electronic surveillance that uncovers evidence of additional crimes "interwoven" or arising directly out of the original crimes specified in the wiretap application does not require a new wiretap authorization. The rationale for this rule is that the original wiretap authorization encompasses the additional crimes. *United States v. Bennett*, 219 F.3d 1117, 1123 (9th Cir. 2000) (denying suppression where drug conspiracy wiretap uncovered murder-for-hire plot because reason for killing "was interwoven" with drug operation); *United States v. Petti*, 973 F.2d 1441, 1446 (9th Cir. 1992) (denying suppression because facts that justified wiretapping phones for gambling scheme investigation justified tapping the same phones when used to further money laundering of drug money); *United States v. Ortega*, 520 F. App'x 626, 629 (9th Cir. 2013) (unpublished) (holding that additional judicial authorization was not required where "kidnapping was not listed as one of the target offenses in the wiretap authorization," but "the kidnapping 'arose out of and was closely related to' the targeted narcotics and money laundering offenses"); *United States v. Homick*, 964 F.2d 899, 904 (9th Cir. 1992)

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS THE YANDELL WIRETAP

9

(explaining that suppression was inappropriate where wiretap surveillance uncovered new crime that "arose out of and was closely related to one of the original crimes specified in the wiretap application," and noting government "the government kept the court apprised of that information").

In this case, interceptions were authorized and Yandell's enterprise-related calls were intercepted pursuant to that lawful authority; the government promptly notified the Court of the violence- and enterprise-related calls; and, the government obtained the Court's explicit authorization to intercept these calls. As a result, suppression is not an available remedy.

The original DEA affidavit explained that the "primary objective of the investigation was to "dismantle the YANDELL DTO, including its primary heroin and methamphetamine supplier, distributors, transporters, and individuals associated with YANDELL, QUESENBERRY, the AB and FAIM through the successful identification, arrest, and prosecution of all its participants and conspirators." Def. Ex. E, at AB_00028141. At the time of the affidavit, DEA developed ample probable cause and necessity to demonstrate Yandell and his co-conspirators were heavily involved in large-scale heroin and methamphetamine trafficking. *Id.* But, the investigation had not yet uncovered the full scope and scale of Yandell and the Aryan Brotherhood's criminal activities.

Where, as here, the investigation involves "a wide-ranging conspiracy with large numbers of participants," *Bennett*, 219 F.3d at 1124, the Supreme Court has acknowledged that "more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise." *Scott v. United States*, 436 U.S. 128, 140 (1978) ("[W]hen the investigation is focusing on what is thought to be a widespread conspiracy more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise").

The intercepted calls detailed in the First Periodic Report make plain that Yandell's communications weaved drug trafficking, murder, and AB business when talking to Matt Hall, Samuel Keeton, Travis Burhop, Brant Daniel, Danny Troxell, and others. Govt Ex. A, at AB_00028446–AB_00028472. Indeed, the calls revealed that Yandell's drug trafficking operation was "part and parcel" of his Aryan Brotherhood activities because it involved participants who were all AB associates or members and Yandell sought to enrich himself, Sylvester, and others from the proceeds they made from their drug dealing.

For example, the calls revealed the following: AB associate Travis Burhop was a drug supplier for Yandell, AB associate Samuel Keeton transported drugs from Burhop up to Quesenberry in Sacramento and Keeton collected drug money for Yandell; meanwhile, AB associate Matt Hall transported drugs to Sacramento and elsewhere while discussing his hope that Yandell would sponsor him for AB membership and complaining about AB member Kenwood Johnson.  The interconnectedness of Yandell's criminal behaviors is detailed in the First Periodic Report.

> The Investigating Agencies in this case have corroborated the theory that YANDELL is a key participant, organizational leader, and source of supply for heroin and methamphetamine for the YANDELL DTO, as well as confirming that YANDELL is a leader of the Aryan Brotherhood and on the three-man Commission. Agents continue to attempt to identify the names, roles, and interrelated relationships of all the co-conspirators, their drug stash locations, and sources of supply, through intercepts over **TARGET TELEPHONE 4**, physical surveillance, GPS tracking data, pen registers, and other investigative techniques useful in this investigation.  As explained above, the YANDELL DTO operates under the authority and for the benefit of the Aryan Brotherhood prison gang. Because intercepts over YANDELL's phone regarding AB criminal business, including the prison interdiction at Folsom with DEMAR and MACNAMARA, as well as various planned murders or murders that have occurred in the past on behalf of the AB, are intertwined with the scope and objectives this investigation, the AB's drug trafficking operations inside and outside of prison are intertwined with violence needed to insure debts are collected and discipline/trust is maintained by the drug trafficking participants, customers, and partners.  Continued interceptions will assist in furthering the goals of this investigation and potentially assist authorities in intervening in acts of violence.

Govt. Ex. B, at AB_00028472 –AB_00028473 (emphasis in original).  Thus, from the outset, the government was transparent about what was happening on the wiretap and what it expected to learn from future interceptions.

The facts of *Homick* demonstrate how even more-attenuated interceptions remain admissible when they capture crimes that are not specifically identified in the wiretap order.  In *Homick*, law enforcement officers obtained wiretap authorization to investigate a robbery and murders. 964 F.2d at 901.  During execution of a search warrant, officers recovered a ring that had been stolen during the robbery under investigation. *Id.* at 901–02.  One of the defendants claimed ownership of the ring, and the police informed him that he would have to present some evidence of ownership in order to reclaim it.  *Id.* at 902.  Officers intercepted conversations involving some of the defendants "discuss[ing] possible methods of recovering the ring from the police," including conversations discussing the

wording of an affidavit regarding the alleged ownership. *Id.* The defendants were ultimately convicted of conspiracy to commit wire fraud. *Id.* The Ninth Circuit noted that "[b]ecause the attempt to obtain the ring [from the police] arose out of and was closely related to one of the original crimes specified in the wiretap application," it was "not convinced that the wire fraud offense falls within the 'other offenses' provision" of 18 U.S.C. § 2517(5). *Id.* at 904.

Here, Yandell's Aryan Brotherhood membership played an even more direct role in his drug trafficking than the attenuated facts described in *Homick*. *See* ECF 1, at 36–50, 72–74, 83–86, 86–89, 98–101, 119–124, 128–130 (detailing extensive drug trafficking captured during the wiretaps involving AB members and associates that arose directly out of conversations Yandell had with Hall, Burhop, Keeton, Quesenberry, Demar, and others). The wiretap investigation in this case was oriented toward gathering evidence of a wide-ranging conspiracy involving Yandell's drug trafficking activities that directly benefited Aryan Brotherhood members and the drug crimes were being committed by them – including Yandell, Sylvester, and Burhop. Thus, under existing precedent, the government took a cautious approach by seeking the Court's express permission to continue intercepting the enterprise-related calls. The government was not required to make a new showing of probable cause and necessity because Yandell's calls over Target Telephone 4 demonstrated unequivocally that his drug trafficking operation arose directly from his other interwoven criminal enterprise activities. As such, defendants' suppression theories fail.

Nevertheless, even if Yandell's violence-related calls involved "other offenses," this Court can properly admit them into evidence because the government complied with the requirements of 18 U.S.C. § 2517(5). Congress intended that judicial approval be retroactively granted under § 2517(5) upon a showing that "the original order was lawfully obtained, that it [was] sought in good faith and not as a subterfuge search, and that the communication was in fact incidentally intercepted during the course of a lawfully executed order." *United States v. Masciarelli*, 558 F.2d 1064, 1068 (2d Cir. 1977) (quoting S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S. Code Cong. & Admin. News p.2189); *see United States v. London*, 66 F.3d 1227, 1234 (1st Cir. 1995) (where intercepted conversation relates to both an offense specified in the authorization order and an unspecified offense, "the interception is unlawful only when it is motivated by an illicit purpose -- e.g., 'subterfuge' interceptions where the

government applies to intercept conversations relating to offenses specified in 18 U.S.C. § 2516(1)(a)-(o) while intending to intercept conversations relating to offenses for which interceptions are unauthorized or for which it has no probable cause to obtain an interception order"). Supplemental court authorization need not be express; it may be implied. *Masciarelli*, 558 F.3d at 1068.

Defendants present no evidence that the government had an illicit purpose in intercepting the calls concerning the AB criminal enterprise's activities. Indeed, the affidavit expressly stated that its primary objective was to "dismantle the YANDELL DTO, including its primary heroin and methamphetamine supplier, distributors, transporters, and individuals associated with YANDELL, QUESENBERRY, *the AB* and FAIM through the successful identification, arrest, and prosecution of all its participants and conspirators." Def. Ex. E, at AB_00028141 (emphasis added). Thus, since the "original order was lawfully obtained" and was "sought in good faith and not as a subterfuge search," then communications "incidentally intercepted during the course of a lawfully executed order" are admissible. *Masciarelli*, 558 F.2d at 1068.

Furthermore, the government complied with the requirements of § 2517(5) by promptly notifying the Court in the First Periodic Report that DEA was intercepting calls related to violence and AB-related enterprise activities. Govt. Ex. B, at AB_00028451 n.1. In an abundance of caution, the government also applied for, and received, expanded authority to intercept Yandell's enterprise-related calls. Def. Ex. G; Def. Ex. H, at AB_00028432–AB_00028434; *see Homick*, 964 F.2d at 904 (government complies with § 2517(5) if it notifies the supervising court of the intercepted evidence in other filings related to the wiretap). Here, the Court expressly authorized the government to continue intercepting enterprise-based calls. Def. Ex. H, at AB_00028432–AB_00028434. Given this undisputed history, such calls are therefore admissible at trial. *See London*, 66 F.3d at 1235; *Masciarelli*, 558 F.2d at 1068.

Finally, even assuming that the government violated the requirements of § 2517(5), suppression is not the proper remedy. Under 18 U.S.C. § 2518(10), "[t]he sanction of suppression is limited to cases in which the government has illegally intercepted evidence . . . [A] suit for damages as provided by 18 U.S.C. § 2520, rather than suppression of evidence, [is] the exclusive remedy for unauthorized disclosures of wiretaps in violation of § 2517." *United States v. Davis*, 780 F.2d 838, 846 (10th Cir.

1985) (holding that government's failure to secure additional authorization under § 2517(5) did not require suppression); *accord United States v. Barnes*, 47 F.3d 963, 965 (8th Cir. 1995). Here, Yandell's violence-related calls were not illegally intercepted. In these circumstances, suppression is not permitted under the Wiretap Act.

E. **Defendants' conflate an "extension" order for a new wiretap with the expanded authority this Court authorized during the wiretap of Target Telephone 4.**

Defendants contend that, even with the government receiving expanded authority during the wiretap, they are somehow entitled to have non-drug-related enterprise calls suppressed in the period between August 11 (when the first calls over Target Telephone 4 occurred) and August 26 (the date of the order expanding authority). Defendants go further and argue that the application and expansion Order were faulty because the "application for expansion contained no sworn affidavit showing probable cause or necessity, in violation of the Wiretap Act." ECF 1836, at 16. As discussed in detail below, this fundamentally misapprehends the Wiretap Act and how authority to intercept calls under a valid wiretap order works.

The critical error in defendants' argument arises from their confusion over terminology used in wiretap precedent. *See* ECF 1836, at 17 (misidentifying the expansion application and Order in this case with a wiretap "extension order."). This mistake results in their suppression theory being fatally flawed. The specific error is conflating a wiretap "extension order" with what the government sought and obtained in this case: expanded authority on an existing, valid wiretap order. Stated another way, the government did not need or seek a wiretap "extension order" during the initial wiretap of Target Telephone 4.

A wiretap extension is sought when an initial wiretap has expired by its terms and the government seeks a new period of interception under the Wiretap Act. *See United States v. Carneiro*, 861 F.2d 1171, 1182 (9th Cir. 1988) ("The Boyd wiretap terminated on April 24, 1986. Five days later, on April 29, 1986, the government applied for an extension of the wiretap."); 18 U.S.C. § 2518(1)(f) ("where the application is for the extension of an order, a statement setting forth the results thus far obtained from the interception, or a reasonable explanation of the failure to obtain such results."). Here, the government did not seek an extension of Target Telephone 4; instead, it sought *expansion* of the

UNITED STATES' OPPOSITION TO MOTION TO SUPPRESS THE YANDELL WIRETAP

14

authority on the existing authorized wiretap for Target Telephone 4.  This is true because the Court's Order authorizing expanded authority was not an extension of a previously-terminated wiretap.  Instead, by its terms, the initial wiretap on Target Telephone 4 was authorized for a 30-day period that began on August 11, 2016, when the first intercepted call occurred.  Govt. Ex. B, at AB_00028444.

The critical distinction between an "extension order" for a new wiretap and the expanded authority granted by this Court on an already-authorized wiretap explains why defendants' caselaw is inapposite. By conflating an "extension order" with the expanded authority granted in this case, defendants undermine any basis for suppression.  Indeed, each of the cases cited on page 17 of their brief reinforce this error.  As an example, defendants argue, "The August 26 nine-page expansion application fails Step One of the wiretap suppression analysis: without a sworn affidavit, the application lacked the necessary factual information showing probable cause and necessity to support issuance of the interception order." ECF 1836, at 17.  (citing *Christie*, 825 F.3d at 1066–69, and *Staves*, 383 F.3d at 981).  As explained in the footnote, each of these cases contain a basic explanation of the requirements for a wiretap (probable cause and necessity) when the government seeks either an initial wiretap or seeks to continue intercepting calls after a previous wiretap has expired.[6]  That is not at issue in this case.  Because the government did not need or seek an extension of an expired wiretap on Target Telephone 4 during the August 2016 interceptions, it was not required to make a new showing of probable cause or necessity when it sought expanded authority for interwoven crimes intercepted over Target Telephone 4.

Defendants compound their error and argue that the separate, independent wiretap application for an extension on Target Telephone 4 are "fruits of the poisonous tree" and must be suppressed.  ECF 1836, at 18 ("Unfortunately for the government, this September 21, 2016 application is fatally contaminated with the fruit of the poisonous tree: unlawful interceptions from previous applications and

---

[6]   In particular, each of the cases cited on page 17 discuss the unremarkable proposition that when the government seeks either an initial wiretap or a new period of wiretap interception after a previous wiretap has expired, the new application must meet the requirements of probable cause and necessity. *Brone*, 792 F.2d at 1506 ("The statute provides for extensions of wiretap orders. The issuing court is required to make the same findings for an extension order as it is for an original order."); *United States v. Garcia-Villalba*, 585 F.3d 1223, 1230 (9th Cir. 2009)  (explaining that "[e]ach wiretap application must separately satisfy the necessity requirement."); *United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016) (describing court authorizing initial wiretaps over two phones of one target, and then government "obtained an extension of those wiretaps and an authorization to tap" another target's phone); *United States v. Staves*, 383 F.3d 977, 981 (9th Cir. 2004) (discussing 49-page affidavit for single wiretap and finding it satisfied probable cause and necessity requirements).

UNITED STATES' OPPOSITION TO MOTION TO
SUPPRESS THE YANDELL WIRETAP

15

orders that did not meet the legal requirements of the Wiretap Act."). As discussed above, defendants misapprehend how the Wiretap Act works and the government complied with it. An independent analysis of the September 21, 2016 affidavit demonstrates that it presents ample probable cause and necessity to support the Court's authorization to wiretap Yandell's phone. In short, the government was entitled to rely on interceptions from the initial wiretap on Target Telephone 4 because it was done in compliance with the Wiretap Act.

      **F.**      **Defendants' reliance on *Carey* is inapposite – nothing like *Carey* occurred in this investigation.**

Defendants' heavy reliance on *Carey* is misplaced because the issue in that case is readily distinguishable from the facts in this case. In *Carey*, the Court examined whether 18 U.S.C. § 2517(5) authorized "officers to listen to *people* who were *unaffiliated* with *the initial wiretap subjects*." *Carey*, 836 F.3d at 1096 (emphasis added). In the same sentence, the Ninth Circuit restated a familiar principle that is dispositive on this motion: "[T]he Wiretap Act allows officials to intercept and use calls 'relating to offenses other than those specified in the order of authorization or approval.'" *Id.* (quoting 18 U.S.C. § 2517(5)). Here, it is undisputed that Yandell was a person affiliated, identified, and targeted along with Quesenberry and the other initial wiretap subjects. This stands in stark contrast to problem in *Carey*: namely, the "wiretap order was used to obtain evidence of an *unrelated person's* crime." *Id.* (emphasis added).

In contrast to *Carey*, agents in this case did not face the problem of realizing during the investigation that Yandell was not the person using the wiretapped phone, or that he "was not the person "authorized to be wiretapped," nor did they ultimately discover that Yandell "had no connection" to the wiretap target – indeed, he was the wiretap target and he regularly used Target Telephone 4. *Carey*, 836 F.3d at 1093, 1094. In addition, unlike *Carey*, agents in this case never knew that they were "listening to conversations outside the scope of the wiretap order," because that didn't happen during this investigation. *Carey*, 836 F.3d at 1098. Instead, agents heard Yandell, an authorized interceptee and the focus of the investigation, communicating about multiple crimes within the scope of the authorized wiretap. Thus, in contrast to *Carey*, there was never a reason to discontinue monitoring the wiretap and secure a new wiretap order.

Moreover, unlike *Carey*, agents in this case did not "know[] or reasonably [] know that the person speaking on the tapped line is not involved in the target conspiracy." *Carey*, 836 F.3d at 1098. Yandell was the correct person using Target Telephone 4 and he was the center of the drug trafficking conspiracy being investigated. Def. Ex. E, at AB_00028141. Dismantling the Aryan Brotherhood criminal enterprise's members and associates was always an explicitly-stated goal of the investigation. Def. Ex. E, at AB_00028141. Thus, the Wiretap Act did not require agents to cease monitoring the wire and seek a new wiretap order, unlike the circumstances detailed in *Carey*.

Even if the agents were somehow required to seek a new wiretap with a showing of probable cause and necessity in order to intercept enterprise-related violence, the *Carey* decision held that "police may use evidence obtained in 'plain hearing' when they overhear speakers unrelated to the target conspiracy while listening to a valid wiretap, without having complied with the Wiretap Act requirements of probable cause and necessity as to those specific speakers." *Id.* at 1093–94. Defendants' attempt to liken *Carey* to this case is unavailing.

Specifically, defendants argue, "Like *Carey*, agents listening for evidence of one conspiracy (authorized by a wiretap order) heard evidence of a different conspiracy (not authorized by a wiretap order)." ECF 1836, at 21. Building on this argument, defendants claim, "Like *Carey*, once the agents heard that evidence they did not stop, but continued listening to the calls unabated." *Id.* As discussed, the law did not require the government to obtain a new wiretap order when it heard crimes arising out of the drug trafficking conspiracy established to obtain the wiretap. *Bennett*, 219 F.3d at 1123; *Petti*, 973 F.2d at 1446; *Ortega*, 520 F. App'x at 629; *Homick*, 964 F.2d at 904. Applying the "plain hearing" rule announced in *Carey* to defendants' arguments in this case, there can be no question that DEA was permitted to intercept Yandell talking about enterprise-related violence because they complied with the Wiretap Act and obtained a valid order to intercept Yandell talking about drug trafficking crimes, as well as extensive enterprise-based criminal acts. *Carey*, 836 F.3d at 1093–94.

### III. CONCLUSION

The United States respectfully requests that the Court deny defendants' motion to suppress the wiretap of Yandell's contraband cell phone known as Target Telephone 4.

Dated: February 5, 2024

PHILLIP A. TALBERT
United States Attorney

By: /s/ *Jason Hitt*
JASON HITT
Assistant United States Attorney