PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>     v.<br><br>RONALD YANDELL,<br>BILLY SYLVESTER, and<br>DANNY TROXELL,<br><br>               Defendants. | CASE NO. 2:19-CR-00107-KJM<br><br>UNITED STATES' OPPOSITION TO MOTION TO QUASH WRITS OF HABEAS CORPUS *AD PROSEQUENDUM* AND/OR TO DISMISS FOR VINDICTIVE PROSECUTION<br><br>[ECF 1801]<br><br>DATE: February 9, 2024<br>TIME: 9:00 a.m.<br>COURT: Hon. Kimberly J. Mueller |

The United States respectfully submits its opposition to defendants Ronald Yandell's and Billy Sylvester's motion, filed January 12, 2024, to quash the writs of habeas corpus *ad prosequendum* and/or to dismiss for vindictive prosecution. ECF 1801 (Motion). Defendant Danny Troxell joined in the motion on January 16, 2024. ECF 1806.

## I.    INTRODUCTION

The impetus for this federal RICO case was straightforward. As part of its investigation into the drug trafficking activities of Jeanna Quesenberry, DEA agents obtained a wiretap order for the contraband prison cellphone used by her drug source of supply, Ronald Yandell. ECF 1, at 1–2, 37–42 (explaining the origins of DEA's drug trafficking investigation leading to wiretaps). During the wiretaps of Yandell's phone in the fall of 2016, agents intercepted communications revealing that he

was a key organizational leader for multiple racketeering acts committed on behalf of the Aryan Brotherhood, including murders, attempted murders, and conspiracies to commit murder, as well as extensive drug trafficking. ECF 1, at 1–2. The wiretap investigation revealed the involvement of other AB members, including Sylvester and Troxell, and AB associates in these RICO crimes. *See generally* ECF 1, at 28–37, 75–79. This federal RICO prosecution followed.

Defendants first challenge the lawfulness of the *ad prosequendum* writs used to transfer them from state to federal custody to face these charges. Defendants do not argue that the writs were improper to secure their appearance and maintain them in federal custody for this prosecution. Instead, they raise an issue that is not yet ripe and that, in any event, they lack standing to raise—where they will serve their prison sentences if convicted in this case, federal or state prison. Defendants want to return to state custody, where they committed the crimes that led to this case, even if they are convicted. The law is clear, however: where an individual is subject to both federal and state prison sentences, it is left to the discretion of executives within the separate federal and state sovereigns to decide which sentence will be served first. The prisoner has no legal right to be heard on the issue.

Defendants also claim, without evidence, that the motivation for this prosecution was vindictive retaliation for the *Ashker* lawsuit that settled in 2015, rather than the extensive wiretap evidence of their RICO conspiracy and related crimes that was obtained in late 2016. Defendants are incorrect. They fail to show actual vindictiveness or any appearance of vindictiveness, and thus their vindictive prosecution claim fails.

## II.   FACTUAL BACKGROUND

The criminal complaint affidavit describes the investigation in this case and how it transformed from a federal drug trafficking investigation focused on a street gang into a federal RICO investigation of the Aryan Brotherhood prison gang when, in late 2016, DEA began intercepting Yandell's cellphone calls. The complaint affidavit provides the following summary:

> 1.  In late 2014, law enforcement officers began investigating a group of northern California drug traffickers who were members or associates of a criminal organization known as Family Affiliated Irish Mafia ("FAIM"). As the investigation progressed, agents learned that one important FAIM member, Jeanna QUESENBERRY, was distributing multiple kilograms of methamphetamine and multiple ounces of heroin in the Sacramento area.

    2. Federal agents used undercover drug purchases, federal wiretaps, and other investigative techniques to develop evidence that QUESENBERRY worked directly for Ronald YANDELL, an influential and incarcerated member of the Aryan Brotherhood prison gang (the "AB," "Aryan Brotherhood," or the "enterprise").  As discussed in more detail below, wiretaps on YANDELL's contraband prison phone revealed during the fall of 2016 that he was a key organizational leader for multiple racketeering acts committed for the benefit of the Aryan Brotherhood.

    3. Intercepts of YANDELL's phone provided critical evidence of the inner workings of the Aryan Brotherhood.  His conversations also revealed an ongoing drug trafficking conspiracy.  They also revealed an ongoing conspiracy to commit a single racketeering offense on behalf of the Aryan Brotherhood, a violation of 18 U.S.C. § 1962(d).  Within that ongoing conspiracy, the Investigating Agencies gathered evidence of multiple racketeering offenses, enumerated in 18 U.S.C. § 1961.  These racketeering offenses included murder and attempted murder.  They also included the manufacture, distribution, and possession with intent to distribute heroin, methamphetamine, and marijuana.  Finally, they included the conspiracy and attempt to commit such violations, all in violation of 21 U.S.C. §§ 841, 843, 846.

ECF 1, at 16–17.

  The *Ashker* settlement, to be sure, did play an indirect role in bringing about this case—but not in the way defendants claim it did.  As a result of the October 2015 *Ashker* settlement, Yandell and other AB leaders were released from the Pelican Bay SHU to less restrictive general population prisons.  *Id.* at 23–27.  Yandell was transferred to Folsom prison, where he obtained contraband cellphones, including the one that DEA intercepted on the wiretap in late 2016.  *See id.*

  Defendants were charged by criminal complaint on May 21, 2019, and by indictment on June 14, 2019, with participation in a RICO conspiracy and related crimes.  *See id.*; ECF 25 (Indictment).

  In the lead up to these charges, in August 2018, the California Department of Corrections and Rehabilitation ("CDCR"), through a letter signed by its Secretary, agreed to relinquish primary jurisdiction over defendants to the Bureau of Prisons to serve any federal sentences imposed in this case, without any return to state custody prior to the conclusion of those sentences.  *See* Exhibit 1, CDCR Letter (submitted under seal).

  On June 19, 2019, upon application of the United States, the Honorable Allison Claire, U.S. Magistrate Judge, issued writs of habeas corpus *ad prosequendum* for defendants.  *See* ECF Nos. 49 (Sylvester), 50 (Troxell), 51 (Yandell).  Consistent with the commitment of CDCR to relinquish primary

USA OPP'N TO MOTION TO QUASH WRITS AND/OR TO DISMISS FOR VINDICTIVE PROSECUTION

3

jurisdiction, the writs provide that defendants will "be retained in federal custody until final disposition of federal charges and federal prison sentence, if any, has been served." *Id.*

### III. ARGUMENT

**A. Defendants have no legal right to challenge the writs and provide no basis to quash them.**

Defendants do not argue any impropriety in the issuance of *ad prosequendum* writs to transfer them to and keep them in federal custody for the duration of this prosecution. Instead, fixating on the language that they shall remain in federal custody until their "federal prison sentence[s], if any, ha[ve] been served," defendants take aim at a hypothetical future issue—where they will be imprisoned, federal or state, if they are convicted in this case. ECF 1801, at 14–18. But defendants have no right to raise this issue in this Court, or in any other court. And courts have no role in the decision of which sovereign, federal or state, takes custody of a prisoner subject to prison sentences with both.

"Determination of priority of custody and service of sentence between state and federal sovereigns is a matter of comity to be resolved by the executive branches of the two sovereigns." *United States v. Warren*, 610 F.2d 680, 684 (9th Cir. 1980). Although priority of jurisdiction typically rests with the sovereign who first arrests an individual, "the sovereign with priority of jurisdiction … may elect under the doctrine of comity to relinquish it to another sovereign." *Id.* at 684–85. "This discretionary election is an executive, and not a judicial, function." *Id.* at 685 (citing *Ponzi v. Fessenden*, 258 U.S. 254, 261–62 (1922)).

Accordingly, it is settled law that a prisoner has no right to complain, and courts have no right to interfere, with executive decisions regarding which sovereign exercises priority of jurisdiction. "It is well recognized rule of law that a person who has violated the criminal statutes of both the Federal and State Government may not complain of the order in which he is tried or punished for such offenses." *Gunton v. Squier*, 185 F.2d 470, 471 (9th Cir. 1950); *see also Ponzi*, 258 U.S. at 260 ("He may not complain if one sovereignty waives its strict right to exclusive custody of him for vindication of its laws in order that the other may also subject him to conviction of crime against it. … Such a waiver is a matter that addresses itself solely to the discretion of the sovereignty making it."); *Stamphill v. Johnston*, 136 F.2d 291, 292 (9th Cir. 1943) ("the arrangement made between the two sovereigns, the state and

federal governments, does not concern the defendant who has violated the laws of each sovereignty and he cannot in his own right demand priority for the judgment of either").

Applying these principles, the Ninth Circuit has held that an Arizona death row inmate, Michael Poland, could not challenge the federal government's transfer of him from federal prison to the custody of the State of Arizona so that Arizona could execute its death sentence. *See Poland v. Stewart*, 117 F. 3d 1094, 1097–98 (9th Cir. 1997). Poland argued that Arizona could not execute him until his federal sentence had "expired." *Id.* at 1097. Relying on *Ponzi*, *Warren*, *Gunton*, and *Stamphill*, the Ninth Circuit held that the federal government's decision to relinquish Poland to Arizona authorities was an unreviewable executive decision and that "neither Poland nor this court is in a position" to question it. *Id.* at 1098.

In light of this binding authority, defendants have no right to litigate the issue of where they will serve their sentences, federal or state prison, if convicted in this case. Thus, their motion to quash the writs must be denied.

**B.  Defendants fail to carry their burden to demonstrate through objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights.**

Vindictive prosecution exists "only when prosecutorial actions stem from an animus toward the exercise of a defendant's rights." *United States v. Gallegos-Curiel*, 681 F.2d 1164, 1169 (9th Cir. 1982). Defendants must show either direct evidence of a vindictive motive or establish a presumption of vindictiveness. *United States v. Goodwin*, 457 U.S. 368, 380–81 (1982). "The presumption [of vindictiveness] applies only to the extent it reflects the very real likelihood of actual vindictiveness." *Gallegos-Curiel*, 681 F.2d at 1167. "A sequence of events is not enough; the likelihood of retaliation is crucial." *Id.* at 1171. A prosecutor is especially free prior to trial to exercise discretion in how he goes about prosecuting cases. *See Goodwin*, 457 U.S. at 382 ("A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution.").

1. <u>Defendants have no evidence of actual vindictiveness.</u>

"To prove actual vindictiveness requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights." *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002). Such a showing is "exceedingly difficult to make." *Id.*

Defendants argue that this prosecution was vindictive because its purpose was to retaliate against defendants "because of [*sic*] they exercised their constitutional rights in the *Ashker* litigation." ECF 1801, at 18. But they point to no evidence to support this claim, and none exists because it is categorically false. This prosecution was brought after the defendants were intercepted on DEA wiretaps committing, and confessing to having committed, the most serious of federal crimes—including murder in aid of racketeering, which carries only two possible sentences: death or a mandatory life sentence, with no possibility of parole. *See* 18 U.S.C. § 1959(a)(1).

The only purported evidence defendants cite is a statement by AUSA Hitt during a debrief that one rationale for this prosecution is to provide additional consequences for validated gang members. ECF 1801, at 19. There is nothing remarkable and certainly nothing vindictive in this statement. It references legitimate prosecutorial considerations—ensuring consequences for serious crimes and focusing on the most culpable offenders, such as the leaders of criminal organizations. *See, e.g.,* Justice Manual 9.27.230 (Principles of Federal Prosecution; Substantial Federal Interest). These considerations were particularly appropriate in this case in light of the extensive evidence from the wiretap and subsequent investigation showing that the defendants were all influential AB members, or "shot callers," who not only committed the most serious of federal crimes but also directed others to do so.

2. <u>No presumption of vindictiveness applies.</u>

A presumption of vindictiveness is "severe" and should not be inferred lightly. *Gallegos-Curiel*, 681 F.2d at 1168. It is warranted "only where, as a practical matter, there is a realistic or reasonable likelihood of prosecutorial conduct that would not have occurred but for hostility or a punitive animus towards the defendant because he has exercised his specific legal rights." *Id.* at 1169. A "reasonable likelihood of vindictiveness" exists only where the charges were "'more likely than not attributable to the vindictiveness on the part of' the Government." *Gary*, 291 F.3d at 34 (quoting *Alabama v. Smith*, 490 U.S. 794, 801 (1989)). Where "charges are filed in the routine course of prosecutorial review or as

1  a result of continuing investigation …, there is no realistic likelihood of prosecutorial abuse, and
2  therefore no appearance of vindictive prosecution arises." *Gallegos-Curiel*, 681 F.2d at 1169 (citing
3  *United States v. Griffin*, 617 F.2d 1342, 1347 (9th Cir. 1980)).

4        Here, nothing about the "circumstances" leading to the charges "give rise to an appearance" or
5  "reasonable likelihood" of vindictiveness. *Id.* at 1168. As explained, the *Ashker* settlement was reached
6  in 2015, following years of litigation. About a year *after* the settlement, DEA began intercepting calls
7  on Yandell's contraband prison cellphone, and arriving there only after buying drugs from Quesenberry
8  on the streets of Sacramento. The wiretap interceptions revealed extensive and detailed discussions
9  about active murder plots that had to be thwarted by moving intended victims to safety, admissions
10 about past murders on behalf of the Aryan Brotherhood, and other calls discussing the ongoing affairs of
11 the Aryan Brotherhood. Because the charges in this case were the "result of [this] continuing
12 investigation … no appearance of vindictive prosecution arises." *Id.* at 1169.

13       Defendants argue this prosecution must be vindictive because prison assaults and drug
14 smuggling are routinely handled by state prosecutors. ECF 1801, at 21. But that ignores the history of
15 federal RICO prosecutions against the leaders of violent, powerful prison gangs, including the Aryan
16 Brotherhood. *See, e.g., United States v. Bingham*, 653 F.3d 983, 990 (9th Cir. 2011) (indictment that
17 charged "40 defendants with committing RICO crimes as part of their involvement with the AB").

18       Defendants also claim there is no "readily-apparent justification for prosecuting this case
19 federally." ECF 1801, at 21. In fact, there are many and defendants' own policy views carry no weight
20 in determining a motion to dismiss where they carry the heavy burdens described above. The
21 defendants in this case were ordering and committing murders in and from the most restrictive prison
22 environments available in the California prison system. Moving them to more restrictive BOP facilities,
23 and thereby decreasing the likelihood of further murders and violent assaults, is certainly a valid reason
24 for federal prosecution. Another valid reason is to substantially reduce the chance of defendants ever
25 being released from prison. While several (though not all or even most) of the charged defendants in
26 this case are serving nominal life sentences in California, release on parole or otherwise is always a real
27 possibility. For example, shortly before the wiretaps in this case, AB member Elliott "Rascal" Grizzle
28 unexpectedly had his life sentence for murder reversed in habeas proceedings and was promptly

USA OPP'N TO MOTION TO QUASH WRITS AND/OR TO     7
DISMISS FOR VINDICTIVE PROSECUTION

released. Within months, he committed another murder and was again sentenced to life in prison. *See* ECF 1, at 106–07. Other justifications, including the potential to seek the death penalty, also supported federal prosecution. These "readily apparent" justifications refute defendant's argument that the most likely explanation for this prosecution is vindictiveness.

Because defendants have failed to make a "threshold showing" of a likelihood of vindictiveness, it would be inappropriate to "inquir[e] into the prosecutor's actual motives." *Gallegos-Curiel*, 681 F.2d at 1169. The law requires "a threshold appearance of vindictiveness sufficient to trigger an inquiry into the prosecutor's actual motives. A careful examination of whether an appearance is raised is generally essential to prevent wasteful delays of trial and to screen out frivolous vindictive prosecution claims. The severe presumption should not be invoked lightly."[1] *Id.* at 1171.

### IV.  CONCLUSION

For the foregoing reasons, the Court should deny defendants' motion to quash the writs of habeas corpus *ad prosequendum* and to dismiss the case for vindictive prosecution.

Dated: February 5, 2024

PHILLIP A. TALBERT
United States Attorney

By: /s/ *David Spencer*
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorney

---

[1] Although shifting the burden to the government is not warranted in the case, if the burden did shift, the government could easily carry it. Where the burden shifts, the government must show that its prosecution "did not stem from a vindictive motive, or was justified by independent reasons or intervening circumstances that dispel the appearance of vindictiveness." *Id.* at 1168. As previewed in this Opposition, the wiretap intercepts in this case were an "intervening circumstance" that led to the charges in this case, and other "independent reasons" warranted the prosecution, not any vindictive motive.