Rene L. Valladares
Federal Public Defender
Brian D. Pugh
Assistant Federal Public Defender
Florida State Bar No. 0907294
Email: brian_pugh@fd.org

Sean A. McClelland
Assistant Federal Public Defender
Nevada State Bar No. 16581
Email: sean_mcclelland@fd.org
411 E. Bonneville Ave., Ste. 250
Las Vegas, NV 89101
(702) 388-6577
(702) 388-6261 (Fax)

Steven G. Kalar
Kalar Law Office
California State Bar No. 189550
Email: Steven@KalarLaw.com
1569 Solano Ave. #312
Berkeley CA 94707
(415) 295-4675
(415) 338-9950 (Fax)

Attorneys for Ronald Yandell

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> RONALD YANDELL, <br><br> Defendant. | Case No. 2:19-CR-00107-KJM <br><br> **DEFENSE RESPONSE TO GOVERNMENT MOTION TO PRECLUDE EVIDENCE OR ARGUMENT THAT THIRD PARTIES ARE CULPABLE FOR HUGO PINELL'S DEATH AND THAT CDCR WITNESSES MAY BE BIASED (ECF No. 1949)** <br><br> Date: March 4, 2024 <br> Time: 1:00 p.m. <br><br> Chief Judge Kimberly J. Mueller, <br> United States District Court |

## I.    INTRODUCTION

The government wants to stop the defense from continuing to prove that third parties—specifically, CDCR officials—played a role in orchestrating Hugo Pinell's murder. ECF No. 1949 at 3–4. But such third-party culpability evidence is "*critical exculpatory evidence.*" *Gray v. Klauser*, 282 F.3d 633, 649 (9th Cir. 2002) (emphasis in original), *vacated on other grounds*, 537 U.S. 1041 (2002).[1] And even if that were not so, evidence on the subject independently tends to prove CDCR witness bias. *See United States v. Abel*, 469 U.S. 45, 52 (1984). So it would be error to exclude evidence or argument on the subject.

Likewise for the government's efforts to insulate its witnesses from questions about CDCR's prior disciplinary proceedings connected to this case. Whether CDCR officials were disciplined for their conduct here implicates various witnesses' motivation to shift blame outside CDCR. It is thus proper bias evidence.

Less than four days into trial, the government's own witnesses have already given the jury significant reason to believe that CDCR officials were involved in orchestrating the Pinell homicide. Those officials had ability, opportunity, and motive to have Pinell killed. Then they created the conditions that permitted Gary Littrell to direct Pinell's murder—indeed, they apparently knew that would happen before they pushed Pinell out on the yard. That tends to disprove Mr. Yandell's involvement. And so evidence of CDCR involvement is relevant to disprove Mr. Yandell's role—and to fully recount Littrell's role—in the homicide.

The government's mischaracterization of this evidence as solely concerning nullification should thus be rejected, and its motion denied.

_____

[1] *See United States v. Espinoza*, 880 F.3d 506, 511–15 (9th Cir. 2018); *United States v. Stever*, 603 F.3d 747, 753, 755 (9th Cir. 2010); *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996).

## II.    BACKGROUND

At the beginning of trial, Mr. Yandell told the jury it may come to wonder whether prison officials wanted Hugo Pinell dead. Just three-and-a-half days of testimony has already proven that statement accurate. In less than a week, the jury has learned various undisputed facts—*all from the government's own witnesses*—suggesting that prison officials at CDCR orchestrated Hugo Pinell's death.

The jury has learned from Rafael Heredia, for instance, that prison officials had the ability, opportunity, and motive to orchestrate Pinell's murder; including:

- that Pinell had sliced the throats of two guards while trying to escape San Quentin State Prison;

- that all the staff at Folsom knew that Pinell was a potential target of homicide attempts;

- that CDCR officials made the decision to push Pinell out onto a general-population yard despite those threats;[2]

- that Heredia was almost a hundred percent sure that Mr. Yandell was not on that yard; and

- that Gary Littrell—who has claimed credit for directing Pinell's death—was on the yard with Pinell the day of the murder.

The jury has also learned from Jeremy Beasley that CDCR officials consciously put Pinell in a position to be murdered—apparently knowing that Littrell or others would do just that; including:

- that CDCR frequently orchestrated "Gladiator Fights" that pitted inmates against each other;[3]

---

[2] The government claims that the defense "improper[ly]" "ask[ed] [Heredia] whether he was part of a conspiracy to have Pinell killed." ECF No. 1949 at 2. That is inaccurate: the *government*—not the defense—asked that question during redirect examination. The defense then specifically clarified on recross that Heredia himself was *not* part of any such conspiracy. Heredia then confirmed that higher-up officials at CDCR made the decision to release Pinell into the general-population yard.

[3] The government similarly claims that the defense asked "gratuitous questions about 'gladiator' fights." ECF No. 1949 at 2. This, too, is inaccurate. On direct, the government

- that guards would help inmates target other inmates for assault (or worse);

- that guards would congratulate inmates when they assaulted others;

- that CDCR staff told Beasley that Pinell would be put out on the general population yard before they released Pinell to that yard;

- that Beasley told staff that Pinell would be dead within a week of being released to the yard;

- that, a few days before Pinell's murder, CDCR staff returned to Beasley and Beasley informed them Pinell would likely be dead within a day or two (which proved accurate); and

- that Beasley understood that Gary Littrell directed Pinell's murder in connection with Pinell being put on the yard.

All of this evidence has come in either without government objection,[4] or after the

_____

opened the door on the "Gladiator Fights" issue by asking Beasley about such a fight in which guards had him and his cellmate fight two black inmates. Beasley then properly elaborated on the practice during cross.

[4] The government did not once object:

    (1)    during Mr. Yandell's opening statement;

    (2)    during Mr. Yandell's examination of Heredia establishing:

        a.    that Pinell had sliced guards' throats;

        b.    that officials knew that Pinell was a potential target of homicides attempts;

        c.    that CDCR officials made the decision to push Pinell onto the yard;

        d.    that Ronald Yandell was not on that yard; or

        e.    that Gary Littrell was on the yard; and

    (3)    during Mr. Yandell's examination of Beasley establishing:

        a.    that CDCR frequently orchestrated "Gladiator Fights";

        b.    that guards would help inmates target others for assault (or worse);

        c.    that Beasley told guards that Pinell would be dead within a week of being released to the yard;

government's objection had been overruled.[5] Mr. Yandell expects that similar evidence will continue to come in throughout trial.[6] And like the instant record, that new evidence will likely tend to prove that CDCR officials and Littrell—rather than Mr. Yandell—orchestrated Pinell's death.[7]

The government now seeks to exclude this and other evidence of CDCR misconduct relevant to this case because (in the government's view) such evidence only "support[s] jury nullification." ECF No. 1949 at 1.

## III.   ARGUMENT

The government mistakes a viable third-party culpability defense for jury nullification. The defense is demonstrating, through the government's own witnesses, that CDCR officials played a role in orchestrating Pinell's murder by Gary Littrell and others. That tends to disprove that Mr. Yandell ordered the murder: if CDCR officials orchestrated it via Littrell, it is less likely Mr. Yandell did. Such evidence thus gives Mr.

---

      d.     that guards returned to Beasley and Beasley informed them Pinell would likely be dead within a day or two; or

      e.     that Beasley understood that Gary Littrell ordered Pinell's murder.

[5] The government once objected (on hearsay grounds)—and was correctly overruled—when Beasley was asked whether guards told him that Pinell would be put back out on the general population yard.

[6] If it would help the Court, the defense can provide an *ex parte* proffer on additional anticipated evidence on these topics.

[7] Mr. Yandell notes that he is not the first to suggest that CDCR officials participated in Pinell's murder. Pinell's own lawyer has suggested the same. *See* Don Thompson, *Notorious inmate's lawyer says officials knew he was target*, ASSOCIATED PRESS (Aug. 13, 2015) ("This was foreseeable, which is what makes it so much worse and why the family is looking for answers as to why prison officials let this happen"), https://apnews.com/general-news-7392644c9f684e4f9faa2304880586c8.

Yandell a third-party culpability defense. The Court should therefore reject government's efforts to deprive Mr. Yandell of his right to present such a defense.

The Court should similarly reject the government's efforts to shield its witnesses from bias impeachment. Whether any CDCR officials were disciplined in connection with the events here implicates core credibility issues: whether CDCR witnesses are self-interestedly shifting blame to inmates to avoid CDCR embarrassment. Such evidence is therefore classic grounds for bias cross-examination.

The government's motion should thus be denied in its entirety.

**A.      CDCR officials' role in orchestrating Pinell's death bears on both a third-party culpability defense and CDCR witness bias.**

The government first tries to exclude evidence and argument that CDCR officials were involved in Pinell's death. ECF No. 1949 at 3–4. Such evidence, the government says, is not "connect[ed]" to "a specific legally-permissible defense" and therefore (in the government's view) could only conceivably relate to "improper nullification." *Id.* at 2, 3. And so, the government claims, any evidence that "CDCR might have orchestrated, condoned, or done too little to stop the murder" must be excluded. *Id.* at 3, 4.

Not so. Undisputed evidence from the government's own witnesses already suggests that CDCR officials are culpable third parties who played at least some role in Pinell's death. They had (at least) the ability, opportunity, and motive to have Pinell killed. And then, knowing Pinell was likely to be murdered, they created (at least) the conditions for Littrell and others to kill Pinell. So their involvement is (at least) logically relevant to proving that another man—Littrell—committed the murder.

That is a viable third-party culpability defense; if CDCR officials were involved, then it is less likely Mr. Yandell did it. And even if that is not so, the evidence is relevant to prove CDCR witnesses' bias—including, specifically, their motivation for shifting blame to anyone outside the CDCR. It would thus be error twice over to exclude such evidence from the jury's consideration.

### 1. CDCR officials' third-party culpability tends to disprove Mr. Yandell's involvement.

Take first this evidence's relevance to a third-party culpability defense. That CDCR officials played a role in orchestrating the Pinell homicide (as the undisputed evidence thus far tends to show) suggests that Mr. Yandell was not involved. Excluding such evidence would thus erroneously deny Mr. Yandell his right to present a third-party culpability defense.

"[T]he Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010) (quoting *Holmes v. South Carolina*, 547 US. 319, 324 (2006)). That right includes, "at a minimum," "the right to put before a jury evidence that might influence the determination of guilt." *Id.* (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 56 (1987)). And that means, as relevant here, that a defendant has the right to elicit evidence pertinent to defending himself. *Id.*

Evidence tending to prove third-party culpability falls in that bucket. *Id.*; *see also United States v. Espinoza*, 880 F.3d 506, 511–15 (9th Cir. 2018). Such evidence is "*critical* exculpatory evidence." *Gray v. Klauser*, 282 F.3d 633, 649 (9th Cir. 2002) (emphasis in original), *vacated on other grounds*, 537 U.S. 1041 (2002). So absent some other basis for exclusion (none of which the government raises here), "all" relevant evidence that a third party might be culpable must be given to the jury. *Espinoza*, 880 F.3d at 511 ("[A]ll evidence of third-party culpability that is relevant is admissible, unless barred by another evidentiary rule"); *see also United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980) (Kennedy, J.) ("Fundamental standards or relevancy . . . require the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged.").

And this standard is rigorously enforced on appeal. Exclusion of third-party culpability evidence commonly results in reversal. *E.g.*, *Espinoza*, 880 F.3d at 511–19 (reversing conviction where district court excluded evidence tending to show that a third

party was involved in offense); *Stever*, 603 F.3d at 753 (same); *United States v. Vallejo*, 237 F.3d 1008, 1022–24 (9th Cir. 2001) (same); *United States v. Crosby*, 75 F.3d 1343, 1349 (9th Cir. 1996) (same); *Armstrong*, 621 F.2d at 953 (same). For good reason: such evidence is ordinarily "crucial to the defense"—even when only "marginally probative." *Crosby*, 75 F.3d at 1347 (first quote); *Espinoza*, 880 F.3d at 515 (second one).

Evidence that "CDCR might have orchestrated, condoned, or done too little to stop" the Pinell murder is admissible on such third-party culpability grounds. *Contra* ECF No. 1949 at 3. That CDCR officials may have orchestrated the homicide—by, for instance, putting Pinell on a yard with Littrell—"tend[s] to make it more probable that [Mr. Yandell] was not involved." *Stever*, 603 F.3d at 753. That is especially so because the government does not allege that Mr. Yandell worked with CDCR officials to orchestrate the murder— indeed, it seems to disclaim as much.[8] *See generally* ECF No. 1949; *see also* ECF No. 1375 (not charging any CDCR officials). So anything "inculpating" CDCR officials "tend[s] to exculpate" Mr. Yandell. *Crosby*, 75 F.3d at 1349. And that similarly gives the jury "an alternative explanation" for the murder "that would not entail the consent, much less the participation" of Mr. Yandell—CDCR officials set Littrell up to do it. *Stever*, 603 F.3d at 753. In brief: CDCR officials' involvement tends to disprove that Mr. Yandell was doing the "orchestrat[ing]." ECF No. 1949 at 3.

Other evidence about CDCR officials' orchestration of violence—and role in the Pinell homicide—is relevant for similar reasons. That CDCR officials routinely directed "Gladiator Fights" and congratulated inmates for assaulting people, for instance, tends to prove that they orchestrated a similar assault by Littrell and others here. *See Espinoza*, 880 F.3d at 514–15 (third party's decades-old drug trafficking conviction admissible to

---

[8] The defense need not inculpate any specific CDCR official. That "any" CDCR official could be involved is enough to "make[] it less likely that [Mr. Yandell] was." *Stever*, 603 F.3d at 753.

prove third party's "ability and motive" to commit present drug trafficking); *Vallejo*, 237 F.3d at 1023 (similar); *see also Crosby*, 75 F.3d at 1347 (third party's "prior beatings" of similarly situated victims "showed that he possessed the requisite strength and emotional instability"). That CDCR officials knew of Pinell's prior violence towards prison guards tends to prove that officials had a motive to arrange for Littrell and others to kill him. *Crosby*, 75 F.3d at 1347 (evidence that third party was "angry at his wife" and that such anger "had driven him to violence in the past" admissible to prove third party's motive for assault). And that CDCR officials put Pinell out on the yard despite threats to his life tends to prove (at least) their ability and opportunity to have someone like Littrell murder him. *Id.* (third party being "in the general area" tends to prove third party opportunity and ability); *accord, e.g.*, *United States v. Freeman*, No. 06–20185, 2010 WL 3927736, at *3 (E.D. Mich. Oct. 4, 2010) (third party's "aware[ness] of [the victim]'s location" and "apparent ability to kill [him]" tends to prove third party culpability). Mr. Yandell can properly identify such facts about CDCR culpability. That the government chose not to charge any CDCR officials despite all this evidence should not prejudice him doing so.

What's more, even if these connections are "speculative" (the evidence already proves they are not), that is "not a valid reason" to exclude evidence on the subject. *Espinoza*, 880 F.3d at 517 ("That the defense's theory may be speculative is not a valid reason to exclude evidence of third-party culpability."). So long as "the evidence that someone else committed the crime is in truth calculated to cause the jury to doubt"— which it is here—"the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt." *Id.* (quoting *Crosby*, 75 F.3d at 1349) (alteration incorporated). Put simply: the jury itself should evaluate whether CDCR officials' involvement exculpates Mr. Yandell. *Id.*

Such evidence is "crucial" to Mr. Yandell's defense. *Crosby*, 75 F.3d at 1347. The jurors are likely to "ask themselves": "If [Mr. Yandell] didn't [orchestrate Pinell's death],

10

who did?" *Id.* The undisputed evidence from the government's own witnesses (less than four days into a months-long trial) already suggests an answer: CDCR officials did. Excluding evidence further proving as much would thus be error.

### 2. CDCR officials' role in the Pinell homicide is also relevant to prove CDCR witness bias.

Additionally, even if the CDCR officials' involvement in the Pinell murder is somehow irrelevant to a third-party culpability defense (as discussed above, such evidence is relevant to that defense on various grounds), CDCR involvement would still be admissible as evidence of CDCR witness bias.

"Proof of bias is almost always relevant." *United States v. Abel*, 469 U.S. 45, 52 (1984). Such evidence commonly includes a witness's possible self-interest in testifying. *United States v. Schoneberg*, 396 F.3d 1036, 1042 (9th Cir. 2005); *see, e.g.*, *Burr v. Sullivan*, 618 F.2d 583, 586–87 (9th Cir. 1980) (Kennedy, J.) (proper bias evidence to demonstrate witness's motive to lie because of involvement in misconduct). And it can stem from a witness's association with an entity accused of misconduct—like the CDCR—even if the particular witness is not involved in that misconduct. *See Abel*, 469 U.S. at 52 (witness's association with A.B. relevant to prove bias, even without any evidence witness was "personally" involved in misconduct). With whatever framing, bias is properly examined on two fronts: "*whether*" the witness was biased and "*why*" that bias might exist. *Schoneberg*, 396 F.3d at 1042 (emphases in original).

Probing bias is particularly important in criminal cases. Consistent with the Confrontation Clause's "command[]" that witness reliability be "test[ed] in the crucible of cross-examination," *Crawford v. Washington*, 541 U.S. 36, 61 (2004), both the Ninth Circuit and the Supreme Court have "emphasized the policy favoring expansive witness cross-examination in criminal trials," *United States v. Larson*, 495 F.3d 1094, 1102 (9th Cir. 2007) (en banc) (quotation omitted). And bias is a particularly favored form of impeachment even beyond those "expansive" rules, *id.*, provable from both "extrinsic evidence" and questioning on cross, *Abel*, 469 U.S. at 52.

Evidence that CDCR officials—even if not these specific witnesses—orchestrated Pinell's death is independently admissible to prove bias under these authorities. CDCR witnesses have a potentially biased motive in testifying: shifting blame for Pinell's murder to anyone outside of CDCR. *See Abel*, 469 U.S. at 52 (witness's motive to shift blame outside A.B. proper bias evidence). That is true even if the particular witnesses were not personally involved in the misconduct. *Id.* ("[C]ommon membership in an organization, even without proof that the witness or party has personally adopted its tenets, is certainly probative of bias."). "[*W*]*hether*" CDCR witnesses might have a "motivation . . . to lie"— and "*why*" they have that motivation—is thus proper bias evidence. *Schoneberg*, 396 F.3d at 1043 (emphases in original).

*          *          *

The defense understands that the government may be embarrassed by its CDCR partners' uncharged role in Pinell's death. But as undisputed evidence in less than four days of testimony from the government's own witnesses already reveals, CDCR officials had the ability, opportunity, and motive to orchestrate Pinell's murder. And then they both factually and proximately caused that result: most obviously, by putting Pinell on a yard with Littrell. It is likely further testimony will continue to confirm as much.

Far from "improper nullification," such evidence tends to disprove Mr. Yandell's involvement in the homicide. And it independently tends to prove CDCR witness bias. The government's effort to exclude the evidence should thus be rejected (at least) twice over.

**B.      The defense has a right to explore the bias of government witnesses— including whether CDCR officials have faced disciplinary proceedings in connection with this case.**

Second, the government seeks to prohibit the defense from asking witnesses "about allegations of misconduct against other CDCR employees." ECF No. 1949 at 4. The government says that "[Mr.] Yandell's counsel" did "precisely" that by "asking whether

the witness had 'heard of misconduct by other CDCR employees.'" *Id.*[9] And such "questions," the government claims, are "wildly" "inappropriate"—either on hearsay or character-for-truthfulness grounds. *Id.*

There are at least two problems with the government's claim about these questions. The first is that it misrepresents the record. The defense never asked whether any witness had "heard of misconduct by other CDCR employees." *Contra* ECF No. 1949 at 4. The defense did ask—and was correctly permitted to do so by the Court—whether Officer Glover was personally aware of any disciplinary proceedings against High Desert officers in connection with the Pequeen and Maynard investigations.[10] That is a proper, non-hearsay line of questioning, premised on the officer's own personal knowledge of events. *Contra id.*

The second problem with the government's claim is that it mischaracterizes the proper impeachment rule. The defense is eliciting this evidence to demonstrate CDCR bias—not to attack individual officers' character for truthfulness. *Contra id.*[11] That CDCR officials might have been disciplined for incidents at play here (or, for that matter, that they might not have been) speaks to their motivation to shift blame to inmates like Mr.

---

[9] The defense understands the government to be attempting to directly quote a defense question from sometime in the first four days of trial. *See* ECF No. 1949 at 4 (using quotation marks). It is unclear where the government is getting this purported quote; as discussed below, the defense has not asked this question at any point in trial.

[10] The government claims that the Court "sustained the government's objections" (plural) "to this line of questioning." ECF No. 1949 at 5. That is inaccurate. The Court sustained an objection (singular) to a question about whether other officers at High Desert had been generally disciplined for manufacturing evidence or items in reports. But the Court properly permitted the defense's questioning about whether Officer Glover was personally aware of any proceedings against High Desert officers in connection with the Pequeen and Maynard investigations specifically.

[11] To be sure, future witnesses may have specific credibility issues involving specific instances of prior misconduct. Examining those witnesses about such misconduct would independently be proper character-for-truthfulness impeachment under Rules 608 and 609.

Yandell. *See Abel*, 469 U.S. at 52. And as discussed above, the defense (1) can prove such bias even if the specific CDCR witness were not "personally" involved in the misconduct, *id.*; and (2) can offer "extrinsic evidence" on the subject if need be, *id.* The Court should thus continue to permit such questioning into CDCR bias on the specific events at issue in this trial.

## IV.    CONCLUSION

Undisputed evidence from the government's own witnesses already suggests that CDCR officials were involved in the Pinell homicide. And similar evidence also suggests that CDCR officials were engaged in various forms of potentially discipline-warranting misconduct connected to the particular incidents at issue in this trial.

Such evidence on the Pinell homicide is relevant both to a third-party culpability defense and to CDCR witness bias. And broader questions about CDCR misconduct are also proper bias evidence against CDCR witnesses. The government's attempts to preclude the defense from presenting a defense and from effectively cross-examining government witnesses should be denied.

Dated this March 3, 2024.

Respectfully submitted,

Rene L. Valladares
Federal Public Defender

*/s/ Brian D. Pugh*
BRIAN D. PUGH
Assistant Federal Public Defender

*/s/ Sean A. McClelland*
SEAN A. McCLELLAND
Assistant Federal Public Defender

Law Office of Steven G. Kalar

*/s/ Steven G. Kalar*
STEVEN G. KALAR