PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:19-CR-00107-KJM |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANTS' MOTIONS FOR ACQUITTAL UNDER RULE 29 |
| v. | |
| RONALD YANDELL, DANNY TROXELL, and BILLY SYLVESTER, | [ECF 2373 (Sylvester), ECF 2377 (Yandell), ECF 2378 (Troxell)] |
| Defendants. | |

The United States respectfully submits its opposition to the motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure submitted by defendants Ronald Yandell ("Yandell"), ECF 2377, Billy Sylvester ("Sylvester"), ECF 2373, and Danny Troxell ("Troxell"), ECF 2378, (collectively "defendants").

In short, the motions should be denied because overwhelming evidence demonstrated that each defendant played a critical role in participating in the crimes of the Aryan Brotherhood criminal enterprise between 2011 and 2019, including murder, conspiracies to murder, and drug trafficking. Indeed, the evidence demonstrated that, by 2016, Troxell and Yandell were so powerful and influential within the enterprise that they had each attained leadership status by securing positions on the AB's three-man commission. For his part, Sylvester murdered Ronald Richardson to gain entrance into the enterprise, orchestrated the brutal murder of Devlin Stringfellow, conspired to smuggle

methamphetamine and contraband cellphones into prison using fake legal visits, and trafficked heroin from his prison cell.  For these reasons, defendants' motions should be denied.

## I.      ANALYSIS

### A.      Standard under Rule 29

Rule 29 permits a trial court to grant a motion for judgment of acquittal only "if the evidence is insufficient to sustain a conviction." *United States v. Soulard*, 730 F.2d 1292, 1307 (9th Cir. 1984).  In making such a determination, the reviewing court must first "consider the evidence presented at trial in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc).  "This means that . . . [the court] may not usurp the role of the finder of fact by considering how it would have resolved the conflicts, made the inferences, or considered the evidence at trial." *Id.*

"Second, after viewing the evidence in the light most favorable  to the prosecution, the reviewing court must determine whether this evidence, so viewed, is adequate to allow any rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original).

### B.      Standard Under Rule 33

Rule 33 allows a court to vacate any conviction and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). While the district court has more discretion to grant a new trial than it does to grant a judgment of acquittal, the standard for vacating the jury's verdict and granting a new trial is still high. *See United States v. Alston*, 974 F.2d 1206 (9th Cir. 1992). A motion for a new trial "should be granted only in exceptional cases in which the evidence preponderates heavily against the verdict." *United States v. Rush*, 749 F.2d 1369, 1371 (9th Cir. 1984). It is defendant's burden to justify a new trial. *United States v. Shaffer*, 789 F.2d 682, 687 (9th Cir. 1986).

### C.      Count One: RICO Conspiracy – Overwhelming evidence demonstrates each defendants' integral role in committing crimes on behalf of the Aryan Brotherhood criminal enterprise.

The elements of RICO conspiracy are: (1) between in or around October 2011, and continuing to in or around June 2019, there was an agreement between two or more persons to conduct or participate, directly or indirectly, in the conduct of the affairs of the enterprise (here, the Aryan Brotherhood) through a pattern of racketeering activity; (2) the enterprise, the Aryan Brotherhood, was engaged in, or

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

its activities affected or would affect, interstate or foreign commerce; (3) the defendant became a member of the conspiracy knowing of its object and agreed that to help further or facilitate the objectives of the conspiracy; and (4) the defendant knew or contemplated that one or more members of the conspiracy, would commit at least two acts of racketeering in furtherance of the conspiracy. 18 U.S.C. § 1962(d); *Salinas v. United States*, 522 U.S. 52, 64–66 (1997); *United States v. Fiander*, 547 F.3d 1036, 1041 (9th Cir. 2008). "What matters for a sufficiency of the evidence inquiry [in a RICO conspiracy] is that there was adequate proof of an overall conspiracy to participate, directly or indirectly, in the conduct of the [Aryan Brotherhood's] affairs through a pattern of racketeering activity." *United States v. Fernandez*, 388 F.3d 1199, 1226 n.18 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005).

Here, proof that each defendant knowingly joined the RICO conspiracy charged in Count One is drawn from overwhelming evidence of each defendant's intercepted, unguarded admissions about participating in the racketeering activities at the heart of the enterprise, as well as the corroborated testimony of Jeremy Beasley, Donald Mazza, Travis Burhop, Samuel Keeton, Nickolas Perez, and Kristin Demar, as well as substantial overlapping layers of undercover drug purchases, surveillance during the investigation, and wiretap-based drug seizures. Each layer of evidence demonstrates "that the key participants and the method of operation remained constant throughout the conspiracy." *Id.* at 1226.

      1.    The Aryan Brotherhood is a criminal enterprise that engaged in a pattern of racketeering activity

As a threshold matter, the government's evidence left no doubt that the Aryan Brotherhood is a criminal enterprise. For this threshold element, the government must prove that an "enterprise" existed that was engaged in or had an effect on interstate commerce. Ninth Cir. Crim. Jury Inst. No. 18.9. "[T]he government must prove beyond a reasonable doubt that this was a group of people (1) associated for a common purpose of engaging in a course of conduct; (2) that the association of these people was an ongoing formal or informal organization, and (3) the group was engaged in or had an effect upon interstate or foreign commerce." *Id.* "This expansive definition is 'not very demanding.'" *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015) (quoting *Odom v. Microsoft Corp.*, 486 F.3d 541, 548 (9th Cir. 2007) (en banc)).

> An association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times.

*Boyle v. United States*, 556 U.S. 938, 948 (2009).

To establish that the enterprise engaged in a pattern of racketeering activity, the government must prove: (1) at least two acts of racketeering were committed within a period of ten years of each other; (2) the acts of racketeering were related to each other, meaning that there was a relationship between or among the acts of racketeering; and (3) Third, the acts of racketeering amounted to or posed a threat of continued criminal activity.  Ninth Cir. Crim. Jury Inst. 18.14 (2002).

The evidence in this case demonstrated that the Aryan Brotherhood is a criminal enterprise engaged in a pattern of racketeering activity based upon the testimony of three former enterprise members: Beasley, Mazza, and Burhop.[1]  Each gave first-hand accounts of the gang's overall purpose to control the white prison population in California, its rivals, its allies, its ability to generate illegal income through criminal activities committed within California prisons, and the use of murder, assaults, and threats of violence to maintain its control over subordinates, disgraced members, and hated rivals.  Their accounts were corroborated by testimony from enterprise associates who committed criminal acts, including drug trafficking, to enrich Yandell, Troxell, and Sylvester.  The subordinate associates who testified about their criminal activities for the enterprise included Keeton, Perez, and Demar.

Even though a RICO enterprise "need not have a hierarchical structure or a chain of command," the evidence established that for many years the Aryan Brotherhood members largely resided in Pelican Bay and were governed by a three-man commission.  *United States v. Bingham*, 653 F.3d 983, 992 (9th Cir. 2011) (quotation omitted).  The commission's purpose was to resolve disputes among enterprise members and, if necessary, approve the murder of an Aryan Brotherhood member.  Each enterprise member enjoyed autonomy over subordinate white inmates in California prisons in which they found

---

[1]     Beasley was an Aryan Brotherhood member from 2002–2012.  R.T., 2/27/2024, at 4. Mazza was an Aryan Brotherhood member from 2007–2020.  R.T., 3/5/2024, at 4–5.  Burhop was an Aryan Brotherhood member from 2017–2020.  R.T., 3/12/2024, at 5.

themselves.  But, each brother was considered equal to every other member of the gang.  This informal

framework permitted the enterprise to carry "out its objectives" and the AB members in good standing

worked as a "continuing unit to achieve a common purpose."  *Id.*

The enterprise members governed themselves by basic codes, expectations, or rules.  In

particular, former enterprise member Beasley testified that the basic codes included: (1) "the Brand

comes first," (2) "don't cooperate with law enforcement," (3) "keep your word," and (4) "don't ever be a

coward."  R.T., 2/27/2024, at 81.  Similarly, former enterprise member Mazza described his

understanding that the Aryan Brotherhood would not tolerate violence against children, women" or

inmates who were convicted of "sex offenses," and, like Beasley, he made clear that "communicating

with law enforcement" was not permitted.  He also described that AB members were expected to show

"courage" and not show "cowardice."  R.T., 3/5/2024, at 174; *see* R.T., 3/14/2024, at 33 (Burhop)

("Number one rule is never talk to law enforcement, as an AB member.").  This informal framework

permitted the enterprise to carry "out its objectives" and the AB members in good standing worked as a

"continuing unit to achieve a common purpose."  *Bingham*, 653 F.3d at 992.

All six government witnesses proved beyond any doubt that the Aryan Brotherhood is a group of

prison-based criminals who "associated for a common purpose" to commit crimes on behalf of the

Aryan Brotherhood.  The evidence further demonstrated that the enterprise was an "ongoing" informal

organization with a unique, stylized vocabulary used by its members for terms that were significant to

the gang.  These universally-recognized enterprise terms included "in the hat," "up for the tip," "the

Brand," "earn your rock," "make the rock shine," "rockin 'em to sleep," "ride 'em into the dirt," "put in

work," and "brother."  The testimony and evidence also proved that the enterprise has one symbol that is

revered throughout the prison system: the three-leaf shamrock.  R.T., 2/27/2024, at 35 ("Well, the

shamrock signifies membership into the Aryan Brotherhood.").  The symbol is so fiercely protected by

the enterprise that both Beasley and Mazza testified that only AB members were permitted to display

such a tattoo in prison.  R.T., 2/27/2024, at 36 (Beasley); R.T., 3/5/2024, at 176 (Mazza).  Failure to

cover up the tattoo or to intentionally display could lead to being targeted for assault.  R.T., 3/5/2024, at

176 ("If you put it on you intentionally, knowing that it's the AB symbol, then you could potentially be

stabbed over that.).  Consistent with their membership in the Aryan Brotherhood, the jury viewed

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

photographs demonstrating that Troxell, Yandell, and Sylvester each have shamrock tattoos displayed on their bodies.  Govt. Exs. 350 (Troxell), 345 (Yandell), 348–49 (Sylvester).

On the pattern of racketeering element, trial evidence demonstrated five enterprise-based murders committed during the charged RICO conspiracy.  These include the murders of: Ronald Richardson (2011), Hugo Pinell (2015), Doug Maynard (2016), Devlin Stringfellow (2018), and Donald Pequeen (2018).  In addition, the evidence demonstrated at least enterprise-related conspiracies to murder captured over the wiretap in 2016.  These include conspiracies to kill: Kenneth "Kenwood" Johnson, James Mickey, Paul "Dreamer" Diaz, Michael "Thumper" Trippe, and Doug Maynard.  Finally, the criminal nature of the enterprise was also proven through the overall 2016 drug trafficking conspiracy to distribute heroin through Quesenberry to an undercover agent.  That evidence featured testimony of direct participants in the drug supply chain (Burhop), the transportation of the drugs and collection of drug proceeds (Keeton and Perez), wiretapped calls, and drugs seized during the undercover buys and multiple wiretap-based seizures of drugs in Las Vegas (October 21, 2016) and Fontana (October 24, 2016).

Given this overwhelming evidence of the Aryan Brotherhood criminal enterprise engaged in a pattern of racketeering, a reasonable juror could infer that the government proved beyond a reasonable doubt that the gang was an "associated-in-fact enterprise" consisting of "a group of persons associated together for a common purpose of engaging in a course of conduct" with different members performing different roles at different times.  *Christensen*, 828 F.3d at 780.

2.    The Aryan Brotherhood criminal enterprise affected interstate commerce

The interstate commerce element is easily met in this case.  Interstate commerce "includes the movement of goods, services, money, and individuals between states" whether "legal or illegal."  Ninth Cir. Crim. Jury Inst. No. 18.9.  Only a minimal effect on commerce is required and the effect need only be probable or potential, not actual.  *Id.*  It is not necessary to prove that the defendant's own acts affected interstate commerce as long as the enterprise's acts had such effect.  *Id.*  "Congress has specifically found, and this court has reiterated, that intrastate drug activities have a substantial effect on interstate commerce."  *United States v. Rodriguez*, 360 F.3d 949, 957 (9th Cir. 2004).

In this case, the undisputed evidence demonstrates that Yandell, Troxell, and Sylvester used

interstate communication devices (cell phones) to communicate with one another and fellow conspirators about the criminal activities of the enterprise. They also each engaged in drug trafficking with other enterprise members and associates.

As for the enterprise-based drug trafficking, the evidence demonstrated that Yandell and Sylvester supplied heroin through the efforts of AB associate (later member) Matt Hall, Burhop's network of drug couriers including Samuel Keeton and Nickolas Perez who transported the drugs for distribution in Sacramento in drug deals consummated by Jeanna Quesenberry with a DEA undercover agent. During and in furtherance of the RICO conspiracy in 2016, the Yandell-Sylvester-Quesenberry drug deals occurred July 11 (Count Six), July 24 (Count Seven), August 12 (Count Eleven), and concluded with two drug deals on October 18 (Counts Twelve and Thirteen). DEA Special Agent Nehring's testimony about these deals, corroborated by surveillance conducted by DEA Special Agent Max Laschuk, as well as retired DEA TFO McClure, were not challenged during trial. DEA chemists confirmed that, during each undercover drug deal, the substances sold by Quesenberry contained heroin. In addition, intercepted calls demonstrated that (1) Yandell orchestrated the amount of money each participant would receive from each drug deal and (2) Sylvester was actively involved in the drug trafficking conspiracy run through Quesenberry. Govt. Exs. 214, 214A (Yandell discussing logistics of sending Matt Hall to deliver drugs to Quesenberry instead of Keeton as in previous deals); Govt. Exs. 229, 229A (Yandell instructing Keeton on division of drug money from undercover buy with Quesenberry on August 12, 2016); Govt. Exs. 266, 266A (Sylvester requesting Perez to deliver heroin to a Southern California customer and drive two types of heroin to Sacramento before October 18, 2016 undercover buy with Quesenberry); Govt. 267, 267A (Yandell asking Perez to pick up a drone on his way to deliver heroin to Quesenberry in Sacramento before October 18, 2016 undercover buy).

Moreover, Nickolas Perez testified that he delivered heroin in specially-wrapped balloons on two occasions to Troxell's wife in order to facilitate her ability to smuggle the heroin into prison for Troxell's benefit. In particular, Perez followed Burhop's instruction to use white water balloons that were double and triple bagged so they did not burst inside Troxell's stomach when they were smuggled to him at the prison. R.T., 3/12/2024, at 86:1–9. An event alluded to in an intercepted call between Yandell and Burhop. Govt. Ex. 118, 118A-005 (Burhop: "And I went ahead and just balled it up the

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1    way he wanted it that way."); R.T. 3/12/2024, at 85:13–25, 86:1–6 (explaining context of intercepted

2    reference to having heroin balled up for Troxell and enlisting Perez to take care of getting heroin to

3    Troxell's wife).

4         Viewed in the light most favorable to the government, the jury can reasonably infer that the use

5    of interstate communication facilities (cell phones) by Yandell, Troxell, and Sylvester during the RICO

6    conspiracy to facilitate Aryan Brotherhood criminal activities, including murders, murder plots, and

7    large-scale drug trafficking had at least a de minimis affect on interstate commerce – that is, a probable

8    or potential impact. *United States v. Shryock*, 342 F.3d 948, 985 (9th Cir. 2003) (holding interstate

9    commerce requirement for RICO conspiracy is "met if 'the enterprise or its activities engaged in or

10   involved interstate or international drug trafficking [or] use of interstate communication devices'"); *id.* at

11   984 n.18 ("RICO has a jurisdictional element and the heart of Appellants crimes, drug trafficking and

12   extortion, are quintessential illegal economic activities."); *Gonzales v. Raich*, 545 U.S. 1, 22 (2005);

13   *United States v. Juvenile Male*, 118 F.3d 1344, 1348 (9th Cir. 1997) ("[W]e conclude that all that is

14   required to establish federal jurisdiction in a RICO prosecution is a showing that the individual predicate

15   racketeering acts have a de minimis impact on interstate commerce."); *id.* at 1349 ("To establish a de

16   minimis effect on interstate commerce, the Government need not show that a defendant's acts actually

17   affected interstate commerce. Rather, the jurisdictional requirement is satisfied by proof of a probable or

18   potential impact.").

19           3.    <u>Each defendant became a member of the conspiracy knowing of its object and</u>

20               <u>agreed that to help further or facilitate the objectives of the conspiracy</u>

21        To demonstrate a defendant knowingly joined a RICO conspiracy, the evidence must

22   demonstrate that two or more people agreed to violate the RICO statute, "which criminalizes

23   racketeering activity." *United States v. Delgado*, 401 F.3d 290, 296 (5th Cir. 2005). The focus is on an

24   intention "to further an endeavor which, if completed, would satisfy all of the elements of a substantive

25   criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."

26   *United States v. Fiander*, 547 F.3d 1036, 1041 (9th Cir. 2008) (quoting *Salinas v. United States*, 522

27   U.S. 52, 65 (1997)). The government must only prove a defendant agreed with the types of racketeering

28   acts that the members agreed to commit, and not the specific acts. *United States v. Cornell*, 780 F.3d

616, 625 (4th Cir. 2015) ("[E]very circuit ... has concluded that for a RICO conspiracy charge the jury need only be unanimous as to the types of racketeering acts that the defendants agreed to commit.") (emphasis added).  "The conspirator need not have committed or agreed to commit the two predicate acts." *Delgado*, 401 F.3d at 296 (citing *Salinas*, 522 U.S. at 61–66).  The defendant "need only have known of and agreed to the overall objective of the RICO offense." *Id.*  "It is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role." *Christensen*, 828 F.3d at 780 (quotation and citation omitted).

Here, the evidence demonstrates that Yandell, Troxell, and Sylvester each conspired with one other and others to further "the interests of their organization" – the Aryan Brotherhood – and planned "its activities," including murder, conspiracies to murder, and drug trafficking, which are each prohibited by the RICO statute.  *Delgado*, 401 F.3d at 296.  Each defendant's own words in incriminating intercepted calls, as verified and explained by the direct testimony of RICO co-conspirators, confirmed that each defendant knew "the general nature" of the Aryan Brotherhood and knew "that the enterprise extends beyond his individual role." *Christensen*, 828 F.3d at 780 (quotation and citation omitted).  Specifically, the government introduced numerous intercepted calls, each defendant was captured speaking openly about committing AB crimes during the charged time period and demonstrated their knowledge of the enterprise through such admissions.  *See United States v. Miranda-Uriarte*, 649 F.2d 1345, 1352 (9th Cir. 1981) (testimony about defendant's own statements during and in furtherance of a drug trafficking conspiracy "clearly sufficient to support a finding that he was a knowing participant").[2]

For each defendant, the jury heard numerous examples of their direct admissions about ongoing enterprise criminal activities, including the need to murder AB member James Mickey in Calipatria, *see*

---

[2]     The evidence in this case is much more robust than what is required for conviction under 18 U.S.C. § 1962(d).  As the Ninth Circuit recently explained, evidence is sufficient to support a conviction if a rational juror can infer that a defendant agreed to participate, directly or indirectly, in the conduct of Aryan Brotherhood's affairs through a pattern of racketeering based on *his general knowledge of AB's criminal acts and his status as a member of the enterprise.  United States v. Jaimez*, 45 F.4th 1118, 1129 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 1038 (2023).  In other words, it is sufficient for a RICO conspiracy conviction if a defendant's status and position within a particular gang would permit a rational juror to reasonably infer that the defendant was aware of Aryan Brotherhood's racketeering activities and contemplated that other members would commit racketeering acts based on the defendant's continued membership in the enterprise.  *Id.*

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1   Govt. Exs. 118, 118A, 120, 120A, the plot to murder Kenneth Johnson, Govt. Exs. 113, 113A, 114,

2   114A, 115, 115A, 116, 116A, 117, 117A, 117.1, 117.1A, 117.2, 117.2A, the conspiracy to kill Michael

3   Trippe, Govt. Exs. 127, 127A, 128, 128A, 130, 130A, the need to remove skinheads, including the

4   USAS from any yard, *see* Govt. Exs. 49, 49A, and even historical disputes within the gang and how it

5   was resolved.  *See* Govt. Exs. 392, 392A (Yandell and Troxell discussing issues dividing the AB at

6   Pelican Bay and Troxell's view that the AB is "blood in, blood out"); Exs. 393, 393A (Troxell telling

7   Sylvester that "if you put a hand on another brother, regardless of what it is, then you answer with the

8   tip" in the context of Sylvester's personal animosity and desire to kill Kenwood Johnson).

9        The intercepted calls overlapped with testimony from multiple witnesses demonstrating that each

10  defendant not only knowingly joined the conspiracy to participate in the affairs of the Aryan

11  Brotherhood, but Troxell and Yandell elevated to positions of leadership positions on the AB's three-

12  man commission.  In particular, Mazza testified that Troxell was part of the commission at Pelican Bay

13  as far back as the early 2000's when Mazza was first communicating with prominent AB members in

14  the prison.  R.T., 3/5/2027, at 72–81.  Yandell later took over one of the three commission spots at the

15  same time as Troxell served on the commission.  *Id.* at 146.  Yandell verified that he and Troxell served

16  on the three-man commission repeatedly throughout multiple intercepted calls.  Govt. Exs. 45, 45A, 282,

17  282A.  Each of these facts was corroborated by Travis Burhop based upon his own conversations with

18  Troxell and Yandell.  R.T., 3/12/2024, at 82.  And, Yandell made plain the criminal purpose of the

19  Aryan Brotherhood, telling Daniel that, even if they were being wiretapped, "You still have commit

20  crimes."  Govt. Ex. 46, 46A.  The jury can reasonably conclude that each defendant was knowingly

21  engaged in a conspiracy to participate in the conduct or operation of the Aryan Brotherhood because

22  Yandell said so:

23           Because brother, they would have came and got me by now if I, I'm pretty
             sure man if I would have said, you know, and they actually try to move on
24           that dude after all that shit [. . .] that's a conspiracy.  That's a RICO.
             Organized crime.  You order a motherfucking hit on another prisoner in
25           another prison on a cell phone.

26  Govt. Ex. 46, 46A.

27        The jury also heard undisputed evidence that Sylvester participated in and directed the murder of

28  Devlin Stringfellow at CSP-Sacramento in January 2018.  In particular, Mazza testified that Sylvester

bragged about lulling Stringfellow into a false sense of security and instructing the two attackers to knock him unconscious and then drive a knife through Stringfellow's eye socket and into his brain. R.T., 3/5/2024, at 168 ("He said that he had some kid hit him with a rock, or some kind of heavy item, on the side of the head. He said he took Stringfellow out in the middle of the yard, was talking to him -- as they like to say, rockin' 'em to sleep -- made him comfortable. And then one of the shooters came up with a heavy item, hit him on the side of the head. Once he was unconscious, he said he directed a second shooter with a knife to push it through his eyeball into his brain.").  Sylvester also admitted his instrumental role in Stringfellow's murder to Keeton.  Sylvester's admissions to Mazza and Keeton matched the testimony of responding correctional officers and medical staff.  His participation in directing the murder and the circumstances surrounding its purpose demonstrates the "essential nature and scope" of the Aryan Brotherhood.  *Fernandez*, 388 F.3d at 1230.  A rational juror, viewing such evidence in the context of Sylvester's entrenched role in the Aryan Brotherhood, could reasonably infer that Sylvester was "aware of the essential nature and scope of the enterprise and intended to participate in it."  *Id.*

Although it is not required that the defendant "be aware of the specific identity or activity" of the other co-conspirators, in this case, each defendant was well aware of one another as well as a wide cast of shared conspirators.  *Christensen*, 828 F.3d at 781.  The wiretap exhibits feature direct evidence of conversations between Yandell and Troxell, as well as Sylvester and Troxell discussing enterprise-based participants, crimes, and politics within the gang.  The wiretaps also reveal multiple, overlapping connections within the RICO conspiracy.  Just a few examples include: Troxell and Burhop communicating about criminal activities; Yandell and Sylvester contacting Nickolas Perez to help with drug trafficking; and Yandell and Sylvester conspiring with Kristin Demar to smuggle drugs and other contraband into CSP-Sacramento to enrich enterprise members.  Evidence of enterprise members and associates interacting with one another through an elaborate drug network spanning the state and the defendants coordinating murder plots amongst themselves and other AB members like Mazza, Burhop, Matt Hall, and Samuel Keeton is target people for murder is quintessential enterprise evidence sufficient to demonstrate that the enterprise functioned "as a continuing unit" and the defendants knowingly participated in its affairs through a pattern of racketeering crimes.  *Boyle v. United States*, 556 U.S. 938,

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

946 (2009) ("The concept of 'associat[ion]' requires both interpersonal relationships and a common

interest.").

In sum, viewing the evidence in the light most favorable to the government, the jury can

reasonably infer that each defendant agreed to further and facilitate the criminal activities of the Aryan

Brotherhood because they openly shared with each other their participation in murders, conspiracies to

murder, and frequently discussed extensive drug trafficking being conducted by co-conspirators.

*Fiander*, 547 F.3d at 1041.  Given each defendant's long tenure in the Aryan Brotherhood and multiple

crimes committed on behalf of the gang with extensive coordinated activity among the conspirators and

discussions about that coordination among other conspirators, there is no doubt that each defendant were

aware of the "essential nature and scope" of that enterprise and intended to participate in it.

*Christensen*, 828 F.3d at 781.

> 4. <u>Each defendant knew or contemplated that one or more members of the conspiracy, would commit at least two acts of racketeering in furtherance of the conspiracy</u>

"The partners in the criminal plan must agree to pursue the same criminal objective and may

divide up the work, yet each is responsible for the acts of each other."  *Salinas v. United States*, 522 U.S.

52, 63–64 (1997).  "A person, moreover, may be liable for conspiracy even though he was incapable of

committing the substantive offense."  *Id.* at 64.  "The RICO conspiracy statute, § 1962(d), broadened

conspiracy coverage by omitting the requirement of an overt act; it did not, at the same time, work the

radical change of requiring the Government to prove each conspirator agreed that he would be the one to

commit two predicate acts."  *Id.*

In this case, each defendant knew or contemplated that multiple members of the RICO

conspiracy would commit at least two racketeering acts in furtherance of the conspiracy.  Below, the

government summarizes evidence that satisfies this RICO element and the substantive charge that is

associated with these facts.

In addition, on the final RICO conspiracy element –  the defendant knew or contemplated that

one or more members of the conspiracy would commit at least two acts of racketeering in furtherance of

the conspiracy – the evidence summarized below on the Mickey murder plot makes plain that Troxell

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

relied on Yandell to make sure Burhop put the kill order on Mickey into action despite the obvious concern inherent in killing an Aryan Brotherhood member.  Similarly, Troxell asked Burhop to have Perez deliver heroin to Troxell's wife on two occasions in order to smuggle the heroin into Troxell's prison for his benefit.  Thus, a rational juror can reasonably infer that, at a bare minimum, Troxell knew that multiple members of the conspiracy would carry out to murder of James Mickey and Burhop and Perez would come together to deliver heroin to his wife in furtherance of the enterprise's pattern of racketeering.  Moreover, a rational juror could find that Yandell and Troxell's "participation in a conspiracy to commit murder" "demonstrates knowledge and facilitation of the [Aryan Brotherhood]'s racketeering acts. *United States v. Nelson*, 2023 WL 4004113, at *17 (N.D. Cal. June 13, 2023) (citing *United States v. Houston*, 648 F.3d 806, 810–12 (9th Cir. 2011) (affirming RICO convictions based on predicate racketeering acts of conspiracy to commit murder and murder)).

### D.   Count Three – Conspiracy to kill James Mickey – Troxell and Yandell[3]

In order to prove a charge of conspiracy to commit murder in aid of racketeering, the government must prove: (1) an enterprise affecting interstate commerce existed; (2) the enterprise engaged in racketeering activity; (3) the defendant committed the crime of conspiring to murder James Mickey; (4) the defendant's purpose in conspiring to commit murder was to gain entrance to, or to maintain or increase his position in the Aryan Brotherhood enterprise.  Ninth Cir. Crim. Jury Inst. 11.1 11.1 (2022) (conspiracy); Ninth Cir. Crim. Jury Inst. 18.8 (2002) (violent crime in aid of racketeering). It is not necessary for the government to prove that this motive was the sole purpose, or even the primary purpose of the defendant in committing the charged crime. *United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008).

The jury can reasonably infer that Troxell agreed with Yandell and relied on Burhop to kill

---

[3]     The elements required to prove a conspiracy to commit murder in aid of racketeering require more elements than the conspiracy to commit murder under California law.  Therefore, the government incorporates the evidence summarized here to demonstrate each substantive charged conspiracy to commit murder in aid of racketeering also satisfies each of the predicate racketeering acts for the RICO conspiracy in Count One that allege the same conspiracies but violate California Penal Code § 182 (conspiracy to commit murder).  For purposes of the "overt act" requirement under state law, each of the multiple phone calls made in furtherance of the conspiracies for each conspiracy to commit murder in aid of racketeering "is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime."  Judicial Council of California Criminal Jury Instruction No. 563 (Cal. Pen. Code § 182) (*revised 9/2020*).

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

James Mickey at Calipatria knowing that Burhop, in turn, would need to task at least one additional white subordinate inmate (more likely two) at the prison in order to kill Mickey because the victim did not reside on the same yard as Burhop.  Troxell, Yandell, and Burhop make their intent to kill Mickey plain over multiple clips from incriminating calls.  Govt. Exs. 118, 118A, 119, 119A, 119.1, 119.1A, 120, 120A, 121, 121A, 122, 122A.  Specifically, when Burhop informs Yandell that Mickey has "hit A-yard," Yandell explains that Mickey: (1) "has gotta go, man,"; (2) "we need someone to kill his ass, man. Not fucking just put a couple of fucking stab wounds, you know."; and (3) "We need to send a message, man."  Govt. Ex. 118, 118A.  After Burhop identifies two candidates for carrying out the killing on Mickey's yard, Yandell explains the reason Mickey is targeted for murder: he violated three enterprise expectations, codes, or rules.

> He was stealing all the money, he didn't come up to the Bay when he was ordered to come up there. And he actually when Chuck got speared by a fucking mobster, had him a spear gun down in fucking LA County Jail over some dope debt. [] the Mexican that got real involved in it came back up to Corcoran and Mickey was on the yard with him and never did nothing to him.

Govt. Exs. 119, 119A.  Thus, Yandell makes plain that Mickey is a disgraced AB member marked for death because (1) he stole enterprise funds, (2) he refused an order to report to Pelican Bay from Corcoran, and (3) he showed cowardice by not retaliating against an inmate who had harmed another enterprise member in Los Angeles County Jail.

Troxell's incriminating intercepted call with Yandell corroborates the conspiracy to kill Mickey in order to enforce Aryan Brotherhood rules.  Govt. Exs. 120, 120A.  In particular, in discussing the plan to kill Mickey at Calipatria, Troxell tells Yandell: "I already put it in motion, getting that handled as soon as uh he hits uh the fresh air."  Govt. Exs. 120, 120A.  As the two commissioners discuss killing an enterprise member, Troxell makes clear that they will make an exception to the rule that only a brother is permitted to kill a brother: "And it doesn't matter if it's The Rock that does it."  Govt. Exs. 120, 120A.  Troxell then reiterates that Mickey "cannot afford to not be dealt with, you know, ASAP . . ."  Govt. Exs. 120, 120A.

Troxell also reached out directly to Burhop and passed along the directive to kill Mickey.  When Burhop learned Mickey had arrived at Calipatria, he reached out to Yandell, Sylvester, and Troxell.

R.T., 3/12/2024, at 82.   Troxell made plain to Burhop that Mickey needed to be killed: "Yeah, that dude needs to go. He needs to be hit ASAP. Killed." R.T., 3/12/2024, at 82.  Burhop's testimony was corroborated with intercepted calls to Yandell that are detailed above.  In the end, Burhop agreed with Troxell and Yandell to kill Mickey and pled guilty to Count Three in this case and the jury reasonably inferred the express agreement for Troxell and Yandell based upon the intercepted calls and testimony of Burhop.  R.T., 3/12/2024, at 5.

To further the plot, each of the phone calls in this plot are overt acts to carry out the murder: Troxell to Yandell, Yandell to Burhop, and Troxell to Burhop.  Moreover, Burhop inquired about who might be able to carry out the murder of Mickey on the A yard.  He specifically identified for Yandell that "Jason from Modesto" and "Ripper" from PENI were both good candidates to carry out the murder. In order to know who was available to carry out the murder, Burhop had called over to "Sam" on the A yard to get an understanding of who might be able to kill Mickey.  Govt. Ex. 118, 118A-004.

### E.    Defense arguments about overt act requirements are without merit

Yandell contends that a "defendant is entitled to acquittal on a VICAR count if the government has not proven a specifically-identified overt act from the indictment." ECF 2377, at 7 (citing *United States v. Muñoz-Martinez*, 79 F.4th 44, 50–51 (1st Cir. 2023).  In the same vein, Troxell relies on California law to contend, "This is case in which the government has simply failed to bring forward any evidence of an overt act in support of the conspiracy to kill James Mickey. The plot is discussed, but neither Burhop, Yandell, nor Troxell take a single step to put it into motion." ECF 2378, at 12.

Yandell and Troxell are both mistaken because the specific state law requirements for conspiracy and the accompanying state law instructions do not apply to the federal charge conspiracy to commit a violent crime in aid of racketeering.

First, federal conspiracy law—not state law—applies to the charges of conspiracy to commit murder in aid of racketeering, a violation of 18 U.S.C. § 1959(a). Section 1959 provides, in relevant part, that it is a crime for anyone who "murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon . . . any individual in violation of the laws of any state or the United States, or attempts or *conspires* so to do." 18 U.S.C. § 1959(a) (emphasis added).

Notably, this provision explicitly requires the list of generic crimes (including murder) to be in

1  violation "of the laws of any state or the United States," but the phrase "or attempts or conspires so to

2  do" comes after, not before, the requirement that the list of generic crimes be "in violation of the laws of

3  any state." *Id.*  The plain language of the statute therefore indicates that Congress intended to

4  incorporate state law for the generic crimes, but use federal law for attempt or conspiracy. Otherwise, if

5  Congress intended Section 1959 to incorporate state law of attempts and conspiracies, it would have

6  provided in straightforward language that it was a crime for anyone who "murders, kidnaps, maims,

7  assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon . . . any

8  individual, or attempts or conspires so to do, in violation of the laws of any state or the United States . . .

9  . "

10  In *United States v. Gonzalez*, 786 F.3d 714 (9th Cir. 2015), a jury convicted the defendant of "the

11  VICAR offense of conspiracy to murder rival gang members under California law." *Gonzalez*, 786 F.3d

12  at 716.  The evidence against Gonzalez "primarily consisted of wiretapped telephone conversations

13  between Gonzalez and other 38th Street Gang members relating to different (often unnamed) members

14  of different gangs and occurring on different dates." *Id.*  On appeal, Gonzalez argued that the district

15  court erred "in failing to instruct the jury that it must unanimously agree on the acts that constituted the

16  conspiracy to murder underlying the VICAR offense." *Id.*  The Ninth Circuit flatly rejected Gonzalez's

17  overt acts argument.

18  "We now join our sister circuits and hold that, so long as jurors in a federal criminal trial

19  unanimously agree that the Government has proven each element of a conspiracy, *see Richardson* [*v.*

20  *United States*, 526 U.S. 813, 817 (1999)], they need not unanimously agree on the particular overt act

21  that was committed in furtherance of the agreed-upon conspiracy." *Gonzalez*, 786 F.3d at 718–19.  In

22  *Gonzalez*, the Ninth Circuit expressly held that "even though the additional unanimity instruction in this

23  case did not require unanimous agreement on a particular overt act, Gonzalez's right to a unanimous

24  jury verdict was not violated." *Id.*  This holding cannot be squared with the arguments advanced by

25  Yandell and Troxell on the issue of overt-act unanimity or pleading and proof.

26  Other courts have reached this conclusion as well and held that Section 1959 only incorporates

27  state law for its list of generic crimes, but not for the state's definitions of conspiracy and attempt. *See*

28  *United States v. Diaz*, 176 F.3d 52, 96 (2d Cir. 1999) ("[T]he government is not required to prove an

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1  'overt act' under Connecticut law because the reference to violating state law in the VICAR count is

2  only meant to indicate unlawful conduct that constitutes a predicate offense for a VICAR charge under §

3  1959(a)(6)."); *see also United States v. Osborne*, 739 Fed. App'x 11, 16 (2d Cir. 2018) (noting that

4  "[s]ubsequent panels of this Court have expressed concern about *Diaz*'s continued viability," but

5  recognizing that the court had "not expressly disavowed *Diaz*, and *Diaz* remains controlling authority")

6  (citing *United States v. Carrillo*, 229 F.3d 177, 185 (2d Cir. 2000); *United States v. Pimentel*, 346 F.3d

7  285, 302–05 (2d Cir. 2003)).  In short, the statute and the caselaw foreclose Yandell and Troxell's

8  interpretations of § 1959(a) by shoehorning all of California conspiracy law into the jury instructions for

9  this federal charge of conspiracy to commit murder in aid of racketeering.

10      Moreover, neither Yandell nor Troxell can demonstrate prejudice because the Court ultimately

11  instructed the jury that it was required to find that "one of the persons committed at least one overt act to

12  accomplish the killing" and "at least one of these overt acts was committed in California."  ECF 2298, at

13  43 (final instructions).  The Court further explained that the "[t]o decide whether the defendant

14  committed this overt act, consider all of the evidence presented about the overt act."  ECF 2298, at 43.

15  Finally, the Court provided a detailed explanation of what an overt act required:

16          An "overt act" is an act by one or more of the members of the conspiracy
            that is done to help accomplish the agreed upon crime. The overt act must
17          happen after the defendant has agreed to commit the crime. The overt act
            must be more than the act of agreeing or planning to commit the crime,
18          but it does not have to be a criminal act itself.

19  ECF 2298, at 43.  Despite federal conspiracy law having no requirement that the United States prove

20  any overt act—let alone that it specify its overt acts in the jury instructions–the Court took a cautious

21  approach and required the jury to find beyond a reasonable doubt that each conspiracy to murder,

22  including the conspiracy to kill James Mickey, included "at least one overt act to accomplish the

23  killing."  ECF 2298, at 43.  Consistent with this instruction, the government argued that each conspiracy

24  included multiple overt acts to help "accomplish the killing."  ECF 2298, at 43.  A rational juror could

25  reasonably infer that multiple acts were proven constitute overt acts sufficient to accomplish the killing.

26  Yandell and Troxell's interpretations of the law, facts, and argument presented in this case are at odds

27  with reality and should be rejected.

28      Relying exclusively on California law, Troxell attempts to define the precise time when he

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

believes the criminal agreement to kill Mickey occurred and then argues that anything before or after

that cannot be an overt act.  ECF 2378, at 11 ("The call between Troxell and Yandell is the point at

which, as a best-case scenario for the government, the agreement to target James Mickey came to

fruition.").  Even under California law, Troxell is mistaken.  A criminal agreement "is not a tangible

occurrence: the specific time when a common illegal design comes into existence cannot, in most

instances, be identified. For this reason an agreement is a continuous act; thus conspiracy is said to be a

continuing crime."  *People v. Von Villas*, 11 Cal. App. 4th 175, 244 (1992), modified (Dec. 15, 1992).

Given this difficulty in precisely pinning down *when* a conspiracy is fully formed, California courts

"decline to hold that an overt act can only be committed after a complete agreement is formed, because

an agreement is continuous."  *Id.*  This holding runs contrary to Troxell's construction of the law.

Yandell and Troxell also both contend that the government's construction of overt acts was

insufficient because the discussions among the co-conspirators were "mere planning" and not overt acts.

ECF 2377, at 10 ("There was insufficient evidence to prove more than mere planning or agreement

here."); ECF 2378, at 13 ("There is simply no evidence from which the jury can infer an overt act

occurred in support of a plan to kill James Mickey.").  The crux of their complaint is that Yandell and

Troxell only *talked* about having people murdered, which, they argue, is insufficient for an overt act.

But even under California law, these arguments fail because California courts have held that

"once a punishable agreement is formed, *internal discussions* and *arrangements between co-*

*conspirators* can *easily constitute overt acts* in furtherance of the conspiracy."  *Id.* (emphasis added).

> If the conspirators partake, among themselves, in arrangements,
> discussions, and preparation in regard to and for the criminal act, then they
> have ventured beyond a mere criminal intention and forgone the
> opportunity afforded them by the overt act requirement: "to reconsider,
> terminate the agreement, and thereby avoid punishment for the
> conspiracy." (*Ibid.*) Such discussions and arrangements among
> conspirators can, therefore, constitute properly chargeable overt acts in a
> criminal conspiracy prosecution.

*Id.* at 245.  In *Von Villas* for instance, the court held that the following conversations between co-

conspirators were valid overt acts: (1) "[t]he solicitation of additional conspirators"; (2) "requests for

information regarding the victim and the plan to kill" the victim; (3) "payments to secure a co-

conspirator's assent to the conspiracy"; and (4) "numerous phone conversations laying out the manner in

which the conspiracy would be carried out." *Id.* at 245.

*Von Villas* proves that Yandell and Troxell are wrong in their interpretation of California law. Yandell and Troxell would characterize each of the categories of discussions in *Von Villas* as mere "conversations." *See* ECF 2377, at 11–12. But *Von Villas* holds that these categories of discussions are, in fact, overt acts. And for each murder conspiracy in this case, at least one category of overt act that the *Von Villas* court identified is present.

First, multiple conspiracies involved "[t]he solicitation of additional conspirators." *Von Villas*, 11 Cal. App. 4th at 245. For the conspiracy to murder Kenneth Johnson, Yandell "solicit[ed] additional conspirators" by calling Troxell to get permission to kill Johnson. For the conspiracy to murder Michael Trippe, Yandell called Elliot "Rascal" Grizzle to get him to kill Trippe, then solicited Donald Mazza to kill Trippe, and also called Matt Hall and Samuel Keeton for each to solicit Mazza to kill Trippe. For the conspiracy to murder Paul Diaz, Corbett told Yandell he was trying to find an attacker on Diaz's yard. For the James Mickey conspiracy, Yandell and Troxell both communicated with Travis to solicit him to carry out the murder, and Yandell also told Travis to reach out to a different yard to solicit two individuals to carry out the murder. Finally, for the Doug Maynard conspiracy, Pat Brady had to solicit Bobby Stockton to actually stab Maynard to death.

Second, multiple conspiracies involved "requests for information regarding the victim and the plan to kill" the victim." *Von Villas*, 11 Cal. App. 4th at 245. For the Trippe murder conspiracy, Yandell asked Grizzle to find Trippe and kill him. For the Mickey murder, Yandell asked Burhop when Mickey was going to hit the yard, and he asked Burhop if he had someone who was going to be able to kill Mickey without getting Burhop's name involved.

Third, multiple conspiracies involved "payments to secure a co-conspirator's assent to the conspiracy." *Von Villas*, 11 Cal. App. 4th at 245. Indeed, one of Yandell's go-to tactics was to offer payment—in the form of increased status in the AB—to those willing to kill for the AB. Yandell did this in the Mickey murder conspiracy, when he told Burhop that successfully arranging to kill Mickey would go a long ways in making Burhop a brother. He also did this in the Diaz murder conspiracy, when he got approval from Troxell to make Corbett a brother if Corbett successfully killed Diaz, a message he then relayed to Corbett. In other words, in order to encourage Burhop and Corbett to carry

1   out the murders, Yandell offered one of the most valuable forms of payment he could:  the chance to

2   become a member of the exclusive Aryan Brotherhood.

3       Finally, nearly all of the conspiracies involved "numerous phone conversations laying out the

4   manner in which the conspiracy would be carried out." *Von Villas*, 11 Cal. App. 4th at 245.  Indeed,

5   Yandell appeared to revel in telling attackers how to carry out murders, as he did with Michael Trippe

6   (kill him and his wife) and James Mickey (bury a bone crusher in his heart and choke him out with a

7   garrote).

8       In short, *Von Villas* shows that these conversations were not mere chatter.  They were overt acts

9   in furtherance of the conspiracy.  And in addition to these overt acts specifically detailed in *Von Villas*,

10  the murder conspiracies involved other acts "looking toward the accomplishment of the crime," such as

11  Yandell's efforts to spread rumors about victims (as he did with Kenneth Johnson, Michael Trippe,

12  James Mickey, and Doug Maynard), which made it more likely that these victims would get murdered

13  by an aspiring white inmate.

14      In this case, as detailed above, multiple overt acts in furtherance of the plot to kill Mickey

15  occurred in the form of internal discussions among Troxell, Yandell, and Burhop.  The intercepted calls

16  and the testimony of Burhop demonstrate unequivocally that the co-conspirators made arrangements for

17  Burhop to have Mickey killed on the A-yard at Calipatria as soon as he "hit fresh air" in Troxell's

18  phrasing.  For these reasons, defendants arguments should be rejected as inconsistent with federal law,

19  state law, and contrary to the evidence presented at trial.

20      Finally, Yandell and Troxell persist in claiming that California pleading requirements or

21  unanimity requirements were required.  ECF 2377, at 7 ("In short: a prosecution for conspiracy to

22  commit murder premised on California law must both plead and prove specifically-identified overt

23  acts.");  ECF 2378, at 9 ("California law is clear that an overt act is required to be plead and proved to

24  support a violation of Penal Code Sections 182, 187, and 189.").  They are incorrect.  As discussed

25  above, state pleading requirements are not binding in their application to federal criminal determinations

26  under Title 18.[4]

27  _____

28  [4]      Even under California law, Yandell and Troxell are wrong.  "An overt act of a conspiracy
    has been held to be part of the 'theory' of the case rather than an actual element of conspiracy."  *Von
    Villas*, 11 Cal. App. 4th at 234 (citations omitted).  "This distinction is significant because it is not

In *Gonzalez*, discussed above, the Ninth Circuit made clear that "so long as the jurors unanimously agreed that the overt-act element was satisfied, it was not necessary for them to agree on which overt act satisfied this element." *Gonzalez*, 786 F.3d at 718. The rationale for this rule in federal court is that, consistent with Supreme Court precedent, "even if different jurors found that different overt acts satisfied the overt-act element, no unanimity problem would arise because the differences of opinion on a particular overt act . . . are ones only of means, and the jurors reached unanimous agreement that the overt-act element was satisfied for the unanimously agreed-upon murder conspiracy." *Gonzalez*, 786 F.3d at 718; *see Richardson*, 526 U.S. at 817 ("a federal jury need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element" of a crime, or "which of several possible means the defendant used to commit an element of the crime."); *see also Salinas v. United States*, 522 U.S. 52, 63 (1997) (despite RICO conspiracy statute incorporating many state criminal offenses, "[t]here is no requirement of some overt act or specific act in the [RICO] statute before us, unlike the general conspiracy provision applicable to federal crimes, which requires that at least one of the conspirators have committed an "act to effect the object of the conspiracy."). Thus, the arguments advanced by Yandell and Troxell for acquittal based upon their incorrect understanding of the interplay between federal and state law should be rejected.

## F.   Count Five – Conspiracy to kill Michael Trippe - Yandell

Like the James Mickey murder plot, Yandell relied on multiple co-conspirators to accomplish the killing of Aryan Brotherhood member Michael Trippe. Govt. Exs. 127, 127A, 128, 128A, 130, 130A. Trippe presented a challenge because he lived out of custody and was not as easily reached from Yandell's perch at CSP-Sacramento. Thus, Yandell tasked two different enterprise members to kill Trippe. First, he told AB member Elliot "Rascal" Grizzle that Trippe needed to be murdered. When Grizzle failed to kill Trippe, Yandell tasked Mazza with killing Trippe.

To carry out the murder of Trippe through Mazza, Yandell sent repeated messages Matt Hall and Samuel Keeton to emphasize that Mazza was obligated by virtue of his AB membership to kill Trippe.

---

necessary to require the jury to agree on one or more of the several theories presented by the prosecution; it is sufficient that each juror is convinced beyond a reasonable doubt that the defendant is guilty of the offense. This rule has been applied in burglary and murder cases." *Id.*

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

Yandell, through Hall's imposing physical presence, called a mandatory meeting to provide an in-person directive that Mazza was required to kill Trippe.  If he refused the directive, Mazza himself would find himself in danger of being put "in the hat."  Yandell then finally connected in an intercepted call to Mazza in which he reiterated the plan to kill Trippe.

### G.   Defense theories on the conspiracies to murder in Counts Three and Five are meritless under the law

Yandell and Troxell argue that the conspiracies to kill Mickey and Trippe are legally deficient because some of the participants in the two plots (Burhop and Mazza) did not desire to carry out the respective murder plots.  But, this is no defense to the conspiracy charges in this case.  The reason is that it is the defendant's intent in entering into the agreement that is the critical focus of the charges.  In other words, even if co-conspirators Burhop and Mazza did not desire, intend, or want to carry out the killings assigned to them by the enterprise members, it is Yandell and Troxell's intent in entering the conspiracies that matters.

> A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor. *He may do so in any number of ways short of agreeing to undertake all of the acts necessary for the crime's completion*. One can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense. It is elementary that a conspiracy may exist and be punished whether or not the substantive crime ensues, for the conspiracy is a distinct evil, dangerous to the public, and so punishable in itself.

*Salinas*, 522 U.S. at 66 (emphasis added).  In other words, it is no answer to a conspiracy to commit murder in aid of racketeering to claim that the defendant intended for the targeted victim to die but the defendant is excused because his co-conspirator got cold feet.  *Id.*  This is particularly true in the case of Mickey because, as retired Special Agent McClure explained, CDCR placed Mickey into protective custody before any harm could be inflicted on him.  Because "[o]ne can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense," it is of no consequence that Burhop and Mazza did not want to carry out the plots – indeed, this is precisely why both entered guilty pleas to the conspiracies to commit murder in this case.  *Id.*

In a strange passage of his brief, Yandell writes separately to complain that the Court's instructions required that the government must prove that "the members of the alleged conspirac[ies]

1   had an agreement and intent to commit murder." ECF 2377, at 12 (citing ECF No. 2269 at 43; ECF No.

2   2298 at 43.).  The gist of this argument is that the Court's instruction on conspiracy to murder required

3   greater proof than is actually required under law.  Specifically, he argues that the correct standard is that

4   "the defendant and *one or more* of the other alleged members of the conspiracy intended" to commit

5   murder but the Court's instruction in this case "required proof that all the members of the alleged

6   conspiracies to murder actually intended to murder."  ECF 2377, at 12.

7          Despite Yandell arguing this precise point to the jury, namely, that Burhop and Mazza did not

8   want to kill their intended target, the jury returned still returned unanimous verdicts finding that all the

9   members of the conspiracies to murder actually intended to murder.  Indeed, Yandell's view of what

10  Burhop and Mazza intended does not control the jury's findings in this case.  "In ruling on a Rule 29(c)

11  motion, a district court must bear in mind that it is the exclusive function of the jury to determine the

12  credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven

13  facts."  *United States v. Rojas*, 554 F.2d 938, 943 (9th Cir. 1977) (internal citation and quotation marks

14  omitted).  His argument failed at trial because both Burhop and Mazza testified that they understood

15  they would have to kill their intended targets or face being targeted for death themselves.  (Burhop)

16  R.T., 3/14/2024, at 15:19 –20 ("Inevitably, I was obligated to do it [kill Mickey], if it didn't somehow

17  work itself out."); (Mazza) R.T., 3/5/2024, at 147:11 –14 ("Q. When you completed the call [with

18  Yandell], in your own mind what was your understanding of what you needed to do as far as Yandell

19  and the gang were concerned? A. Kill Michael Trippe.").  Neither Yandell nor Troxell engaged

20  meaningfully with this evidence at trial and they ignore it now.  In contrast, the government specifically

21  argued this point in its closing and the jury found it persuasive based upon the verdicts.  More to the

22  point, Yandell points to no authority suggesting that when the government proves more than it is

23  required to under the law, then he is entitled to relief.  Not surprisingly, the law is to the contrary

24  because cannot demonstrate prejudice where the government proved more than the law required.  *See*

25  *United States v. Duran*, 189 F.3d 1071, 1081–83 (9th Cir. 1999) (holding that conviction should be

26  affirmed despite the existence of two conspiracies where the indictment charged only one, because the

27  variance did not prejudice the defendant); *United States v. Herrera*, 210 Fed. App'x 569, 573–74 (9th

28  Cir. 2006) ("[D]espite the fact that the government actually proved two separate conspiracies and not the

single conspiracy charged, there is no risk that the jury convicted Herrera for a conspiracy or for transactions in which he did not participate.").

### H.   Count Seven – Conspiracy to distribute and possess with intent to distribute methamphetamine and heroin – Yandell and Sylvester

Yandell and Sylvester relied on multiple enterprise co-conspirators to carry out their drug trafficking.  The jury heard Yandell's intercepted instructions to Samuel Keeton that corroborated the testimony of Burhop, Keeton, and Perez and demonstrates Yandell was intimately familiar with the drug trafficking operation.  In the intercepted call, Yandell instructs Keeton to give Quesenberry $1,500 from money left over from a drug sale conducted with the DEA undercover agent.  Govt. Exs. 229, 229A. Yandell knew how much money there should be from a drug deal on the streets because he's deeply involved in the details of the drug conspiracy.  Yandell knew of the drug conspiracy's purpose because he was communicating with Quesenberry about her drug sales to the DEA undercover agent and Yandell was directing where and how much of the money from the drug deals should be distributed.

The jury heard similar uncontested evidence about Sylvester's intimate involvement int he drug trafficking conspiracy.  For example, during an intercepted call between Sylvester and Nickolas Perez, Sylvester asks Perez to deliver heroin in Southern California and drive heroin up to Sacramento in advance of an undercover drug deal in October 18, 2016.  Govt. Exs. 266, 266A.  Perez's testimony and wiretapped call matched the testimony and intercepted calls between Travis Burhop and Yandell to demonstrate that Yandell and Sylvester were active partners in a drug trafficking conspiracy that involved sourcing drugs from Burhop by way of Southern California and brought in role players like Perez, Keeton, Quesenberry, Matt Hall, and Kathleen Nolan to accomplish its objectives.

### I.   Count Ten – Distribution of methamphetamine during fake lawyer visit at CSP-Sacramento – Sylvester

During and in furtherance of the drug trafficking conspiracy in Count Seven, Sylvester relied on a wide cast of characters to execute the conspiracy to smuggle methamphetamine and other contraband into CSP-Sacramento through an attorney visit on August 11, 2016.  The intercepted calls and testimony of witnesses at trial reveal that Sylvester relied on Yandell, his cellmate and fellow AB member, to handle the logistics of connecting Samuel Keeton with attorney Kevin MacNamara and drive him up to

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

Sacramento.  R.T., 3/25/2024, at 40:20–25, 42:21–25, 43:1–25, 44:1–25, 45:1–24.  Once in Sacramento, while Sylvester prepared for his legal visit, Kristin Demar explained that Yandell connected her with Jeanna Quesenberry and, eventually, Demar met up with Keeton, Quesenberry, and MacNamara. Quesenberry provided the heat-sealed bags of tobacco, the methamphetamine, and cell phones and Keeton packed the contraband into MacNamara's wheelchair underneath MacNamara's buttocks.

The jury viewed video clips of the exchanges from Demar to Sylvester in the attorney visiting room coupled with Demar's narration of the events.  Govt. Exs. 237–46.  The uncontroverted evidence of Sylvester's central involvement in the smuggling plot was verified through the overlapping testimony of Burhop, Keeton, and Kristen Demar.



### J.    Sylvester's challenge to Count Ten should be rejected

Keeton testified that Quesenberry brought a plastic bag of methamphetamine to the staging area (a hotel) before the visit with MacNamara, Demar, and Sylvester at CSP–Sacramento on August 11, 2016, and Keeton placed the methamphetamine under MacNamara.  R.T., 3/25/2024, at 45:3–10. Demar testified that, during the visit with Sylvester, she removed the bag of methamphetamine from underneath MacNamara's buttocks and handed it to Sylvester through the cage.  After prison officials intercepted Sylvester and removed the methamphetamine from his body, an intercepted call between Yandell, Keeton, and Burhop confirmed that "20 grams" of methamphetamine had passed from Demar to Sylvester.  Govt. Exs. 225, 225A.  CDCR Special Agent Scott Givens testified that the substance recovered from Sylvester returned to a presumptive positive result for the presence of methamphetamine.  ECF 2373, at 2.  The jury considered a photograph of the positive test result taken by Special Agent Givens at or near the time of the test being administered.  Govt. Ex. 254.  It is

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1   reproduced below.

2

3

4

5

6   

7

8

9

10

11

12

13   Govt. Ex. 254.

14   The presumptive test performed by Special Agent Givens is one piece of a much larger set of

15   undisputed contextual evidence that supports a reasonable inference that the substance seized from

16   Sylvester on August 11, 2016 was methamphetamine.  The Ninth Circuit has explained that, viewing the

17   evidence in a light most favorable to the government, a sufficiency-of-the-evidence determination in the

18   context of a controlled substance must consider all of the evidence presented on the subject and whether

19   it, "combined with the inference premised on the contents of the bag, would permit a reasonable juror to

20   conclude beyond a reasonable doubt that the substance seized from [the defendant] was

21   methamphetamine."  *United States v. Solorio*, 669 F.3d 943, 955 (9th Cir. 2012).

22   Here, the presumptive positive result for methamphetamine matched the testimony of Keeton

23   who established that Quesenberry, a prolific drug dealer, provided the methamphetamine for the

24   smuggling operation at the request of Yandell.  R.T., 3/25/2024, at 45:3–10.  Similarly, Demar, an

25   experienced drug user, testified that she removed the baggie of methamphetamine from underneath

26   MacNamara and handed it to Sylvester, facts corroborated by video clips introduced at trial.  And, after

27   the seizure, Yandell, Keeton, and Burhop discuss that "20 grams" of methamphetamine that Sylvester

28   hid on his person as a result of the smuggling operation.  Govt. Exs. 225, 225A.  Moreover, the place

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

where Sylvester secreted the drugs – hidden inside his body – is consistent with the substance being contraband methamphetamine that he hoped CDCR officials would not discover.  Given this undisputed evidence that the substance was anything other than methamphetamine, a "rational fact-finder could conclude, beyond a reasonable doubt, that the substance" supplied by Quesenberry and passed to Sylvester by Demar "was actually methamphetamine." *Solorio*, 669 F.3d at 956.

Sylvester's reliance on inapposite state caselaw is unpersuasive.  More fundamentally, Sylvester's motion fails to account for the substantial contextual evidence beyond the presumptive test result obtained by Special Agent Givens.  Such an approach is inconsistent with a proper analysis under Rule 29.  Under Rule 29, the Court must examine whether the evidence presented "combined with the inference premised on the contents of the bag, would permit a reasonable juror to conclude beyond a reasonable doubt that the substance seized from [the defendant] was methamphetamine." *Solorio*, 669 F.3d at 955.  For these reasons, Sylvester's motion on Count Ten should be denied.

### K.    Count Fifteen – Murder of Ronald Richardson – Sylvester

To prove murder in aid of racketeering (a racketeering act considered under the RICO conspiracy as well), the government must prove: (1) the Aryan Brotherhood was an enterprise affecting interstate commerce; (2) the enterprise engaged in racketeering activity; (3) the defendant committed the crime of murder; and (4) the defendant's purpose in committing murder was to gain entrance to, or to maintain or increase his position in the Aryan Brotherhood enterprise.  Ninth Cir. Crim. Jury Inst. 18.8 (2022).[5] Here, there is no dispute that Sylvester acted with express malice aforethought because he "unlawfully intended to kill" Richardson on October 7, 2011.  Judicial Council of California Criminal Jury Instruction No. 520 (Cal. Pen. Code § 187).  The video viewed by the jury leaves no doubt that Sylvester intentionally stabbed Richardson to death on the B facility yard that day, acting in concert with Lance Clemens to accomplish the unlawful killing.  Govt. Ex. 51.  Indeed, from opening statement and throughout answers elicited during cross-examination, Sylvester's counsel conceded that he killed Richardson.  Thus, this "murder" element of Count Fifteen is not in dispute.

---

[5]     The evidence supporting the first two elements of Count Fifteen and Sixteen are summarized above in the discussion of the RICO conspiracy in Count One.  The government does not repeat the evidence summarized above because that discussion and evidence applies with equal force here and is incorporated here by reference.

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1     The motive or "purpose" element of murder in aid of racketeering is satisfied if "if the jury

2 could properly infer that the defendant committed his violent crime because he knew it was expected of

3 him by reason of his membership in the enterprise or that he committed it in furtherance of that

4 membership." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992) (quoted approvingly in

5 *Fernandez*, 388 F.3d at 1233).  In Sylvester's case, the overwhelming evidence demonstrated that

6 Sylvester murdered Richardson to earn his membership in the Aryan Brotherhood.  In particular,

7 Sylvester told Burhop that he "stabbed and killed" Richardson "in the SHU" in order to "earn[] his

8 rock."  R.T., 3/12/2024, at 67.  Sylvester also bragged to Keeton that killed "Rock Steady" to earn his

9 AB membership.  He specifically told Keeton that he killed Richardson with the first stab wound but

10 kept stabbing him "to make it look good."

11     Sylvester's admissions are consistent with his tattoos.  Before the murder, in 2009, gang

12 investigators photographed Sylvester's legs and they did not display shamrocks.  Govt. Ex. 346.  After

13 the 2011 murder, gang investigators photographed two massive shamrocks displayed on Sylvester's

14 thighs.  Govt. Exs. 347, 348.  Sylvester's admissions are also consistent with ample evidence introduced

15 demonstrating that, in the early 2000's, AB members at Pelican Bay issued an edict that all members of

16 the United Society of Aryan Skinheads ("USAS") be assaulted because the group openly defied the

17 enterprise's authority over the white inmate population.  Moreover, an intercepted call in 2016 verified

18 Sylvester's knowledge of the edict because he provided the names of the skinhead groups to Yandell

19 while they informed Daniel which groups needed to be removed from Daniel's Salinas Valley prison

20 yard.  Govt. Ex. 49, 49A (Sylvester identifying USAS as one of the skinhead groups with an "alliance

21 against the Brand.").

22     Both Beasley and Mazza independently described the discussions among AB members at Pelican

23 Bay about the existential threat to the AB posed by insubordinate skinhead groups, including the USAS,

24 refusing to fall under the enterprise's control.  During his time at Pelican Bay, AB members tasked

25 Mazza with trying to broker a resolution with USAS and, to that end, he had direct discussions with

26 high-ranking USAS to find common ground.  But, as he described, he was not successful and the AB's

27 determination was final: there was a "green light" on all USAS members who refused to operate under

28 the AB's authority.  As a demonstration of the enterprise's long reach throughout California prisons,

Sylvester carried out the AB's Pelican Bay mandate on the B facility of CSP-Sacramento's Security Housing Unit ("SHU").

The Richardson murder was a quintessential AB hit: a coordinated murder that required substantial planning and premeditation in order to be carried out by two armed, lethal attackers against one victim in a highly-secure prison environment.  In the case of Richardson, the jury reasonably inferred that Sylvester and Lance Clemens used substantial planning and premeditation because, in order to carry out the attack in an extremely-restrictive SHU, they had to secure inmate-manufactured weapons,[6] secret them, smuggle them passed a metal detector and carry them out to a small, concrete recreation yard within the SHU.  Once on the concrete yard, Sylvester and Clemens pounced on Richardson when he was vulnerable.  Sylvester and Clemens inflicted 30 stab wounds, landing multiple lethal blows severed Richardson's jugular vein, partially severed his spine at the base of his skull, and punctured multiple vital organs.  For his efforts in murdering Richardson, Sylvester earned membership in the enterprise and bragged about this fact.  In sum, Sylvester's admissions to Burhop and Keeton, his display of the enterprise's primary symbol – the shamrock – and the intercepted call in which his voice is heard repeating the rule that was enforced when he killed Richardson, the jury can reasonably infer that Sylvester earned his membership in the AB by carrying out the order to kill members of the USAS.  For these reasons, Sylvester's Rule 29 motion should be denied

## L.   Count Sixteen – Murder of Hugo Pinell – Yandell

To prove murder in aid of racketeering (a racketeering act considered under the RICO conspiracy as well), the government must prove: (1) the Aryan Brotherhood was an enterprise affecting interstate commerce; (2) the enterprise engaged in racketeering activity; (3) the defendant committed the crime of murder; and (4) the defendant's purpose in committing murder was to gain entrance to, or to maintain or increase his position in the Aryan Brotherhood enterprise.  Ninth Cir. Crim. Jury Inst. 18.8 (2022).

---

[6]     The jury heard overlapping, corroborative testimony from Beasley, Mazza, and Burhop about "the planning required merely to obtain weapons in prison," especially in a highly-restrictive SHU environment like the one where Sylvester murdered Richardson.  *United States v. Snarr*, 704 F.3d 368, 391 (5th Cir. 2013) (finding substantial planning and premeditation to support first degree murder where defendants committed the crime using "the general ability of inmates to exploit or precipitate the conditions" in order to enable them "to carry out their attacks[s]" while each being housed in extremely-restrictive prison environments).

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1   Here, like the Richardson murder, there is no dispute that Jayson Weaver and Waylon Pitchford acted

2   with express malice aforethought because they "unlawfully intended to kill" Hugo Pinell on August 15,

3   2015.  Judicial Council of California Criminal Jury Instruction No. 520 (Cal. Pen. Code § 187).  And,

4   the jury heard undisputed evidence that Weaver and Pitchford earned their enterprise membership for

5   carrying out the killing of Pinell.  Thus, the focus of Yandell's defense was on third-party culpability by

6   CDCR officials – a theory that does not excuse or terminate Yandell's criminal liability under either

7   *Pinkerton* or an aiding-and-abetting theory.  Under either theory of responsibility, the jury could

8   reasonably conclude that Yandell was responsible for Pinell's murder.

9       In particular, Yandell participated in the murder of Hugo Pinell by offering Aryan Brotherhood

10  membership to AB associate Jayson Weaver if he could pull off the murder a high-value AB target.

11  Before the murder, Weaver told Burhop he was going on a mission for Yandell and Sylvester to kill a

12  "BGF guy" in order to earn his enterprise membership.  R.T., 3/12/2024, at 46.  This fact, alone, is

13  sufficient to demonstrate Weaver kill Pinell in order to increase his status with the gang.  About a year

14  after the murder, a jury can reasonably interpret Yandell's intercepted calls bragging to Pat Brady and

15  Travis Burhop about directing the murder of Pinell as being about him and Sylvester.  Govt. Exs. 73,

16  73A ("But, you know, we had that fucking dude, uh, Beaver fucking kill that nigger Yogi who's been in

17  -- the Brothers been trying to kill for years and he smoked that motherfucker. And he was put, he was

18  doing shit for the Brothers on the money tip selling drugs for the Brothers for years so we made him a

19  brother."); Exs. 76, 76A ("So, and we did the same thing with Beaver[7] that killed that nigger Yogi for

20  us."); Govt. Exs. 317, 317A ("So anyway, when DJ was on -- after the killing when we had that nigger

21  Yogi killed, uh, DJ [Danny Jones] was on his phone at 9 o'clock in the morning when IGI busted him

22  with the phone. And he stomped on it, right. Hey, brother, I seen enough You Tube videos to know, they

23  can still get the information out of a phone.").  Yandell also directed that enterprise money be directed to

24  support Weaver and Pitchford while they remained in administrative segregation after the Pinell murder.

25  Govt. Exs. 421, 421A (Yandell telling Pat Brady to send money to Weaver while in administrative

26

27       [7]      Context from the call and testimony at trial demonstrated that Yandell was explaining
         that Yandell and Sylvester made Weaver an AB member without full enterprise consensus because "that
28       was before we're all in contact and to get everybody's opinion."  Govt. Ex. 76, 76A.

segregation); Ex. 418 (Yandell directing Sylvester's associate Carrie Side to put money on Weaver and Pitchfod's inmate accounts).   And, CDCR records confirm that Yandell and Sylvester were housed in the security housing unit at CSP-Sacramento during the time period when Pinell's murder was planned and executed.  Govt. Exs. 429, 430.

Thus, Pinell's murder was unquestionably an Aryan Brotherhood hit and, under either *Pinkerton* or an aiding-and-abetting theory, Yandell was responsible for the killing.

Under *Pinkerton*, the evidence showed: (1) Jayson Weaver and Waylon Pitchford committed the crime of murder in aid of racketeering; (2)  Weaver and Pitchford were member of the RICO conspiracy charged in Count One; (3) Weaver and Pitchford committed the crime of murder in aid of racketeering in furtherance of the conspiracy; (4) Yandell was a member of the same conspiracy at the time the offense charged in Count Sixteen was committed; and (5) the murder fell within the scope of the unlawful agreement and could reasonably have been foreseen to be a necessary or natural consequence of the unlawful agreement.  Ninth Cir. Crim. Jury Inst. No. 11.6 (2022) (approved 3/2021).  "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators."  *Salinas*, 522 U.S. at 64.

Here, each element was met because Weaver and Pitchford were aspiring Aryan Brotherhood members who killed Pinell to increase their status with the gang in August 2015.  The murder was in furtherance of the RICO conspiracy because Pinell had been a long-time enemy of the enterprise based upon his disrespect of various brothers over decades at Pelican Bay – facts confirmed by Beasley and experienced by Mazza.  At the time of the murder, Yandell was a member of the RICO conspiracy because was on the commission and directing the AB's criminal activities at CSP-Sacramento, having been freshly released from the Pelican Bay SHU.  The murder was within the scope of the RICO conspiracy because carrying out public, overwhelming acts of violence against any group or person who disrespects or disobeys the Brand is a core purpose of the enterprise.  The murder was reasonably foreseeable because Weaver told Burhop that Weaver's enterprise membership was contingent on successfully killing Pinell.[8]

---

[8]     Indeed, Yandell's third-party culpability theory essentially concedes this element by arguing that Pinell's murder "could reasonably have been foreseen to be a necessary or natural consequence" of the Aryan Brotherhood's long-term desire to kill Pinell.  This is why the theory is more

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

Moreover, Yandell is responsible for Pinell's murder under an aiding-and-abetting theory. Aiding and abetting requires proof that (1) Weaver or Pitchford committed the murder of Hugo Pinnell in aid of racketeering; (2) Yandell aided, counseled, commanded, induced, or procured that person(s) with respect to at least one element of murder of Hugo Pinell in aid of racketeering in Count Sixteen; (3) Yandell acted with the intent to facilitate the murder of Pinell in aid of racketeering; and (4) Yandell acted before the crime was completed.  Ninth Cir. Crim. Jury Inst. 4.1 (2022) (approved 9/2019).

In this case, these elements are met because Yandell "commanded," "induced," and "procured" Weaver's commitment to murder Pinell by offering Weaver a thing of value: membership in the Aryan Brotherhood.  Based on the undisputed testimony of Burhop, Yandell's offer to Weaver occurred before the murder because Weaver needed to let Burhop know that Yandell and Sylvester would soon be in touch while Weaver spent time in administrative segregation after the murder.  R.T., 3/12/2024, at 45– 46.  The jury could reasonably infer that Yandell had no other intent than to kill Pinell because the very point of his offer to Weaver was for Pinell to end up dead in order to vindicate the enterprise's long-standing hatred of Pinell.  A commonsense interpretation of Yandell's later intercepts celebrating the murder of Pinell is that Yandell was eager to share his success in pulling off the murder of a hated enterprise rival when he had his first opportunity to speak to AB member Pat Brady over a cell phone, Govt. Exs. 73, 73A , 76, 76A, and when he was bringing Burhop into the enterprise because Burhop was "up for the tip" and being given information about the gang's high-profile success in killing Yogi.  Govt. Exs. 317, 317A.  On these grounds, Yandell's Rule 29 motion should be denied.

### M.  <u>Count Two – Conspiracy to murder Kenneth Johnson – Yandell</u>

Trial featured overwhelming evidence that Yandell agreed with multiple RICO participants that he wanted to murder Aryan Brotherhood member Kenneth "Kenwood" Johnson at Kern Valley state prison for violating the enterprise's codes of expected conduct.  The evidence on this charge was overwhelming.

Burhop testified that Yandell and Sylvester each told him that they both wanted Kenwood

---

akin to a nullification argument to the jury because it concedes that the enterprise would inevitably kill Pinell if CDCR officials provided housing to Pinell that was not in the security housing unit.  In other words, even if Yandell is correct about CDCR culpability (a proposition that the government flatly rejects), it does not follow that Yandell is not responsible for Pinell's murder under the law.

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

Johnson killed.  R.T. 3/12/2024, at 61:2–19 (explaining Yandell said "he wanted to kill Kenwood" and Syvlester said "if he was on the yard with [Kenwood] he'd kill him in a heartbeat.").  Intercepted calls verified Burhop's testimony on the plot to kill Kenwood.  In particular, in a series of intercepted calls between Yandell and Matt Hall, Yandell made plain that he and Sylvester intended to have Kenwood murdered.  Govt. Exs. 44, 44A (Yandell telling Hall that Hall works for Yandell and not Kenwood; that Kenwood is a rat; and that Yandell is going to kill Kenwood); Govt. Exs. 117, 117A (Yandell telling Hall that he told Troxell that they're going to kill Kenwood and that Troxell said the people on the street are going to be under Yandell).  In each of the phone calls, Yandell emphasizes to Hall that he and Sylvester are going to kill Kenwood and each call, including the discussions about the plot with Burhop, are overt acts – things done – to further the plot to Kenwood.  As the trial evidence demonstrated, this was not idle chatter – these men and this gang were capable of using their long reach to have inmates killed in any prison.  The plan to kill Kenwood Johnson arose out of an intra-gang dispute.  Govt. Exs. 44, 44A, 117.2, 117.2A.  Yandell and Sylvester wanted control over a valuable asset: Matt Hall.  Govt. Exs. 44, 44A, 117.2, 117.2A.  During intercepted calls between Yandell and Hall, Yandell made clear that Yandell and Sylvester did not want Hall working for Kenwood and, instead, wanted Hall working for them.  Govt. Exs. 44, 44A, 117.2, 117.2A.  In fact, even after Troxell told Kenwood to stand down and that Yandell and Sylvester have control over Hall and others on the streets, Yandell and Sylvester still insisted that they wanted to kill Kenwood.  Govt. Exs. 117, 117A.  Given the overwhelming evidence presented on this count, Yandell's Rule 29 motion should be denied.

## N.    Count Four – Conspiracy to murder Paul Diaz – Yandell

The evidence demonstrates overwhelmingly that Yandell agreed with RICO co-conspirator Jason "Jake" Corbett to murder Aryan Brotherhood associate Paul "Dreamer" Diaz at High Desert state prison for violating the enterprise's codes of expected conduct.  In particular, intercepted calls demonstrated that Corbett believed Diaz "had a death wish" because Diaz "wouldn't fucking listen to reason."  Govt. Exs. 123, 123A.  A later call between Yandell and Pat Brady confirms that Diaz was targeted for death because he "disrespected fucking Jake."  Govt. Exs. 324, 324A.  Corbett made plain to Yandell that "we're going to just fucking smoke his ass."  Govt. Exs. 123, 123A.  The agreement to kill Diaz was completed when Yandell affirmed for Corbett that "if that dude Dreamer comes over there, brother,

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1   smoke his fucking punk ass, man." Govt. Exs. 124, 124A. During the same call, Corbett mentions that

2   he's reached out to Bobby Stockton within High Desert prison and has also discussed the plan to kill

3   Diaz if the opportunity arose. Govt. Exs. 124, 124A.

4          During and in furtherance of this plot, Yandell increased the stakes if Corbett carried out the

5   murder of Diaz. Specifically, Yandell told Corbett that he would "have a motherfucking, right in the

6   back pocket" if he killed Diaz. Govt. Exs. 124, 124A. This modus operandi of offering enterprise

7   membership for carrying out a murder matches exactly with what Yandell offered Burhop to kill James

8   Mickey and what Yandell offered Weaver if he pulled off the Pinell murder.

9          Yandell followed up with Corbett on his offer of AB membership in exchange for Diaz's murder.

10  In a follow-up text message from Yandell to Corbett, Yandell informs Corbett that Troxell agreed to put

11  Corbett up for membership. Govt. Ex. 125. Chillingly, Yandell also texts to Corbett, "Had u take his

12  life and I'll make u a brother." Govt. Ex. 125. Given this undisputed evidence, the jury reasonably

13  concluded Yandell conspired with Corbett to kill Paul Diaz. His Rule 29 motion should therefore be

14  denied.

15         **O.     Count Six – Conspiracy to murder Doug Maynard – Yandell**

16         The evidence demonstrates overwhelmingly that Yandell agreed with RICO co-conspirator Jason

17  Pat Brady to murder Aryan Brotherhood associate Doug Maynard at High Desert state prison for

18  violating the enterprise's codes of expected conduct. This conspiracy, sadly, was successful because

19  Bobby Stockton ultimately murdered Maynard in October 2016.

20         The conspiracy was uncovered during intercepted calls between Yandell and Brady. Brady

21  asked for background on Maynard. Yandell explains that Maynard got into trouble at CSP –

22  Sacramento for generating a drug debt to other inmates at a time when Yandell and Sylvester controlled

23  the yard for white inmates. Govt. Exs. 100, 100A, 143.1, 143.1A. As a result, Yandell and Sylvester

24  ordered Maynard stabbed and two assailants carried out the attack in June 2016. Govt. Exs. 100, 100A,

25  143.1, 143.1A. After Maynard recovered from the stabbing, he arrived at High Desert state prison

26  where Pat Brady was the overall authority for white inmates at the prison. Brady told Yandell that

27  Maynard got himself in trouble with drug debts, even after Yandell had him stabbed at CSP-Sac. Govt.

28  Exs. 100, 100A, 143.1, 143.1A. Making matters worse, Maynard was talking badly about Yandell and

1   Sylvester – another clear violation of the gang's rules.  Govt. Exs. 100, 100A, 143.1, 143.1A.  Yandell

2   admits that he knew Pat Brady was going to kill Maynard at High Desert in advance of the murder

3   because he discussed Maynard's history with Brady before they killed him at High Desert and Yandell

4   told Brady, "You go to do what you got to do."  Govt. Exs. 143.1, 143.1A.  Once Maynard got into

5   trouble again, Yandell agrees that Brady has "got to do what" he has to do – that is, kill Maynard for

6   violating the gang's rules again.  Govt. Exs. 143.1, 143.1A.  Yandell also told Brady there should be no

7   more second chances for Maynard.  Govt. Exs. 100, 100A, 143.1, 143.1A.  Bobby Stockton carried out

8   the conspiracy's objective on October 27, 2016, by brutally murdering Maynard on the prison yard.

9   Given the overwhelming on this count, Yandell's Rule 29 motion should be denied.

10          **P.      Defendants' attacks on the credibility of government witness fails under Rule 29's**
11                  **required standards**

12          To the extent the defendants challenge the credibility of government witnesses, their arguments

13   are not well taken, especially in the context of deciding a Rule 29 motion.  "It is the exclusive function

14   of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable

15   inferences from proven facts.  Therefore the reviewing court must assume that the jury resolved all such

16   matters in a manner which would support the verdict."  *United States v. Nelson*, 419 F.2d 1237, 1241

17   (9th Cir. 1969).  "[T]he question is not whether the court itself would find that every reasonable

18   hypothesis of innocence had been excluded, but rather whether the jurors could reasonably arrive at" the

19   conclusion that the defendant is guilty.  *Id.* at 1243; *see also White v. United States*, 279 F.2d 740, 748

20   (4th Cir. 1960) ("In appraising [the] sufficiency [of the evidence], it is not necessary that the trial court

21   or [the appellate] court be convinced beyond a reasonable doubt of the guilt of the defendant.  The

22   question is whether there is substantial evidence upon which a jury might justifiably find the defendant

23   guilty beyond a reasonable doubt.").  Here, whatever claims the defendants make about the bias or

24   motivation to lie of the government cooperators, such arguments are inapplicable as a matter of law and

25   should be rejected.  "It is well established that the uncorroborated testimony of a single witness may be

26   sufficient to sustain a conviction."  *United States v. Katakis*, 800 F.3d 1017, 1028 (9th Cir. 2015).

27          For these reasons, defendants' attack on the credibility of government witnesses should be

28   rejected as a basis to grant a Rule 29 motion.

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29

1

## II.    **<u>CONCLUSION</u>**

2      The United States respectfully requests that the Court deny defendants' Rule 29 motions.

3

4   Dated:  July 15, 2024                                    PHILLIP A. TALBERT
                                                             United States Attorney
5

6                                                   By:   /s/ *Jason Hitt*
                                                          JASON HITT
7                                                         Assistant United States Attorney

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES' OPPOSITION TO DEFENDANTS'
MOTIONS FOR ACQUITTAL UNDER RULE 29