PHILLIP A. TALBERT
United States Attorney
JASON HITT
ROSS PEARSON
DAVID SPENCER
Assistant United States Attorneys
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile: (916) 554-2900

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 2:19-CR-00107-KJM |
| Plaintiff, | UNITED STATES' OPPOSITION TO DEFENDANT KEVIN MACNAMARA'S MOTION TO SUPPRESS SOUNDLESS VIDEO OF CONTRABAND SMUGGLING INTO THE PRISON AT CSP-SACRAMENTO |
| v. | |
| KEVIN MACNAMARA, | |
| Defendant. | [ECF 2399] |

The United States respectfully submits its opposition to the motion to suppress soundless video from a room within the prison at CSP–Sacramento showing co-defendant Kristen Demar and defendant Kevin MacNamara ("defendant" and "MacNamara") passing methamphetamine, cell phones, and tobacco to inmate and co-defendant Billy Sylvester ("Sylvester") on August 11, 2016.  ECF 2399. MacNamara did not have a reasonable expectation of privacy in being able to engage in unlawful behavior within a prison in violation of California law.  *See* Cal. Penal Code § 4573 (making it a felony to bring controlled substance into a California prison); *id.* § 4573.5 (making it a felony to bring contraband, including cellphones or tobacco into a prison).  Moreover, MacNamara's participation in a criminal conspiracy to smuggle contraband into Sylvester during an attorney visit on August 11, 2016, does not qualify as a privileged attorney-client meeting because the illegal passing of contraband is not germane to the attorney-client relationship.  For these reasons, the government respectfully requests that

the Court deny the defendant's motion to suppress.

## I.  FACTS RELATED TO THE SMUGGLING PLOT

### A.  August 11, 2016 – DEA intercepts Yandell discussing a plot to use Jeanna Quesenberry, Samuel MacNamara, Kristen Demar, and Kevin MacNamara to smuggle methamphetamine, cell phones, and tobacco to Billy Sylvester at CSP-Sacramento using an attorney visit as a façade to accomplish the plot

As detailed in the Criminal Complaint, and verified through intercepted calls and testimony introduced during the recent trial, Sylvester relied on Yandell to handle the logistics of connecting a wide cast of characters to execute a multi-step conspiracy to smuggle methamphetamine, cell phones, and tobacco into Sylvester at CSP–Sacramento through a staged attorney visit on August 11, 2016. *See* ECF 1, at 56–69[1] (detailing plot to smuggle contraband to Sylvester and fall out after Sylvester is caught with cell phones, methamphetamine, and tobacco).[2]  Because agents intercepted the plot in real time and then corroborated the co-conspirators' actions with GPS and physical surveillance, they took steps to make sure the plot would not be successful while also not compromising the wiretap on Yandell's contraband cellphone.

During the week leading up to August 11, DEA agents intercepted calls in which Jeanna Quesenberry discussed a plot to have Keeton transport MacNamara to the Sacramento area. ECF 1, at 57.  Agents correctly interpreted the intercepted calls to demonstrate that, once MacNamara arrived in the Sacramento area, he would visit Sylvester at CSP–Sacramento in order to facilitate the smuggling of contraband to Sylvester during an attorney visit. ECF 1, at 57.  Agents subsequently confirmed that Sylvester was scheduled to have a lawyer visit him at CSP–Sacramento prison on August 11. ECF 1, at 57.

---

[1] Consistent with the Court's practice, the government's citations to page numbers in ECF documents refers to the ECF page number at the top of the document.

[2] Keeton testimony: R.T., 3/25/2024, at 40:20–25, 42:21–25, 43:1–25, 44:1–25, 45:1–24; wiretapped calls: Govt. Exs. 223, 223, 224, 225, 226, 228; clips of video surveillance from August 11 visit: Govt. Exs. 237, 238, 239, 240, 241, 242, 243, 244, 245, 246; photos of seized contraband: Govt. Exs. 249, 250, 251, 252, 253, 254, 255, 256; surveillance photos of Demar and MacNamara at CSP–Sacramento: Govt. Exs. 259, 260, 261, 261.  Demar also testified extensively about the plot and narrated the actions shown in the video clips.  However, the government does currently have access to her final trial transcript at the time of this writing.

On August 11, during the early morning hours, Demar sent Yandell a series of intercepted text messages at about 7:17 a.m.  ECF 1, at 57.  They read, "Oh my god wtf I haven't heard from anybody about time game plan meeting place NOTHING if they here NOTHING I just know they hotel in complete opposite direction I though this supposed to not be like this agin this shit not knowing where to go when to go or what time apt. At has me stressed out I got 2 kids here that I have to wake up get to dad and nobody wants to let me plan my shit that's how shit get fucker up."  ECF 1, at 57–58.

Yandell responded to Demar at 8:04 a.m.: "Sister call our boy Sammy 951/595-9294. Algo call Gina 740-213-3509."  ECF 1, at 58.

Agents correctly interpreted the text exchange to mean that Yandell told Demar to call Keeton ("Sammy") and Jeanna Quesenberry ("Gina") because the phone numbers listed by Yandell matched the numbers used by Keeton and Quesenberry during that time in the investigation.  ECF 1, at 58.  Also, intercepted calls on Quesenberry's phone confirmed that Keeton and Quesenberry were tasked with assisting with the smuggling operation at CSP–Sacramento.  ECF 1, at 58.

At about 8:16 a.m. on August 11, agents intercepted Yandell calling Keeton at (951) 595-9294.  ECF 1, at 58.  This phone number matched the number that Yandell's text to Demar listed for "Sammy" earlier that morning.  ECF 1, at 58.  During the intercepted call, Yandell gave Demar's phone number to Keeton.  ECF 1, at 58.  Yandell told Keeton to call "Kristen" and to let her know the plan for that day.  ECF 1, at 58.  Keeton said he was at a hotel waiting for Quesenberry to arrive with a vacuum-seal machine.  ECF 1, at 58.  Keeton said that it would be "5 today and 5 tomorrow."  ECF 1, at 58.

After this call, GPS locator information showed Quesenberry's telephone travelling from her Sacramento home to a Red Lion Inn located at 500 Leisure Lane, in Sacramento.  ECF 1, at 58.  Surveillance agents also traveled to this location and saw Quesenberry, Keeton, Demar, and MacNamara meeting together in the rear parking lot of the hotel.  ECF 1, at 58.  Agents then saw Demar and MacNamara leave in a black Toyota Sienna minivan registered to the MacNamara Trust.  ECF 1, at 58.

**B.  Agents follow Demar and MacNamara to CSP–Sacramento as they prepare to smuggle contraband into the prison**

Agents followed the Toyota Sienna to CSP–Sacramento.  ECF 1, at 59.  Agents saw Demar and MacNamara park in the parking lot and enter the prison.  ECF 1, at 59.  Once the visit was underway,

1  CDCR investigators allowed MacNamara and Demar to meet with Sylvester for the scheduled visit.
2  ECF 1, at 59.  However, CDCR investigators outfitted the meeting room with a video camera.  ECF 1, at
3  59.  They recorded and monitored a visual feed of the meeting.  ECF 1, at 59.  The room and video
4  device did not have the ability to capture sound, so no audio was heard or recorded.  ECF 1, at 59.

During the meeting, Demar reached into a bag on MacNamara's wheelchair multiple times and produced items to Sylvester.  ECF 1, at 59.  MacNamara was off screen for most of the video.  ECF 1, at 59.  However, the bags on one side of his wheelchair were visible when Demar reached into them.  ECF 1, at 59.  During the course of about 20 minutes, Demar quickly handed Sylvester several items, including what appeared to be a cell phone.  ECF 1, at 59.  Demar obscured her passing the contraband by holding a notepad on top of the items.  Two stills from the surveillance video are below. .



ECF 1, at 60.

When the visit concluded, CDCR officers searched Sylvester.  ECF 1, at 60.  They found a new iPhone in a hand-sewn pocket on the right side of Sylvester's waistband.  ECF 1, at 60. In the same waistband, officers discovered three other iPhones and three vacuum-sealed baggies of tobacco.  ECF 1, at 60.  Upon further search, officers discovered about 20 grams of suspected methamphetamine in Sylvester's rectum.  ECF 1, at 60.  A field test returned a positive result for the presence of methamphetamine.  ECF 1, at 60.  Below is a photograph of some of the evidence collected.



ECF 1, at 61.

CDCR officials also searched MacNamara and Demar before they left the prison grounds. ECF 1, at 61. In the seat cushion of MacNamara's wheelchair, the officials found three new phones, plastic wrappers, and cell phone power cables. ECF 1, at 61.

Investigators approached Demar and read her *Miranda* warnings. ECF 1, at 62. She said she understood her rights and agreed to make a statement. ECF 1, at 62. According to Demar, she was assisting MacNamara on a case involving Sylvester. ECF 1, at 62. Investigators confronted Demar with the finding of contraband on Sylvester. ECF 1, at 62. Demar dropped her head and said, "I need to think about my husband before I say anything." ECF 1, at 62. Demar said she wanted to cooperate but she didn't want to get herself or her husband "Charlie" into more trouble. ECF 1, at 62. Demar claimed that she could die if she cooperated or said something that she wasn't supposed to say. ECF 1, at 62.

Demar explained that her husband was incarcerated at Calipatria prison and had been put "in the hat," meaning the Aryan Brotherhood had marked him for death. ECF 1, at 62. Demar admitted that she and MacNamara had visited Sylvester at CSP–Sacramento on five occasions. ECF 1, at 62. According to Demar, the first visit was just a meeting, but on a few occasions, MacNamara brought contraband for Sylvester. ECF 1, at 62. At one point in the interview, Demar lowered her head and said, "Know this: I wasn't a willing participant." ECF 1, at 62. Then, she said, "Just take me to jail." ECF 1, at 62. Eventually, Demar requested a lawyer, and questioning ceased. ECF 1, at 62.

1   Officers released Demar and MacNamara later that afternoon.  ECF 1, at 62.  DEA surveillance
2   saw Demar and MacNamara leave CSP–Sacramento together in a black Toyota Sienna van at about 2:50
3   p.m.  ECF 1, at 62.  After the failed smuggling operation, agents intercepted multiple incriminating calls
4   confirming every detail of the plot and subsequent actions taken to protect against law enforcement
5   detection.  *See* ECF 1, at 63–65.

## II.   ANALYSIS

### A.   MacNamara did not have a reasonable expectation in committing crime within a prison during an attorney visit

MacNamara's motion to suppress his illegal meeting with Sylvester fails because he did not have a reasonable, justifiable, or legitimate expectation of privacy under the Fourth Amendment in using an attorney visit as a façade to pass contraband to a prisoner during an attorney visit as part of a broader criminal conspiracy.

#### 1.   MacNamara's expectation of privacy to violate California law is not one that society is prepared to recognize as reasonable

"[A]pplication of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979).  A reasonable expectation of privacy must include both a subjective component – "whether the individual, by his conduct, has exhibited an actual (subjective) expectation of privacy" – and an objective component – "whether the individual's subjective expectation of privacy is one that society is prepared to recognize as reasonable." *Smith*, 442 U.S. at 740; *United States v. Van Poyck*, 77 F.3d 285, 290 (9th Cir. 1996) ("[A] 'constitutionally protected reasonable expectation of privacy' exists only if (1) the defendant has an 'actual subjective expectation of privacy' in the place searched and (2) society is objectively prepared to recognize that expectation.") (quoting *United States v. Davis*, 932 F.2d 752, 756 (9th Cir. 1991)).  Within that framework, Fourth Amendment jurisprudence makes plain that prisons share "none of the attributes of privacy of a home, an automobile, an office, or a hotel room.'" *Hudson v. Palmer*, 468 U.S. 517, 527 (1984) (quoting *Lanza v. New York*, 370 U.S. 139, 143–144 (1962)); *Van Poyck*, 77 F.3d at 291 (recognizing Fourth Amendment rights are "severely curtailed" for prisoners).

1    "Prisons, by definition, are places of involuntary confinement of persons who have a
2    demonstrated proclivity for antisocial criminal, and often violent, conduct." *Smith*, 442 U.S. at 526.  As
3    a result, what society is prepared to recognize as "reasonable," "justifiable" or "legitimate" under the
4    Fourth Amendment within prisons is radically different from a private, non-custodial setting.

5    Here, MacNamara claims that his filing of routine pleadings to have CDCR provide him with
6    confidential calls with Sylvester demonstrates his "intent" to have "privileged" and "confidential"
7    discussions with Sylvester.  ECF 2399, at 4.  But, even if MacNamara manifested a subjective intent to
8    keep his phone calls with Sylvester private, the use of soundless video surveillance on August 11 did not
9    invade that subjective intent because confidential communications were not intercepted.  Moreover, the
10   specific setting in which MacNamara's subjective intent must be examined is where the criminal activity
11   with Sylvester occurred: not over a phone call, but rather, it occurred within a prison meeting room
12   where MacNamara and Sylvester hoped to accomplish their criminal scheme.

13   MacNamara's claim of subjective intent in being able to commit violations of California law
14   within a prison visiting room is plainly not legitimate, justifiable, or reasonable.  To interpret the Fourth
15   Amendment in the way that MacNamara suggests would in effect grant him a wide-ranging license to
16   use his status as an attorney to violate the law within prison visiting rooms with impunity.  It would turn
17   the Fourth Amendment into a form of immunity for his behavior and render prison officials powerless to
18   stop attorneys from facilitating criminal acts inside attorney visiting rooms.  Such an interpretation of
19   the Fourth Amendment is inconsistent with well-established precedent and represents an untenable
20   interpretation of what society is prepared to recognize as reasonable.

21   In balancing of Fourth Amendment interests, MacNamara's unreasonable interest in using a
22   prison visit to violate California law is heavily outweighed by the "interest of society in the security of
23   its penal institutions." *Hudson*, 468 U.S. at 527.  In *Hudson*, the Supreme Court explained why the
24   Fourth Amendment's balancing of interests in the prison setting tilts heavily against an individual's right
25   to privacy.

> Within this volatile "community," prison administrators are to take all
> necessary steps to ensure the safety of not only the prison staffs and
> administrative personnel, but also visitors. They are under an obligation to
> take reasonable measures to guarantee the safety of the inmates
> themselves. They must be ever alert to attempts to introduce drugs and

> other contraband into the premises which, we can judicially notice, is one of the most perplexing problems of prisons today; they must prevent, so far as possible, the flow of illicit weapons into the prison; they must be vigilant to detect escape plots, in which drugs or weapons may be involved, before the schemes materialize. In addition to these monumental tasks, it is incumbent upon these officials at the same time to maintain as sanitary an environment for the inmates as feasible, given the difficulties of the circumstances.

*Hudson*, 468 U.S. at 526–27; *Van Poyck*, 77 F.3d at 291 (holding that "any expectation of privacy in outbound calls from prison is not objectively reasonable" and the Fourth Amendment is "not triggered by the routine taping of such calls"); *id.* ("Assuming that the Fourth Amendment were triggered, institutional security concerns justify such recordings and render them reasonable for Fourth Amendment purposes.").

In sum, MacNamara did not have a reasonable expectation of privacy in his prison meeting with Sylvester to effectuate the passing of contraband in violation of California law because such an expectation is not justifiable or legitimate and it is not one that society is prepared to recognize as reasonable. *See In re Nelson*, 2019 WL 12841181, at *2 (D. Alaska Oct. 7, 2019) (Finding that "video-taping attorney client visits in prison does not necessarily violate a prisoner's already diminished expectation of privacy.").

Given that MacNamara did not have a reasonable expectation of privacy, the Fourth Amendment is not triggered and, even if it applied to his visit, "institutional security concerns" justify the investigative measures taken to protect the prison from the introduction of contraband through MacNamara's criminal plot with Sylvester and others.

    2.  <u>MacNamara's reliance on inapposite precedent does not support suppression</u>

MacNamara's reliance on *Katz v. United States*, 389 U.S. 347 (1967), is misplaced. ECF 2399, at 3. In *Katz*, FBI agents attached "an electronic listening and recording device to the outside of the public telephone booth." *Katz*, 389 U.S. at 348. The Court held that the recording of the defendant's private phone calls "violated the privacy upon which he justifiably relied while using the telephone booth." *Id.* at 353.

In contrast to *Katz*, the video surveillance in this case did not acquire the contents of communications. Indeed, the investigative use of a soundless video recording device to monitor the

criminal conduct of MacNamara, Demar, and Sylvester on August 11 was a minimally-intrusive approach to protect the institutional security of the prison. The use of soundless video assured that any potentially-privileged communications would not be heard or recorded. And, agents confined their surveillance to the focal point of the criminal activity uncovered during the wiretap that day: the visit between MacNamara, Demar, and Sylvester.

MacNamara urges a view of the Fourth Amendment that is inconsistent with the "significant deference" courts apply to a prison official's judgment that a particular security measure is warranted. *Casey v. Lewis*, 4 F.3d 1516, 1521 (9th Cir. 1993); *Bell v. Wolfish*, 441 U.S. 520, 547–48 (1979) (explaining that courts must give "wide-ranging deference" to the "expert judgment" of corrections officials regarding institutional security measures since such matters "are peculiarly within the province and professional expertise of corrections officials") (internal quotation marks and citations omitted). Well-established precedent recognizes the substantial interest in prison officials "maintaining institutional security and preserving internal order and discipline." *Bell*, 441 U.S. at 546. These "essential goals" "may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546–47. "[C]entral to all other corrections goals is the institutional consideration of internal security within the corrections facilities themselves." *Id.* Indeed, under existing precedent, prison officials would have been justified in performing extremely-intrusive searches of MacNamara and Demar based upon the evidence uncovered by the DEA wiretap and surveillance. *See Cates v. Stroud*, 976 F.3d 972, 980 (9th Cir. 2020) ("In circumstances where they threaten prison security, prison visitors may be strip searched when based on reasonable and individualized suspicion."). For these reasons, *Katz* is inapposite because MacNamara did not have a reasonable, justifiable, or legitimate expectation of privacy and, as a result, soundless video surveillance of his visit did not implicate the Fourth Amendment and, if it did, the actions taken by prison officials were reasonable under the Fourth Amendment.

The decision in *Kyllo v. United States*, 533 U.S. 27 (2001), is also inapposite. *See* ECF 2399, at 4. In *Kyllo*, law enforcement used "a thermal-imaging device aimed at a private home from a public street to detect relative amounts of heat within a private residence." *Kyllo*, 533 U.S. at 29. The Court held that the use of the thermal-imaging device constituted a "search" within the meaning of the Fourth

Amendment because the homeowner had a reasonable expectation of privacy in the contents of his home not being searched without a warrant. *Id.* at 40. The decision in *Kyllo* turned on "the Fourth Amendment sanctity of the home." *Id.* at 37. Because the Fourth Amendment's protections of the home are heightened, the Court concluded that "the Fourth Amendment draws a firm line at the entrance to the house" without a warrant and held that the warrantless imaging of the residence was an unreasonable "search." *Id.* at 40 (internal quotation and citation omitted).

*Kyllo* is readily distinguishable from the present facts because prisons share "none of the attributes of privacy of a home, an automobile, an office, or a hotel room.'" *Hudson*, 468 U.S. at 527 (quotation omitted). Here, MacNamara traveled to a prison to smuggle contraband into an inmate in violation of California law. Prisons have diminished expectations of privacy for inmates and visitors. This stands in stark contrast to the "sanctity of the home" that was pivotal to the decision in *Kyllo*. In this case, unlike the defendant in *Kyllo*, MacNamara did not have a subjective expectation of privacy that society recognizes as reasonable given the criminal nature and purpose of his meeting with Sylvester on August 11. For these reasons, *Kyllo* does not support MacNamara's motion to suppress the video recording from the visit with Sylvester.

**B.   MacNamara's participation in a criminal conspiracy to smuggle contraband into CSP–Sacramento is not privileged conduct between an attorney and a client**

1.   Criminal conduct is not subject to the attorney-client privilege

MacNamara's motion also fails because his unlawful behavior in participating in a conspiracy to violate California law does not qualify as attorney-client privileged meeting.

California law makes it a felony to pass "contraband" or controlled substances to a prison inmate during a visit. In particular, California Penal Code § 4573 criminalizes bringing drugs into a prison. Similarly, California Penal Code § 4573.5 makes it a felony to bring "contraband" into a prison and each of the items carried by MacNamara constitute contraband under California law. Specifically, California law prohibits prisoners from possessing cellphones, tobacco, and methamphetamine. *See* Cal. Penal Code §§ 4575(a), (b) (criminalizing prisoner possession of cellphones and tobacco); *id.* § 4576(a) (making it a crime for "a person who possesses with the intent to deliver, or delivers, to an inmate . . . in the custody of the department any cellular telephone or other wireless communication device or any

component thereof").

MacNamara's participation in a scheme to illegally pass contraband is "not the passing of confidential information germane to the to the attorney-client relationship." *Brewer v. Runnels*, 2010 WL 3245330, at *24 n.12 (E.D. Cal. Aug. 17, 2010), *aff'd*, 484 F. App'x 132 (9th Cir. 2012). Indeed, the soundless video surveillance did not capture any communications at all. It merely captured MacNamara's, Sylvester's and Demar's illegal *actions* in attempting to smuggle methamphetamine, cell phones, and other contraband into a maximum-security California prison. Accordingly, MacNamara's reliance on his attorney-client relationship with Sylvester as a basis to invoke the Fourth Amendment fails as a matter of law.

2. <u>MacNamara's communications with Sylvester during the August 11 prison visit are not protected from disclosure under the crime-fraud exception to the attorney-client privilege</u>

Even if investigators had intercepted communications between MacNamara and Sylvester, they would not be protected from disclosure because they would be subject to the crime-fraud exception to the attorney-client privilege. For the crime-fraud exception to apply, the government "is not obliged to come forward with proof sufficient to establish the essential elements of a crime or fraud beyond a reasonable doubt, since the crime-fraud exception does not require a *completed* crime or fraud but only that the client have consulted the attorney in an *effort* to complete one." *In re Grand Jury Proc.*, 87 F.3d 377, 381 (9th Cir. 1996) (citation omitted) (emphasis in original). The crime-fraud exception applies where the government develops evidence that "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme." *Id.*

In this case, before investigators used a surreptitious soundless video recording device to capture MacNamara, Demar, and Sylvester in the act of committing multiple state felonies, the DEA investigation had developed overwhelming evidence that a criminal conspiracy was afoot to introduce contraband into CSP–Sacramento through that particular visit on August 11. As detailed in factual summary above, DEA knew from wiretapped calls that Yandell had enlisted Keeton to bring MacNamara up for the visit, coordinated with Demar to accompany MacNamara to the visit in order to pass the hidden contraband from MacNamara's wheelchair to Sylvester, and Jeanna Quesenberry was responsible for gathering the phones, methamphetamine, and tobacco for the conspirators to smuggle

into the prison. ECF 1, at 57–59.

If MacNamara were to claim that he didn't know what Sylvester and the other conspirators had planned,[3] the crime-fraud exception would still apply to MacNamara's communications with Sylvester on August 11. This is true because "it is the client's knowledge and intentions that are of paramount concern to the application of the crime-fraud exception; the attorney need know nothing about the client's ongoing or planned illicit activity for the exception to apply." *In re Grand Jury Proc.*, 87 F.3d at 381–82. In this case, Sylvester's knowledge of the smuggling scheme and his intention to take the contraband and smuggle it back to his prison cell cannot seriously be disputed. Indeed, the very point of Sylvester summoning MacNamara and Demar to an attorney visit on August 11 was to obtain valuable contraband to benefit himself, Yandell, and the overall operations of the AB criminal enterprise. For these reasons, even if audio recordings of MacNamara's communications with Sylvester were captured during the August 11 criminal meeting (they were not), such communications would not be protected from disclosure based upon application of the crime-fraud exception to the attorney-client privilege.

### III.   CONCLUSION

The United States respectfully requests that the Court deny defendant Kevin MacNamara's motion to suppress soundless video from a room within the prison at CSP–Sacramento showing the criminal plot to pass methamphetamine, cell phones, and tobacco to Sylvester on August 11, 2016.

Dated: August 7, 2024

PHILLIP A. TALBERT
United States Attorney

By: /s/ *Jason Hitt*
JASON HITT
Assistant United States Attorney

---

[3]   Such a claim would not be credible given the overwhelming evidence presented at trial that MacNamara knew about the criminal plot to smuggle contraband to Sylvester through attorney visits in MacNamara's name. The trial evidence featured the undisputed testimony of Keeton and Demar about the overall plot, including how it had been executed in previous visits with Sylvester at CSP–Sacramento. That overlapping testimony was corroborated extensively by wiretapped calls among the conspirators reacting to Sylvester being caught with contraband on August 11, and calls in which the conspirators confirm the past success that MacNamara had in using attorney visits to smuggle contraband to Sylvester.