1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   United States of America,                    No. 2:19-cr-00107-KJM

12                     Plaintiff,                  ORDER

13        v.

14   Ronald Yandell, Daniel Troxell, and
     William Sylvester,
15

16                     Defendants.

17

18        A jury convicted Ronald Yandell, Daniel Troxell and William Sylvester of racketeering,

19   conspiracy, murder and drug charges earlier this year.  While the trial was underway, the

20   government disclosed an email sent several years ago by a case agent, Drug Enforcement

21   Administration Special Agent Brian Nehring, to the lead prosecutor, Jason Hitt.  In Yandell's

22   view, the email proved the government was prosecuting him vindictively because he advocated

23   for reforms within the California prison system, such as by leading a hunger strike against solitary

24   confinement and gang validation policies.  He now moves to dismiss the indictment.  As

25   explained in this order, Yandell has not shown there is a reasonable likelihood the government

26   would not have charged him if he had not advocated for reforms, so the court **denies** his motion.

27   /////

1

## I.   BACKGROUND

The investigation that ultimately led to the charges in this case began in late 2014, when Agent Nehring and other officers were looking into a group of California drug traffickers.  *See* Compl. Aff. at 16, ECF No. 1.  One member of that group, Jeanna Quesenberry, was distributing large amounts of methamphetamine and heroin, and agents found evidence she was working in the community for Yandell, who was incarcerated in California state prison.  *See id.*

This was not the first time Nehring had run into Quesenberry and Yandell.  *See id.* at 16 n.1.  His experience with them dated back much further.  *See id.*  Nehring did not detail that history in the affidavit he prepared for the criminal complaint, but he does so in a declaration filed in opposition to Yandell's pending motion.  *See generally* Nehring Decl., ECF No. 2394-1. According to that declaration, Nehring first learned about Yandell in the early 1990s, while he was working on a case in Contra Costa County, California.  *See id.* ¶ 3.  Agent Nehring was investigating a woman who was married to one of Yandell's friends, and that same woman was working with Yandell to manufacture and distribute methamphetamine.  *See id.*  Yandell was in federal custody at the time, and Nehring recalls he was already a member of the Aryan Brotherhood.  *See id.*

Yandell's connections to the illegal drug market surfaced again several years later, first in the year 2000, when Nehring found a methamphetamine lab in the home of a woman who was working for Yandell's partner.  *See id.* ¶ 4.  The next year, after Yandell's release, sources told Nehring Yandell was still working with the same partner and collecting "protection" money from local methamphetamine cooks, who he also was attempting to bring under his control.  *Id.* ¶¶ 5–6. Then Nehring found another meth lab in the same partner's home.  *Id.* ¶ 7.  Nehring also learned Yandell was suspected to have played a role in two murders that had occurred in the same neighborhood.  *Id.* ¶ 8.  And from what Nehring remembers, Yandell was ultimately convicted for his involvement in at least one of those murders.  *Id.*

About ten years later, while Yandell was still serving a state prison sentence for the murder conviction, Nehring heard he was working with a gang known as the Family Affiliated Irish Mafia or "FAIM."  *See id.* ¶ 9.  Sources told Nehring Yandell had brought all of the white

1    gang members in Contra Costa County under his control and was working with a member of

2    FAIM to orchestrate the operation of a methamphetamine lab in another nearby county.  *See id.*

3    Nehring confirmed the FAIM member was in fact selling methamphetamine in 2014 and 2015,

4    while he also was investigating Quesenberry and others in FAIM, as described in his affidavit in

5    support of the criminal complaint in this case.  *Id.*; Compl. Aff. at 16.

6         Yandell's history with Quesenberry and FAIM is just one thread of this case's history.

7    Another thread traces back to 2009, when Troxell and another Aryan Brotherhood member, Todd

8    Ashker, who were both serving prison sentences in California state prison at the time, filed a pro

9    se civil rights lawsuit.  *See generally* Compl., *Ashker v. Governor*, No. 09-5796 (N.D. Cal.

10   Dec. 9, 2009), ECF No. 1.  They challenged the conditions of their long-time solitary

11   confinement within the Pelican Bay State Prison and, more broadly, the state's policies for

12   identifying and segregating some prison gang members from other inmates.  *See, e.g.*, *Ashker v.*

13   *Newsom*, 81 F.4th 863, 872 (9th Cir. 2023) (summarizing allegations).  Several years into the

14   litigation, in 2014, Ashker, Yandell and others housed in the Pelican Bay security housing unit,

15   the so-called "SHU," began a hunger strike that garnered attention from outside the prison.  *See*

16   Benjamin Wallace-Wells, *The Plot from Solitary*, New York Magazine (Feb. 21, 2014).[1]  The

17   parties in the *Ashker* case signed a settlement agreement the next year, which the court approved

18   in 2016.  *See* Order Granting Final Approval of Class Action Settlement Agreement, *Ashker v.*

19   *Governor*, No. 09-5796 (N.D. Cal. Jan. 26, 2016), ECF No. 488; Joint Mot. Conditional Cert. &

20   Prelim. Approval, *Ashker v. Governor*, No. 09-5796 (N.D. Cal. Sept. 1, 2015), ECF No. 424.  As

21   part of the settlement agreement, Yandell, Troxell and other members of the Aryan Brotherhood

22   were transferred from Pelican Bay to less restrictive housing units elsewhere in California.  And

23   so, in 2016, while the DEA and Agent Nehring were investigating Quesenberry and others

24   affiliated with FAIM and Yandell, Yandell and other members of the Aryan Brotherhood were

25   leaving or had recently left the Pelican Bay SHU.

---

[1] A snapshot of the page as it was available on January 26, 2024 is available on the internet archive via https://web.archive.org/web/20240126003206/https://nymag.com/news/features/solitary-secure-housing-units-2014-2/

1    These threads came together in the summer of 2016, when Agent Nehring was exchanging
2    recorded calls and text messages with Quesenberry under an assumed identity in an effort to
3    collect evidence about her drug trafficking connections.  *See* Compl. Aff. at 40.  Phone records
4    showed she was in regular contact with Yandell at the time; he was using a contraband phone to
5    speak with her from his cell.  *See id.*  The government ultimately requested and the court
6    approved wiretaps on Quesenberry's and Yandell's phones.  *See id.* at 16, 23 & n.3, 37, 40.  The
7    government used the wiretaps to collect a great deal of evidence about the drug trafficking
8    operation and the Aryan Brotherhood's membership, leadership and efforts to exert influence
9    within the California state prison system.  *See id.* at 50–132.

10    The government filed this case about three years after the wiretaps concluded.  *See*
11    *generally id.*; Indictment, ECF No. 25.  It charged Yandell, Troxell, Sylvester, Quesenberry and
12    many others, both inside and outside the state prison system, with conspiracy to participate in a
13    criminal enterprise in violation of the Racketeer Influenced and Corrupt Organizations Act
14    (RICO), the statute punishing violent crimes in aid of racketeering (VICAR) and the Controlled
15    Substances Act.  *See* Indictment ¶¶ 1–32 (citing 18 U.S.C. § 1962(d)).  Among other things, the
16    government alleged Yandell and Troxell were members of the Aryan Brotherhood's three-man
17    leadership commission, *see id.* ¶¶ 16–17; it alleged Yandell, Troxell and Sylvester had murdered
18    and conspired to murder in aid of the enterprise, *see id.* ¶¶ 33–55; and it alleged Yandell and
19    Sylvester had led an interstate drug conspiracy from within their cells, *see id.* ¶¶ 56–63.

20    No crime charged in the original indictment was punishable by death, but the allegations
21    against five defendants could potentially have supported charges of crimes punishable by death,
22    so the court appointed "learned" counsel to represent those defendants under 18 U.S.C. § 3005
23    and treated the case essentially as a capital case.  *See* ECF Nos. 108, 109, 111, 119, 120.  Yandell
24    and Sylvester were among those facing allegations that could have led to capital charges; Troxell
25    was not.  The government ultimately filed a superseding indictment that added four charges for
26    murder in aid of racketeering under 18 U.S.C. § 1959(a)(1) and (2) against five defendants,
27    including Yandell.  *See* Superseding Indictment at 17–22, ECF No. 1375; 18 U.S.C. § 1959(a)(1).
28    The maximum penalty for these new charges was death.  *See id.*  The government took care to

4

note, however, it still had not "made a final determination on whether to pursue the maximum penalty" of death, Superseding Indictment at 54–55 & nn.8–11, and it ultimately confirmed in late 2023 it would not seek the death penalty against Yandell or any other defendant in this case, *see* Death Penalty Notice, ECF No. 1675.

Before trial, Yandell moved to dismiss this action as an unconstitutionally vindictive prosecution. *See generally* Prev. Yandell Mot., ECF No. 1801. He painted the case as retaliation for the successful settlement of the *Ashker* litigation and as an attempt to "negate" the protections the *Ashker* class had secured for himself and others because:

- Nehring's investigation into Yandell's drug trafficking began soon after *Ashker* was settled. *See* Prev. Yandell Mot. at 9–10.

- The complaint describes Yandell as a "beneficiary" of the *Ashker* settlement, and it draws a line of cause and effect from the *Ashker* settlement to increased prison violence. *See id.* at 10 (quoting Compl. Aff. at 26).

- The lead prosecutor had explained in a private investigative interview that an "underlying rationale" for this action was imposing an "additional consequence" on "validated gang members." *Id.* at 11.

- Prosecutors had sought and obtained the unusual authority to permanently transfer Yandell and other defendants from state custody into federal custody, where the terms of the *Ashker* settlement would not apply. *See id.* at 13–14.

- Other similar federal criminal charges had been filed against other *Ashker* class members. *See id.* at 11.

- This and other similar cases could have been filed in state court, and they could have been prosecuted as violations of state criminal law. *See id.* at 12.

Dr. Keramet Reiter, Ph.D., a professor in the department of Criminology, Law & Society at the University of California, Irvine, submitted a declaration in support of that earlier motion. *See* Reiter Decl. ¶ 1, ECF No. 1801-1. She summarized the hunger strikes, the *Ashker* litigation and an "Agreement to End Hostilities" by prominent members of race-based prison gangs, including Yandell. *See id.* ¶¶ 9–10. Reiter also described her opinion that California prison

1    officials have attempted to demonize and discredit the strikers and undermine the plaintiffs'

2    claims in the *Ashker* litigation.  *See id.* ¶¶ 11–12.  She saw the government's claims against

3    Yandell and Troxell in this case as further retaliation in the same vein.  *See id.* ¶¶ 13, 22–23.

4         Yandell argued on this foundation that the federal government was attempting to take him

5    and others from the California state prison system—where they had just secured their release

6    from solitary confinement—and shuttle them off to a federal maximum-security prison, where

7    they would, once again, be housed in indefinite isolation.  *See* Prev. Yandell Mot. at 2.

8         The court denied the motion.  First, it found the lead prosecutor's statement in the

9    investigative interview reflected "legitimate prosecutorial considerations—ensuring consequences

10   for serious crimes and focusing on the most culpable offenders, such as the leaders of criminal

11   organizations."  *See* Prev. Order at 4, ECF No. 1917.  Second, the court found the record showed

12   the prosecution here had not stemmed from the *Ashker* litigation, but rather from the

13   government's long-running investigation into drug trafficking by Quesenberry and others outside

14   the prison.  *See id.* at 4–5.

15        Trial went forward on the charges against Yandell, Troxell and Sylvester in February,

16   March and April 2024.  The jury reached verdicts of guilty on all of the charges in the

17   superseding indictment.  *See* Verdict, ECF No. 2317.  But before then, as the trial was nearing its

18   conclusion, the government produced an email Agent Nehring had written to Jason Hitt, the lead

19   prosecutor, in February 2016.  *See* Nehring Email, ECF No. 2277-1.  As summarized above,

20   Nehring was investigating Quesenberry and buying drugs from her using an assumed identity at

21   the time, and he knew about her relationship with Yandell, but the court had not yet authorized a

22   wiretap.

23        In the email, Nehring explained a then-recent development in his investigation:

24   Quesenberry had unexpectedly changed her phone number.  *Id.*  Nehring was "puzzled."  *Id.*  Her

25   old phone could not have run out of minutes.  Why had she changed it?  At first Nehring

26   wondered whether she had begun changing phones more regularly, which could have made a

27   wiretap virtually impossible.  As it turned out, however, the prison had seized a phone from

28   Yandell the day before, while searching his cell.  Officers had searched his cell because they

1    believed he had recently "arranged a murder" in another California prison.  *Id.*  As Nehring told

2    Hitt in the email, that seizure would explain why Quesenberry had dropped her own phone.

3           Nehring's suspicions were confirmed when prison officials searched Yandell's phone for

4    evidence and found he had tried to remove call records from the phone, apparently in anticipation

5    that it would be seized.  Investigators found Quesenberry's number in the phone, along with other

6    information suggesting Yandell was working with several other people to smuggle drugs from

7    Mexico into California and other states.  "This is looking good," Nehring wrote to the prosecutor.

8    *Id.*

9           As for Yandell, Nehring's internet research had led him to believe Yandell had exchanged

10   messages with a man named Barry Mills during the time the government was conducting a

11   previous investigation into the Aryan Brotherhood's leadership.  *See id.*  Like Yandell, Mills was

12   once a member of the Aryan Brotherhood's commission, and he had been named a defendant in a

13   racketeering prosecution in the Central District of California many years before.  *See, e.g.*, *United*

14   *States v. Bingham*, 653 F.3d 983, 989 (9th Cir. 2011) (summarizing charges and evidence against

15   Mills and other defendants); Superseding Indictment ¶¶ 1–64, *United States v. Mills*, No. 02-938

16   (C.D. Cal. Aug. 25, 2005), ECF No. 2295 (alleging Mills and others were part of an Aryan

17   Brotherhood racketeering enterprise).  Nehring also wrote that he had learned Yandell "led the

18   hunger strike at Pelican Bay SHU back in the mid-2000's."  Nehring Email at 1.  He ended his

19   email to Hitt with a direct, quite personal note: "I want to crush him so bad my teeth hurt," he

20   wrote, referring to Yandell.  *Id.*

21          Although the government gave Yandell a copy of Nehring's email while the trial was still

22   in progress, Yandell did not seek to call Nehring to the stand to confront him about his email or

23   his potential bias.  Nor did the other defendants.  Yandell instead renewed his previous vindictive

24   prosecution motion.  *See* Yandell Mot., ECF No. 2277.  He portrays the email as smoking-gun

25   evidence of the same point he advocated before: this case is an "explicitly vindictive" attempt to

26   "crush" him, "the man who 'led the hunger strike at Pelican Bay SHU back in the mid-2000's.'"

27   Yandell Mot. at 3. (alterations omitted) (quoting Nehring Email at 1).  Professor Reiter also

28   submitted an updated declaration in support of Yandell's motion.  *See generally* Updated Reiter

7

Decl., ECF No. 2277-2.  "In more than fifteen years of writing about the history of California state prisons and reviewing thousands of documents as part of [her] research and writing," she states, the 2016 email "is the most explicit articulation [she has] ever seen of an intent to retaliate against and prosecute a specific individual (Yandell), who was previously involved in publicly criticizing California state prisons."  *Id.* ¶ 11.

Sylvester and Troxell both join Yandell's motion.  *See generally* Sylvester Joinder, ECF No. 2296; Troxell Joinder, ECF No. 2304.  Sylvester does not advance independent arguments for dismissal.  Troxell explains only briefly that he "also served as a leader and organizer of the prison hunger strikes undertaken to publicize the issues of CDCR's cruel and unusual punishment of inmates raised in the *Ashker* case."  Troxell Joinder at 2.  The government opposes and argues now, as before, that this case grew from its long-running investigation of Quesenberry, Yandell and FAIM and is not vindictive.  *See generally* Opp'n, ECF No. 2394.  It says the investigation in general—and Nehring in particular—focused on Yandell "because he was a convicted murderer who was still ordering murders from prison, dealing significant quantities of drugs, and participating in the Aryan Brotherhood."  Opp'n at 2, ECF No. 2394.  Briefing is now complete. *See generally* Reply, ECF No. 2415.  The court held a hearing on August 21, 2024.  Jason Hitt, Ross Pearson and David Spencer appeared for the government.  Steven Kalar and Sean McClelland appeared for Yandell.

## II.    LEGAL STANDARD

It is "a due process violation 'of the most basic sort'" to punish a person for doing "what the law plainly allows him to do."  *United States v. Goodwin*, 457 U.S. 368, 372 (1982) (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978)).  "For while an individual certainly may be penalized for violating the law, he just as certainly may not be punished for exercising a protected statutory or constitutional right."  *Id.*  The government may not file criminal charges against a person as a penalty "for exercising a protected statutory or constitutional right."  *United States v. Jenkins*, 504 F.3d 694, 699 (9th Cir. 2007).  A criminal defendant may move to dismiss a retaliatory indictment in such a "vindictive prosecution."  *United States v. Hooton*, 662 F.2d 628, 634 (9th Cir. 1981).

1    Sometimes vindictiveness can be proven by "direct evidence of the prosecutor's punitive

2    motivation." *Jenkins*, 504 F.3d at 699.  Prosecutions in this category are sometimes described as

3    cases of "actual vindictiveness."  *E.g.*, *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002)

4    (quoting *Maddox v. Elzie*, 238 F.3d 437, 446 (D.C. Cir. 2001)).  These prosecutions involve

5    "objective evidence that the prosecutor's actions were designed to punish a defendant for

6    asserting his legal rights."  *Id.* (quoting *Maddox*, 238 F.3d at 446).

7    But motives are "complex and difficult to prove," and direct evidence of a vindictive

8    motive is rare.  *See Goodwin*, 457 U.S. at 373.  The Supreme Court has held it is sometimes

9    necessary to presume a prosecution is vindictive, thus shifting the burden to the government to

10   prove the legitimacy of its motivations.  *See id.*  "Given the severity of such a presumption,

11   however—which may operate in the absence of any proof of an improper motive and thus may

12   block a legitimate response to criminal conduct—the Court has done so only in cases in which a

13   reasonable likelihood of vindictiveness exists."  *Id.*  The question is not whether the prosecutor

14   has acted in "bad faith" or "maliciously."  *Jenkins*, 504 F.3d at 699 (quoting *United States v.*

15   *Groves*, 571 F.2d 450, 453 (9th Cir. 1978)).  It is whether there is a "realistic" or "reasonable

16   likelihood" that the government would not have brought the disputed charges if the defendant had

17   not exercised his rights.  *See United States v. Gallegos–Curiel*, 681 F.2d 1164, 1168–69 (9th Cir.

18   1982).  If the presumption arises, the government must offer "objective evidence justifying the

19   prosecutor's action" to rebut it.  *Jenkins*, 504 F.3d at 701 (quoting *Goodwin*, 457 U.S. at 376 n.8).

20   **III.   DISCUSSION**

21   Yandell argues this is a rare case of an actually vindictive prosecution, supported by direct

22   evidence, citing Nehring's email.  To support that claim, Yandell "must show vindictiveness on

23   the part of those who made the charging decision."  *United States v. McWilliams*, 730 F.2d 1218,

24   1221 (9th Cir. 1984).  "[T]he proper focus in discriminatory prosecution cases is on the ultimate

25   decision-maker."  *United States v. Gomez-Lopez*, 62 F.3d 304, 306 (9th Cir. 1995).  Although

26   Agent Nehring's 2016 email sheds light on his own motivations, he is not a prosecutor.  No

27   evidence shows Agent Nehring made the charging decision.  He signed the affidavit attached to

28   the criminal complaint, but as the government points out, federal regulations forbade anyone from

1    moving forward with this case, even local prosecutors, before they obtained approval from the

2    Criminal Division of the United States Department of Justice. *See* Opp'n at 5 (citing U.S. Dep't

3    Justice, Justice Manual § 9-110.101 ("No RICO criminal indictment or information or civil

4    complaint shall be filed, and no civil investigative demand shall be issued, without the prior

5    approval of the Criminal Division.")). Yandell offers no reason to suspect the government

6    departed from that procedure in this case. There is no direct evidence of a vindictive decision by

7    the "ultimate decision-maker." *Gomez-Lopez*, 62 F.3d at 306.

8         Because there is no direct evidence of a vindictive prosecution, Yandell must rely on the

9    alternative, burden-shifting test described above. But as is true in cases of direct evidence, to

10   prove there is a "reasonable likelihood of vindictiveness" under the alternative test, a defendant

11   must also show "vindictiveness on the part of those who made the charging decision." *United*

12   *States v. DeTar*, 832 F.2d 1110, 1112 (9th Cir. 1987). The Ninth Circuit has repeatedly rejected

13   vindictive prosecution claims like the one Yandell advances. *See id.* (rejecting arguments about

14   disputes between defendant and Internal Revenue Service); *McWilliams*, 730 F.2d at 1121–22

15   (dismissing allegations about another prosecutor's bias); *Hooton*, 662 F.2d at 633–34 (rejecting

16   claims about investigation by agent of Bureau of Alcohol, Tobacco, Firearms and Explosives);

17   *United States v. Erne*, 576 F.2d 212, 216–17 & n.4 (9th Cir. 1978) (rejecting arguments based on

18   agent's "improper discriminatory motive" because others made charging decision). Again,

19   although Nehring signed the affidavit in the criminal complaint, Yandell cites no evidence to

20   show Nehring had any authority to decide whether Yandell or any other defendant would be

21   charged.

22         There is a second, broader disconnect in Yandell's theory of vindictive prosecution as

23   well: the difference between—on the one hand—the California authorities whose policies came

24   under scrutiny during the hunger strikes and the *Ashker* litigation and—on the other hand—the

25   federal authorities who pursued the investigation and charges in this case. Yandell has not

26   explained why federal prosecutors and investigators would harbor improper biases against him or

27   anyone else for asserting constitutional claims about the conditions in California's state prisons.

28   Federal authorities were not responsible for Yandell's previous incarceration. They were not

1    responsible for the conditions of his past confinement.  They did not set the policies the plaintiffs

2    challenged in the *Ashker* litigation.

3         Yandell's theory seems to be founded on the implicit and dubious assumption that law

4    enforcement officers and prosecutors of any stripe would reflexively oppose and retaliate against

5    anyone who advances prison reform efforts.  There are many reasons to doubt that assumption.

6    Federal authorities have often sought to vindicate the rights of those who suffer unconstitutionally

7    at the hands of state and local officials.  *See, e.g.*, Stip. & Proposed Order re Settlement, *United*

8    *States v. County of Los Angeles*, No. 15-5903 (C.D. Cal. Aug. 1, 2015), ECF No. 4-1 (proposing

9    settlement in action by United States to vindicate constitutional rights of persons confined in Los

10    Angeles County jails); U.S. Dep't of Justice, *Investigation of the Mississippi State Penitentiary*

11    (*Parchman*) (Apr. 20, 2022) (reporting on investigation of conditions of confinement at

12    Mississippi prison).[2]  The Ninth Circuit also has "expressed doubt as to whether a prosecution

13    could be condemned as 'vindictive' when the defendant's claim is that one sovereign is punishing

14    him for rights he asserted against a different sovereign."  *United States v. Robison*, 644 F.2d

15    1270, 1273 (9th Cir. 1981) (citing *United States v. Burt*, 619 F.2d 831, 836 (9th Cir. 1980)).

16         It is no response to point out, as Yandell does in his brief, that the affidavit in the criminal

17    complaint mentions the *Ashker* settlement and hunger strikes.  *See* Compl. Aff. at 23–27.  Those

18    references were simply part of a chronology: they explained how and why the Aryan Brotherhood

19    operated as it did after the *Ashker* settlement in 2016.  *See* Prev. Order at 4.  A defendant cannot

20    establish the necessary "reasonable likelihood" of vindictiveness without explaining why "the

21    prosecutor has some stake in deterring the defendant's exercise of his rights."  *United States v.*

22    *LaDeau*, 734 F.3d 561, 566 (6th Cir. 2013) (alterations omitted) (quoting *Bragan v. Poindexter*,

23    249 F.3d 476, 482 (6th Cir. 2001)).  Nor can courts infer prosecutors acted vindictively "simply

24    because [their] actions followed the exercise of a right, or because [those actions] would not have

25    been taken but for exercise of a defense right."  *Gallegos-Curiel*, 681 F.2d at 1168.  "It is only

26    when prosecutorial actions stem from an animus toward the exercise of a defendant's rights that

27    vindictive prosecution exists."  *Id.*

---

[2] https://www.justice.gov/crt/case-document/file/1495956/dl.

Setting these logical gaps aside, Yandell's theory of vindictiveness is unpersuasive on its own terms as well.  In early 2016, when Agent Nehring wrote his email to the prosecutor, Nehring was following the leads he had long been chasing: the drug-trafficking connections between Quesenberry, FAIM and Yandell.  Agent Nehring was already investigating Quesenberry and collecting evidence about her suppliers.  He already suspected she was working with Yandell.  He already believed Yandell was a long-time member of the Aryan Brotherhood.  When Quesenberry changed her phone number in early 2016, Nehring made another connection between her and Yandell, and he found evidence to suggest the drug conspiracy went further than just California and Quesenberry.  His own research then revealed a relationship between Yandell and another prominent and well-known member of the Aryan Brotherhood.  With this context, Nehring's comment about the hunger strike does not look like an expression of anger at Yandell—or anyone else—for an exercise of constitutional rights.  Yandell's "long history" of drug trafficking, gang connections and violence "suggest[ed] the appropriateness of initiating criminal action, not an appearance of vindictiveness."  *DeTar*, 832 F.2d at 1112.  In short, Nehring's personal comment is most fairly construed as conveying that Yandell appeared to Nehring as an especially culpable and dangerous target.

The broader circumstances support the same conclusion.  As Nehring detailed in his affidavit in the criminal complaint, the wiretap and resulting investigation uncovered extensive, detailed evidence showing Yandell, Troxell and Sylvester were at or near the top of a violent and often murderous conspiracy to traffic drugs and exert influence within the California state prison system.  And the government did not indict just them.  It brought charges against more than a dozen other people, many with no connection to the *Ashker* litigation or the hunger strikes, and it did not decide until late in this case whether it would seek the death penalty.

The court has reviewed Dr. Reiter's declaration but finds it is largely unhelpful in providing support for the court's application of the legal standard the Supreme Court and Ninth Circuit have laid out.  Judges on their own are capable of deciding whether evidence is direct and what that evidence reveals about a prosecutor's or an agent's motives.  That is apparent in the

/////

1    many decisions cited in both sides' legal memoranda that do not turn on the opinions of an expert

2    witness, but rather the workaday task of applying law to facts.[3]  This case is no exception.

3          It may very well be, as Reiter writes in her declaration, that many inmates have run into

4    retaliation and other roadblocks in their attempts to vindicate their constitutional rights, including

5    in *Ashker* and the related hunger strikes.  But if this case in particular was meant as an end-run

6    around the *Ashker* settlement, as Yandell contends it was, then it was quite an overinclusive and

7    convoluted end-run.  The government charged not just Yandell and Troxell, but also more than a

8    dozen other men and women.  As an end-run, the plan would succeed only through the secretive

9    and seamless coordination among many independent actors, including officials at the Department

10   of Justice in Washington, D.C.  The government would accomplish its allegedly retaliatory

11   goal—i.e., the return of Yandell and others to solitary confinement—only if it persuaded a jury of

12   twelve citizens beyond a reasonable doubt that Yandell and many others had committed many

13   violent federal felonies.  Now, as before, the government argues persuasively that the truth is

14   simpler.  "[L]egitimate prosecutorial considerations" were actually what motivated its charging

15   decisions: "ensuring consequences for serious crimes and focusing on the most culpable

16   offenders, such as the leaders of criminal organizations."  Prev. Order at 4 (citation omitted).

17         The court will not permit discovery or conduct an evidentiary hearing because Yandell has

18   not made the necessary preliminary showing.  *See id.* at 4–5.

19   **IV.    CONCLUSION**

20         The motion to dismiss (ECF No. 2277) is **denied**.

21         IT IS SO ORDERED.

22   DATED:  November 8, 2024.

23

                                         UNITED STATES DISTRICT JUDGE

---

[3] In *Gomez-Lopez*, the defense did offer the opinions of an expert sociologist, who opined that people with Latino surnames had been prosecuted at higher rates than others and concluded the difference could not be explained by random variation.  *See* 62 F.3d at 305.  Resolving this motion requires no equivalently complex analysis.