**REDACTED**

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:19-cr-00107-KJM |
| Plaintiff, | ORDER |
| v. | UNDER SEAL |
| Daniel Troxell, | |
| Defendant. | |

Defendant Daniel Troxell moves for a new trial based on his contention the government did not disclose evidence in violation of the rule first established in *Brady v. Maryland*, 373 U.S. 83 (1963). As the court explains in this order, Troxell has not demonstrated the undisclosed evidence was favorable to him, nor that there was a reasonable probability of a different outcome if it had been disclosed. The court therefore **denies** the motion.

I.  **BACKGROUND**

The government indicted Troxell on two charges under the Racketeer Influenced and Corrupt Organizations (RICO) Act. *See* Indictment, ECF No. 25; Superseding Indictment, ECF No. 1375. First, the government alleged he was a member of the California Aryan Brotherhood, a prison gang, and part of a criminal enterprise whose members committed murders and trafficked narcotics. *See* Superseding Indictment ¶¶ 24–35 (citing 18 U.S.C. § 1962(d)). According to the superseding indictment, this conspiracy began "in or around October 2011" and continued "to in

1

or around June 2019." *Id.* ¶ 25. Second, the government alleged Troxell conspired with his codefendant, Ronald Yandell, to murder a man named James Mickey in pursuit of the Aryan Brotherhood's goals. *Id.* ¶¶ 40–41 (citing 18 U.S.C. § 1959(a)(5)). The government alleged this second conspiracy began and ended within about two days in August 2016. *Id.* ¶ 41.

The court presided over a jury trial in the case against Troxell, Yandell and a third defendant, William Sylvester, in spring 2024. *See* Mins., ECF Nos. 1912, 2314. Troxell's attorney, Todd Leras, pursued a defense based in part on the theory that Troxell was not a member of the violent conspiracies described in the indictment. He argued Troxell had used his status as an influential and senior member of the Aryan Brotherhood not to commit murders or to traffic narcotics, but rather to advocate for peace in the prisons and better living conditions. For example, in Leras's opening statement, he told the jury the evidence would show how Troxell and his former cellmate filed a civil rights lawsuit challenging the conditions of their confinement, signed an agreement to end hostilities between various race-based gangs within the California prison system, and ultimately secured a settlement that freed inmates from the housing units they had alleged were inhumane. *See* Trial Tr. (Feb. 26, 2024) at 63–66. In the same vein, Leras told the jury the evidence would show how Troxell used his position to protect men who had fallen out of favor with other members of the Aryan Brotherhood. *See, e.g., id.* at 66.

Leras also made arguments on Troxell's behalf that took aim at Yandell and Sylvester and other members of the Aryan Brotherhood. For example, in his closing argument, he urged the jury to find Yandell and Sylvester had followed their own rules and their own agenda, even if doing so might put them out of step with the Aryan Brotherhood's other members or its leadership, including Troxell. *See, e.g.,* Trial Tr. (Apr. 23, 2024) at 52–53. To support this argument, Leras worked during trial to elicit evidence of a division within the Aryan Brotherhood, of a rift that separated Troxell on the one hand from Yandell and Sylvester on the other. *See, e.g., id.* at 57–58; Trial Tr. (Feb. 28, 2024) at 106–07; Trial Tr. (Mar. 5, 2024) at 86–87; Trial Tr. (Mar. 6, 2024) at 61–62, 93–95. Leras also presented evidence suggesting this division had grown so stark that some Aryan Brotherhood members or associates even planned to kill Troxell. *See* Trial Tr. (Feb. 28, 2024) at 109–16; Trial Tr. (Apr. 3, 2024) at 39–73. For

1   example, Leras confirmed with one former member of the Aryan Brotherhood, a cooperating
2   witness named ▒▒▒▒▒, that he had once spent the "better part of a year" plotting to kill
3   Troxell over a disagreement about the Aryan Brotherhood's leadership. *See, e.g.*, Trial Tr. (Feb.
4   28, 2024) at 109–14.

5       Divisions and conflicts within the Aryan Brotherhood also came up during Leras's cross-
6   examination of ▒▒▒▒▒, another cooperating witness. *See* Trial Tr. (Mar. 5, 2024) at 22–
7   204; Trial Tr. (Mar. 6, 2024) at 50–198; Trial Tr. (Mar. 7, 2024) at 10–47. ▒▒▒ testified he
8   was a member of the Aryan Brotherhood between 2007 and 2020. Trial Tr. (Mar. 5, 2024) at 22.
9   On cross-examination, Leras asked ▒▒▒ about his decision to cooperate with the government.
10  *See id.* at 198–204. ▒▒▒ explained he had been housed in the same facility as Troxell, Yandell,
11  Sylvester and other codefendants while this case was pending. *Id.* at 199. While he was there,
12  the government disclosed in discovery recorded interviews of Sylvester and Yandell, conducted
13  two years before by investigators with the California Department of Corrections and
14  Rehabilitation (CDCR). *Id.* at 199. ▒▒▒ agreed with Leras that this disclosure was "big news."
15  *Id.* ▒▒▒ testified, for example, that a defendant named Brant Daniel had accused Yandell and
16  Sylvester of cooperating with law enforcement after he learned about the recordings. *Id.* ▒▒▒
17  also agreed with Leras that another defendant, Pat Brady, was so "upset" about the recordings that
18  he "was saying that he was planning on killing" Yandell and Sylvester when the trial was over.
19  *Id.* at 203. For his part, ▒▒▒ agreed with Leras that Yandell and Sylvester had "broken a
20  cardinal rule of the Aryan Brotherhood." *Id.* at 199–200. Troxell, by contrast, "rarely spoke at
21  all" while ▒▒▒ was around. *Id.* at 198. He "kept to himself." *Id.*

22      In short, the defense Leras presented on Troxell's behalf portrayed him as in conflict with
23  Yandell, Sylvester and others within the Aryan Brotherhood. The tension between their positions
24  boiled over, outside the presence of the jury, after the exchange between ▒▒▒ and Leras during
25  the cross-examination summarized above. The court had adjourned for the day immediately after
26  ▒▒▒ agreed with Leras that Yandell and Sylvester had broken a "cardinal rule." *See id.* at 204.
27  After the jury and the court left the courtroom, Yandell began cursing at and insulting Leras and
28  the paralegal who accompanied him to court. Leras Decl. ¶¶ 9–10, ECF No. 2799; *see also* Trial

Tr. (Mar. 6, 2024) at 8, 9–10, 13. In response, Leras said to Yandell, "At least I'm not a rat." *Id.* The next morning, having learned of the exchange, the court discussed it with Leras and with counsel for Yandell, Sylvester and government counsel on the record, without the jury present, at first with the attorneys only, then later with their clients as well. *See* Trial Tr. (Mar. 6, 2024) at 4–23. Leras apologized to the court for his failure to restrain himself. *See id.* at 19–20. Each defendant promised not to speak disrespectfully to others in the courtroom. *Id.* at 22–23. The jury then returned to the courtroom. *Id.* at 24. ▮▮▮▮ completed his testimony later that day and the next, and the trial continued for several weeks without any similar incidents.

Troxell's current motion focuses on events that transpired a few weeks later, as the trial was drawing to a close. The parties were scheduled to begin their closing arguments on Monday, April 22, 2024. *See* Trial Tr. (Apr. 18, 2024) at 4–10. The day before, CDCR investigators discovered that Brady, the codefendant mentioned above, had spoken to a man named Donald Maxwell, who also was associated with the Aryan Brotherhood. *See* Nehring Aff. ¶ 22, *United States v. Maxwell*, No. 2:24-mj-0053-JDP (E.D. Cal. Apr. 25, 2024).[1] Unlike Brady, however, Maxwell was out of custody. *See id.* Brady told Maxwell he had recently spoken to Sylvester, Troxell's codefendant. *See id.* Brady then referred vaguely to some recent event. He did not say what had happened or who was involved, but he described it as "a slap in the face to the Tip [i.e., the Aryan Brotherhood] and anybody that's associated to us." *Id.* Brady said the "slap" could not go unanswered. *Id.* He told Maxwell to expect a call about a task that would need to be completed urgently, within a day or two, in a place that was a few hours' drive from where Maxell was currently staying. *Id.* ¶¶ 23–24. This travel time was consistent with a drive to Sacramento. *See id.* ¶ 26.

Counsel for the government and Sylvester presented their closing arguments to the jury the next morning, as scheduled. *See generally* Trial Tr. (Apr. 22, 2024). That day, CDCR investigators recorded another of Brady's conversations, this time with his fiancée. Nehring Aff.

---

[1] This affidavit was filed under seal as an exhibit to Leras's declaration on the docket of this action at ECF No. 2799. In the affidavit, Brian Nehring, a Special Agent with the federal Drug Enforcement Administration, describes information he had received from CDCR investigators a few days before.

4

¶ 25. Brady gave her Maxwell's name and told her to relay a message to an unnamed associate whose identity is unclear: Maxwell was waiting for a call, and he knew it was important to move quickly, within 48 hours. *Id.* Brady did not explain the need for urgency. But closing arguments were expected to conclude the next day, including the arguments by counsel for both Yandell and Troxell. *See* Trial Tr. (Apr. 22, 2024) at 127–28.

CDCR arranged for Maxwell to be surveilled and tracked, and the next day, they forwarded information about Brady's recorded calls to Brian Nehring, a Special Agent with the federal Drug Enforcement Administration. *See* Nehring Opp'n Decl. ¶¶ 3, 7, ECF No. 2808-2. Nehring was the agent who had been heavily involved in the investigation that ultimately led to the federal charges against Yandell, Sylvester, Troxell, Brady and their codefendants in this case. *See generally*, *e.g.*, Nehring Crim. Compl. Aff., ECF No. 1. He testified at trial and attended it often as the government's case agent. Nehring therefore knew several previous members of the Aryan Brotherhood were cooperating with the government and had offered testimony during the government's case in chief. Nehring Decl. ¶ 21. He also knew the Aryan Brotherhood "frequently targets former members who cooperate with law enforcement, especially when they publicly provide evidence against the gang." *Id.* ¶ 26. Nehring thus avers he interpreted Brady's statements on the recorded calls as evidence that Brady and Sylvester were "orchestrating an attack on a cooperating witness who was out of custody and who had testified at the trial," i.e., ▮▮▮▮▮▮▮, the former Aryan Brotherhood member mentioned above. *See* Nehring Opp'n Decl. ¶ 4; *see also* Trial Tr. (Feb. 28, 2024) at 7–132. Nehring also says, at the time he prepared his previous affidavit, it did not immediately occur to him that Leras might be a target. Nehring Opp'n Decl. ¶ 4.

In any event, although Nehring believed people associated with the Aryan Brotherhood, including Brady and Sylvester, were part of a plan to attack or kill a witness, neither he nor government counsel disclosed information about the recorded calls or the suspected plan to Leras or any other defense counsel. Fortunately, neither Leras nor any witness was attacked. Leras presented closing arguments on Troxell's behalf, as scheduled, on Tuesday April 23. *See* Trial Tr. (Apr. 23, 2024) at 41–85. The jury began to deliberate the next morning, on April 24. *See*

Mins., ECF No. 2300. It reached a verdict about a week later, finding Troxell, Yandell and Sylvester guilty on all of the charges against each of them. *See* Redacted Verdict, ECF No. 2317.

Nehring understands that CDCR investigators first came to the conclusion that Leras might be at risk on the very same day the jury reached its verdict. *See* Nehring Opp'n Decl. ¶ 7. An Assistant United States Attorney attempted to contact Leras that evening, April 30, after the jury returned the verdict and court had it read into the record, but he was unsuccessful. *Id.* He did speak to Leras the next morning, on May 1, 2024. *Id.* Maxwell was arrested the same day. *Id.* Leras has taken measures to protect himself since then. *See* Leras Decl. ¶¶ 21–24.

Troxell, still represented by Leras, now moves for a new trial.[2] ECF No. 2799. He contends that by failing to disclose the information about a potential attack—regardless of the target—the government withheld favorable evidence from the defense in violation of the disclosure rules established by the Supreme Court in *Brady*, 373 U.S. 83. The government opposes the motion, ECF No. 2808-1, and Troxell has filed a reply, ECF No. 2810-2. The court held a hearing and heard argument on October 15, 2025, sealing the courtroom given the sensitive and confidential nature of the information covered in the parties' briefing and counsel's argument. ECF No. 2815. Jason Hitt appeared for the government, and Leras appeared for Troxell.

## II.   LEGAL STANDARDS

In *Brady*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. The Court later "held that the duty to disclose such evidence is applicable even though there has been no request by the accused, and that the duty encompasses impeachment evidence as well as exculpatory evidence." *Strickler v. Greene*, 527 U.S. 263, 280 (1999) (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976) and *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The

---

[2] The court delayed briefing and argument on this motion to permit Leras to determine whether he faced a conflict that would prevent him from continuing to represent Troxell in this matter. *See, e.g.*, Status Conf. Mins., ECF Nos. 2783, 2775. He ultimately concluded he does not face such a conflict.

6

1   Court also has made clear "that the duty encompasses evidence 'known only to police
2   investigators and not to the prosecutor.'" *Id.* at 280–81 (quoting *Kyles v. Whitley*, 514 U.S. 419,
3   438 (1995)).

4         A defendant may move for a new trial based on an alleged violation of the *Brady* rule.
5   *See United States v. Price*, 566 F.3d 900, 907 (9th Cir. 2009). A defendant is entitled to a new
6   trial if there was evidence "favorable to the accused," the government "suppressed" that evidence,
7   and "prejudice" ensued. *Id.* (quoting *Strickler*, 527 U.S. at 281–82). The defendant who files a
8   motion for a new trial based on an alleged suppression "bears the initial burden of producing
9   some evidence to support an inference that the government possessed or knew about material
10  favorable to the defense and failed to disclose it." *Id.* at 910. "Once the defendant produces such
11  evidence, the burden shifts to the government to demonstrate that the prosecutor satisfied his duty
12  to disclose all favorable evidence known to him or that he could have learned from 'others acting
13  on the government's behalf.'" *Id.* (quoting *Kyles*, 514 U.S. at 437). If the government's response
14  falls short of proving all favorable evidence was disclosed, then the court must decide "if there is
15  a reasonable probability that, had the evidence been disclosed to the defense, the result of the
16  proceeding would have been different." *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at
17  682).

18        The government argues Troxell's motion should be denied under the standard that would
19  apply to a motion for a new trial based on the discovery of new evidence, citing Federal Rule of
20  Criminal Procedure 33. *See* Opp'n at 3, 7–9. In effect, the parties dispute what the *Brady* rule
21  requires and whether newly discovered evidence justifies a new trial under Rule 33. *See, e.g.*,
22  *United States v. Miller*, 953 F.3d 1095, 1107 n.17 (9th Cir. 2020) (acknowledging this overlap).
23  As the government acknowledges, however, "the bar for materiality in a Rule 33 claim is higher"
24  than the "prejudice" standard that applies to an alleged *Brady* violation, Opp'n at 7 (quoting
25  *Miller*, 953 F.3d at 1107 n.18). For that reason, the most efficient method of evaluating Troxell's
26  motion is to first ask whether he is entitled to a new trial based on the rules that apply to alleged
27  *Brady* violations. If he is not, then Troxell is not entitled to a new trial based on the discovery of
28  new evidence under Rule 33. *See Miller*, 953 F.3d at 1107 n.18.

7

## III. DISCUSSION

As summarized above, Troxell's initial burden is to produce evidence "to support an inference that the government possessed or knew about material favorable to the defense and failed to disclose it." *Price*, 566 F.3d at 910. As this language implies, this initial burden has two parts.

First, the evidence, whatever it is, must have been "suppressed." The "good faith or bad faith of the prosecution" does not play into the decision about whether evidence has been "suppressed." *Id.* at 907–08 (quoting *Brady*, 373 U.S. at 87). Even "an 'innocent' failure to disclose favorable evidence constitutes a *Brady* violation." *Id.* at 908. Here, Troxel has offered evidence to support an inference that Nehring had evidence about an urgent plan by members or associates of the Aryan Brotherhood to attack someone with a connection to this case. No one disclosed that evidence to the defense before the jury reached a verdict. The court finds Troxell has carried his initial burden to show evidence was "suppressed."

But second, was this evidence "favorable" to him? Troxell does not argue he would have used the undisclosed evidence to impeach any witness, so the question the court must answer is whether that evidence was "exculpatory." *Id.* at 907 (citation omitted). Brady's plan, Troxell argues, was to prevent Leras from arguing to the jury in closing that Yandell and Sylvester ran a separate and more violent conspiracy. *See* Mot. at 2; Reply at 5–6. An attempt to stop a lawyer from presenting a closing argument could theoretically show the planned argument and the evidence behind it has persuasive force, but it is doubtful the undisclosed evidence in this case was favorable in this way. "[T]he character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record." *Kyles*, 514 U.S. at 439. That is true here. The context of Brady's recorded conversations shows they were at least as likely to incriminate Troxell as to exonerate him. There are three reasons.

First, Brady mentioned Sylvester in connection with a recent event, which he did not describe, but which he characterized in coded language as offensive to the Aryan Brotherhood and deserving of an urgent response. Based on Sylvester's involvement, the driving time Brady estimated, the ongoing trial in this case, and the Aryan Brotherhood's past efforts to target

cooperators, Nehring suspected a cooperating witness in the Sacramento area was at risk. That was a reasonable deduction, and there is no reason to believe he would have testified differently at trial. Troxell argues otherwise, but to infer Leras was actually the target, one would need to believe his closing argument would be so powerful as to motivate the Aryan Brotherhood to silence him, more so than the arguments and statements of any other attorney or witness, including hours of sworn testimony by multiple codefendants and other former members of the Aryan Brotherhood, including witnesses who had described past desires and plans to take Troxell's life. If, as Nehring suspected, a witness was the target, then evidence about Brady's recorded conversations would incriminate Troxell as much as Yandell and Sylvester. The government had presented evidence showing Troxell was part of the same leadership commission as Yandell, *see, e.g.*, Trial Tr. (Mar. 5, 2024) at 124, and it had offered recordings of unguarded phone conversations between Troxell and Sylvester that implied Troxell had authority over Sylvester, *see* Gov't Ex. 393 & 393A. The government also had played recordings in which Troxell spoke about a plan to murder another member of the Aryan Brotherhood based on that man's violations of the gang's rules. *See* Order (Nov. 13, 2024) at 14–15, ECF No. 2483 (summarizing trial evidence). The introduction of Brady's similar recorded conversations could have inculpated Troxell at the time. The government would likely have argued as much. *See* Opp'n at 5 (arguing "the effect of the evidence would be to strengthen the government's case against Troxell").

Second, even assuming Leras was the target—and that this should have been immediately obvious to Nehring—evidence about Brady's recorded conversations still was quite likely to reinforce the government's case against Troxell. In the recorded call, Brady told Maxwell there had been some recent event. Plans formed in response to recent events were unlikely to cast doubt on Troxell's longstanding membership in Aryan Brotherhood and its leadership, nor on his involvement in a criminal enterprise years earlier, which was the focus of the charges in the indictment. Moreover, as the government argues in opposition, evidence of murderous infighting might actually help prove the existence of an illegal enterprise in a case like this one. *See* Opp'n at 5–6. "[T]he mere existence of a dispute between rival factions within an organization is not

1  dispositive of whether it qualifies as an associated-in-fact enterprise" in violation of the RICO
2  statute. *United States v. Fernandez*, 388 F.3d 1199, 1224 (9th Cir. 2004), *as modified*, 425 F.3d
3  1248 (9th Cir. 2005). But power struggles and infighting can imply "different factions of the
4  enterprise" are "struggling for position within and control of the organization." *Id.*

5  Third, the undisclosed evidence was also likely to be irrelevant, given its context. The
6  recent offensive event Brady mentioned in his call with Maxwell may very well have been
7  Leras's dismissal of Yandell to his face as a "rat" inside the courtroom, not Leras's efforts to
8  prove Yandell and Sylvester were part of a different, more violent conspiracy, and not the
9  evidence he had elicited in support of that theory. The motivation behind the plan might have
10 been personal and focused on Leras. If so, there would be no inconsistency between the
11 undisclosed evidence and the changes against Troxell and his codefendants: a jury could find both
12 that Brady and Sylvester were part of a recent plan to exact revenge on Leras and that Troxell was
13 a member of the larger Aryan Brotherhood enterprise, as charged.

14 For these reasons, the court cannot conclude the government withheld "favorable"
15 evidence. But even if the court were to assume the evidence would have been favorable to
16 Troxell, "the Constitution is not violated every time the government fails or chooses not to
17 disclose evidence that might prove helpful to the defense." *Kyles*, 514 U.S. at 436–37. The court
18 could grant Troxell's motion only if he met his burden to show there is a "reasonable probability
19 that, had the evidence been disclosed to the defense, the result of the proceeding would have been
20 different." *Strickler*, 527 U.S. at 280 (quoting *Bagley*, 473 U.S. at 682). If a court reaches this
21 question, it "must 'undertake a careful, balanced evaluation of the nature and strength of both the
22 evidence the defense was prevented from presenting and the evidence each side presented at
23 trial.'" *United States v. Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc) (quoting *Bailey*
24 *v. Rae*, 339 F.3d 1107, 1119 (9th Cir. 2003)). "In other words, 'the withheld evidence must be
25 analyzed in the context of the entire record.'" *Id.* (quoting *Benn v. Lambert*, 283 F.3d 1040, 1053
26 (9th Cir. 2002)).

27 Considering the totality of the record as required, the court finds there was no reasonable
28 probability of a different result based on the record in this case. The strongest support for this

conclusion rests in the more relevant and direct evidence Leras had already offered and elicited, before the CDCR investigators and then Nehring learned of the plot Brady was devising. As summarized above, Leras was presenting, on Troxell's behalf, a defense based on the theory that Yandell and Sylvester "ran a separate and distinct ultra-violent conspiracy." Reply at 5. Troxell argues a recorded conversation about an attack on his own lawyer would both have underscored the violence of the "separate" conspiracy and shown he was not a party to it. *See, e.g., id.* at 6. By the conclusion of the trial, however, Leras had successfully introduced evidence about Troxell's efforts to prevent violence, protect inmates and improve prison conditions, as reviewed above. The jury also had heard witnesses testify about brutal attacks and murders by Yandell, Sylvester and those acting under their direction, and they had heard multiple recorded conversations about those attacks and murders. *See* Order (Nov. 13, 2024) at 14–15 (summarizing trial evidence). Moreover, Leras had successfully introduced unrebutted testimony from two witnesses who described two different plans to kill Troxell, and both were closer in time to the conspiracies charged in the indictment. *See* Trial Tr. (Feb. 28, 2024) at 109–16; Trial Tr. (Apr. 3, 2024) at 39–73. More evidence about a different, later plot would have added little value to Troxell's defense, and it would have been cumulative if the court had allowed the jury to hear about it. Moreover, as discussed above, the evidence might actually have incriminated Troxell.

Regarding admissibility, as the government argues in opposition, Troxell would have faced strong and persuasive objections if he had attempted to admit the newly discovered recorded conversations and other evidence about them. *See* Opp'n at 4–5. Those conversations did not occur until the parties were about to begin their closing arguments at the conclusion of a trial that had already lasted nearly three months. Closing arguments had begun by the time Nehring received information from CDCR, so Troxell could not have presented any new evidence without first moving to put closing arguments on hold and reopen the presentation of evidence. The government and Troxell's codefendants likely would have opposed such a motion and objected under Federal Rule of Evidence 403. Although it is impossible to say with confidence, the court would likely have sustained that objection. The new evidence was vague and had limited probative value in light of what had already come into the record. Presenting the new

evidence would have taken time, the jury had already heard other more direct and relevant evidence, and the dangers of undue prejudice and confusion were significant: Troxell was attempting to show one or more of his codefendants planned to attack or kill the same lawyer who had been representing him throughout the trial. At hearing, Leras agreed the new evidence would likely have thrown the case into disarray. In terms of Rule 403, the danger of unfair prejudice, confusion, delay, and the prospect of needlessly cumulative evidence and a waste of time would have substantially outweighed the new evidence's limited probative value. *Cf. United States v. Hinkson*, 585 F.3d 1247, 1265–66 (9th Cir. 2009) (en banc) (holding district court did not abuse its discretion or clearly err by finding it would have excluded new evidence under Federal Rule of Evidence 403 and Federal Rule of Criminal Procedure 33).

For these reasons, Troxell has not met his burden to show the undisclosed evidence was favorable to him. The court finds there was no reasonable probability of a different outcome if the evidence had been disclosed. Troxell is not entitled to a new trial under the *Brady* rule. And for the same reasons, he is not entitled to a new trial under Rule 33 based on newly discovered evidence.

## IV. CONCLUSION

The motion for a new trial (ECF No. 2799) is **denied**. The clerk's office is directed to file this order provisionally **under seal** and to serve copies of it on counsel for the United States and defendant Troxell only. Within **fourteen days**, the parties are directed to meet and confer and file a joint statement about whether all or some portions this order should remain under seal and whether a redacted version of this order can be filed on the public docket.

IT IS SO ORDERED.

DATED: October 29, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE